1  Rafey S. Balabanian (SBN 315962)
   rbalabanian@edelson.com
2  EDELSON PC
   150 California Street, 18th Floor
3  San Francisco, California 94111
   Tel: 415.212.9300/Fax: 415.373.9435
4
   *Counsel for Plaintiff Edelson PC*
5

6  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**
7

8  EDELSON PC, an Illinois professional     Case No.:
   corporation,
                                            **COMPLAINT FOR:**
9              *Plaintiff,*
                                            1. **RACKETEERING**
10      v.                                  2. **CONSPIRACY TO COMMIT**
                                               **RACKETEERING**
11 DAVID LIRA, an individual, KEITH         3. **RECEIPT OF STOLEN PROPERTY**
   GRIFFIN, an individual, ERIKA GIRARDI    4. **AIDING AND ABETTING**
12 a/k/a ERIKA JAYNE, an individual, EJ        **CONCEALMENT OF STOLEN**
   GLOBAL, LLC, a California limited           **PROPERTY**
13 liability company, CHRISTOPHER           5. **MONEY HAD AND RECEIVED**
   KAMON, an individual, GEORGE            6. **CONVERSION**
14 HATCHER, an individual, WRONGFUL         7. **UNLAWFUL BUSINESS PRACTICE**
   DEATH CONSULTANTS, a California          8. **CONSUMERS LEGAL REMEDIES ACT**
15 corporation, JOSEPH DINARDO, an          9. **DECEIT**
   individual, CALIFORNIA ATTORNEY
16 LENDING II, INC., a New York
   corporation,                             **DEMAND FOR JURY TRIAL**
17
               *Defendants.*
18

19      Plaintiff Edelson PC ("Edelson") as assignee of the bereaved families[1] whose Lion Air

20 settlement monies were stolen through the fraudulent scheme described below, brings this lawsuit

21 against Defendants Erika Girardi a/k/a Erika Jayne ("Erika"), EJ Global, LLC ("EJ Global"), David

22 Lira ("Lira"), Keith Griffin ("Griffin"), Christopher Kamon ("Kamon"), George Hatcher

23 ("Hatcher"), Wrongful Death Consultants, Joseph DiNardo ("DiNardo"), and California Attorney

24

25 [1]    Bias Ramadhan A.S. Bin Misyadi, Guntur Idil Akbar Bin Misyadi, Dzikri Agung Haryadi,
   and Hana Kamila Chairunnisa Binti Misyadi (the "Bias Family"); Dian Daniaty Binti Uidn
26 Zaenudin and minor M.N. (the "Dian Family"); Anice Kasim, Zahra Amanda, and minors T.A.S.
   and S.C.S. (the "Anice Family"); Elza Warti, Multi Rizki, Westhi Ramadina, Mugni Rifki,
27 Muhammad Nur Fuadi, M. Nuran Tk. Mudo (the "Multi Family"); and Septiana Damayanti and
   minors N.I.R. and A.M.Q. (the "Septiana Family"), together, the "Lion Air Clients." Note that
28 second names in Indonesia are not family names.

COMPLAINT                                                        i

Lending II ("California Attorney Lending") to recover actual and punitive damages for their

injuries. Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and

experiences, and, as to all other matters, upon information and belief.

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................... 1

PARTIES ......................................................................................................................... 7

JURISDICTION .............................................................................................................. 8

FACTUAL BACKGROUND ........................................................................................... 9

    **A.  Tom and Erika misappropriated client settlement money to project an image of wealth and to prop up a lifestyle made for reality TV** ............................................. 9

    **B.  Money begins to run out, and Erika obfuscates to the media** .................................. 14

    **C.  The Lion Air tragedy** ................................................................................................. 16

    **D.  The Girardi Family Enterprise springs into action** ................................................. 17

    **E.  Tom and Erika go to DiNardo and his companies for litigation funding** ............... 17

    **F.  The Lion Air Litigation and Settlement** .................................................................... 19

    **G.  The Girardi Family Enterprise Steals the Lion Air Clients' Settlement, Lies to Them and to Plaintiff, and Commits Hundreds of Federal Crimes in the Process** . 20

        *1.  Theft of Settlement Money to Girardi Keese Account: Wire Fraud (18 U.S.C. § 1343)* ......................................................................................................... 21

        *2.  Laundering of Illicit Proceeds: Money Laundering (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957)* ..................................................................................... 24

        *3.  ▮▮▮▮ Fee Fraud: Wire Fraud (18 U.S.C. § 1343); Money Laundering (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957)* ................................................................. 26

        *4.  Dian Daniaty Loan Scam: Wire Fraud (18 U.S.C. § 1343); Obstruction of Justice (18 U.S.C. § 1503)* ..................................................................................... 27

        *5.  TXI Riverside Cement Fraud: Mail Fraud (18 U.S.C. § 1341); Money Laundering (18 U.S.C. § 1956)* ..................................................................................... 29

        *6.  Lira Lies to Bias, Anice, Septiana, and Dian: Wire Fraud (18 U.S.C. § 1343)* ...... 30

        *7.  False Letters to Bias, Septiana, and Dian: Wire Fraud (18 U.S.C. § 1343)* .......... 31

        *8.  Hatcher Lies to the Clients and Takes His Cut: Wire Fraud (18 U.S.C. § 1343); Transportation of Stolen Goods (18 U.S.C. § 2314)* ........................................ 33

*9. Griffin's Lulling Communications to Multi Rizki: Wire Fraud (18 U.S.C. § 1343); Obstruction of Justice (18 U.S.C. § 1503)* ...................................................38

**H.  Erika uses her platform to protect the Girardi Family Enterprise, and the "divorce"**...................................................................................41

**I.   The scheme is uncovered**.................................................................................42

**J.   Erika's defense of Tom and the bizarre shifting stories about his car accident**........43

**K.  Erika leverages the scandal to further her career and stay relevant in the tabloids**...................................................................................................46

**CAUSES OF ACTION** ............................................................................................48

1.  **RACKETEERING, 18 U.S.C. § 1962(c)
    (against Lira, Griffin, Kamon, and Hatcher)**..........................................48

2.  **CONSPIRACY TO COMMIT RACKETEERING, 18 U.S.C. § 1962(d)
    (against Lira, Griffin, Kamon, Hatcher, Wrongful Death Consultants, EJ
    Global, and Erika Girardi)**......................................................................51

3.  **RECEIPT OF STOLEN PROPERTY, Cal. Penal Code § 496(c)
    (against Griffin, Lira, Kamon, Hatcher, Wrongful Death Consultants,
    Erika Girardi, and EJ Global)**................................................................52

4.  **AIDING AND ABETTING CONCEALMENT OF STOLEN PROPERTY,
    Cal. Penal Code § 496(c)
    (against Griffin, Lira, Kamon, Hatcher, and Wrongful Death Consultants)**.....53

5.  **MONEY HAD AND RECEIVED
    (against California Attorney Lending and Joseph DiNardo)**.......................54

6.  **CONVERSION
    (against Kamon, Griffin, Lira, Hatcher, and Wrongful Death Consultants)**.....55

7.  **UNLAWFUL AND UNFAIR BUSINESS PRACTICE, Cal. Bus. & Prof.
    Code § 17200 *et seq.*
    (against California Attorney Lending, Lira, and Griffin)**...................................56

8.  **CONSUMERS LEGAL REMEDIES ACT, Cal. Bus. & Prof. Code § 1780
    (against California Attorney Lending, Griffin, and Lira)**...................................57

9.  **DECEIT (against Griffin and Lira)**..........................................................58

10. **DECEIT (against Griffin)**.......................................................................59

**PRAYER FOR RELIEF** ..........................................................................................59

**DEMAND FOR JURY TRIAL** ................................................................................**60**

# NATURE OF THE ACTION

1.      From the outside, the Girardi Keese law firm appeared to be doing all the things that an ultra-successful, top-tier plaintiff's law firm should do: represent injured clients in difficult cases, secure groundbreaking settlements, and win headline-grabbing trial victories. The firm's founder and namesake, Thomas Girardi ("Tom"), was a celebrity both inside and outside the courtroom, and was viewed by many as perhaps the most prominent plaintiff's lawyer in the country. But inside the firm's doors, the story was completely different. As the layers have been pulled back more and more each day with the pending bankruptcies of Girardi Keese and Tom, and the torrent of claims and investigations that came in the wake of the firm's collapse, the real story is one that seems like a tale out of a John Grisham novel: Girardi Keese was little more than a criminal enterprise, disguised as a law firm.

2.      Indeed, the Girardi Keese firm operated what we now know was the largest criminal racketeering enterprise in the history of plaintiffs' law. All told, it stole more than $100 million dollars from the firm's clients, co-counsel, vendors, and many others unfortunate enough to do business with the firm.

3.      Before its downfall, the cases that Girardi Keese took on were high profile, in which the firm represented grievously injured people or the surviving families of those who had died in tragic accidents. The firm's work drew the eye of Hollywood, portraying one of firm's cases and staff in the hit film ERIN BROCKOVICH. The office was littered with publications praising Tom and recounting the legendary cases and legal adversaries that he felled over a career spanning decades.

4.      But every bit of this outward-facing success was built atop a house of cards. In reality, the firm was siphoning off millions to fund Tom's and his wife Erika's all-consuming need to spend—funding a lifestyle so lavish that Erika was a cast member of *The Real Housewives of Beverly Hills*. And the couple certainly played and the fact that Tom was a wealthy, powerful attorney who wooed celebrities, judges, and politicians alike. But that money was not earned by the firm or by Tom. It was stolen: from co-counsel, from vendors with long overdue bills, and—by far the most unforgiveable for an attorney—from the firm's own injured clients.

5.      The basic scheme operated like this: when a new opportunity for cases came in, the firm would tap into its network of non-lawyers, sometimes called "case runners," to find injured clients. These individuals were paid with cash for getting clients to hire the firm (which is illegal) and would also take a cut of any eventual recovery for the client (which is also illegal). As just one example, Defendant George Hatcher, a non-lawyer "consultant" who was responsible for referring the families of air crash victims, got hundreds of thousands of dollars to ensure that his referrals to Girardi were "exclusive," along with a similarly-illegal percentage of whatever the client eventually got.

6.      Within the firm, Defendants David Lira (Tom's son-in-law) and Keith Griffin, two of Tom's most senior lawyers, made sure that the client and lawyer-facing aspects of the scheme were managed and appeared to be on the up-and-up. They struck the deals the firm needed to get a case to settlement—like securing co-counsel in the locations a case would be filed—while, in some cases, committing to pay out more than 100% of the available fees. In other words, Lira and Griffin would make deals with co-counsel with full knowledge that they were never going to be paid. Once a client's settlement money was funneled into the black hole that was the Girardi Keese scheme, Lira and Griffin were tasked with fending off inquiries from clients and other lawyers about why that money never came back out.

7.      Administering from the inside was Defendant Christopher Kamon, the firm's accountant, who was responsible for disappearing client money out of the firm's trust account and funding the firm's operating accounts. From there, the firm made payroll—including paying Lira and Griffin millions in salary—as well as paying off things like the American Express bill on which Erika and Tom debited more than $14 million in exorbitant luxury items, food, and services.

8.      Erika acted as the "frontwoman" of the operation, selling to the world (including unsuspecting clients) that Girardi Keese was successful. And she was exceptionally good in the role. With tens of millions of dollars backing her, Erika shamelessly displayed a nationwide showroom of the money they stole on *Real Housewives*, famously spending $40,000 per month on her "look," and releasing a song called "XXPEN$IVE"—featuring the refrain "It's expensive to be me." And when push came to shove and the fraud was close to being exposed, Erika clamped down

1  on misleading the public into believing that an otherwise damning lawsuit was false and that the

2  plaintiffs behind it were forced to apologize to Tom and the firm.

3       9.    When the firm couldn't fund its operations with client money, it went to lenders,

4  taking out tens of millions in financing. Eventually, though, Girardi Keese became untouchable as a

5  routinely-delinquent debtor. One creditor of Girardi Keese became a beneficiary of the scheme:

6  Defendant Joseph DiNardo and his company Defendant California Attorney Lending II. In order to

7  make back some of the money that Girardi Keese had borrowed, DiNardo continued to fund the

8  firm into 2020 provided that he got a "first cut" of settlement money coming in from Girardi Keese

9  cases—making sure that money was paid *directly* to his company before it ever hit a Girardi Keese

10  account.

11       10.    When the curtain was finally pulled back, it became clear that Girardi Keese

12  operated in a manner similar to a Ponzi scheme, but much worse. The clients whose money the firm

13  stole didn't just "invest" their cases with the firm; they trusted Tom, Lira, Griffin and the other

14  lawyers of Girardi Keese to help piece their lives together. These clients didn't think they were

15  purchasing an asset, risky or otherwise; they thought they were buying competent legal

16  representation to redress a horrific injury or the death of a loved one. And when Girardi Keese

17  clients agreed to settle their cases, the money that belonged to them was *exclusively* theirs and

18  should only ever have been held briefly in trust before being immediately disbursed. Not a single

19  cent of a client's money should ever have been funneled to a Girardi Keese operating account, to

20  the firm's payroll, to a lender, or to an American Express bill.

21       11.    But time and time again, for over a decade, Girardi Keese only added to the pain and

22  suffering of these victims, doing the unthinkable for a law firm—stealing their clients' money. And

23  until recently, the firm, Tom, and his partners got away with it. In order to pull off such a brazen

24  and lengthy scam, Girardi Keese attorneys lied to, manipulated or bribed anyone who might reveal

25  the scheme. Tom would leverage his larger-than-life persona, carefully curated both on-screen

26  (through Erika in *Housewives*) and off, and would wheedle and promise that anyone he owed

27  money to would ultimately be made whole through his massive wealth and influence.

28

12.     When that didn't work, Tom would try to intimidate them. Tom cultivated the impression that not only was he a successful and powerful attorney, but he actually controlled the relevant authorities, including the agency charged with disciplining attorneys, the State Bar of California ("State Bar"). Tom deployed his wealth and celebrity status to entertain State Bar officials at lavish parties and reportedly went so far as to bribe a longtime investigator at the State Bar.

13.     On those few occasions when someone actually brought suit against Tom or the firm, Girardi Keese would frequently win on procedural grounds, like a statute of limitations, or—if things couldn't be solved that easily—enter into a confidential settlement that prevented the scheme from being detected. To be sure, despite years of complaints and allegations of fraud and mismanagement, Tom maintained a spotless record before the State Bar. The fraud thus continued, with only the occasional glimpse of the rot inside the Girardi Keese firm.

14.     Any one of the breaches of ethical duty and outright crimes that the members of the enterprise committed in these years would—and should—have been enough to end the careers of the people involved and, in many cases, for them to face criminal prosecution. Indeed, the goings-on inside the firm during these years seem to have sprung from the head of someone who intended to violate *every* cardinal rule that lawyers are expected to abide by, including but not limited to:

(a)     stealing and then co-mingling client money (so it wasn't easily traceable) from the client trust accounts by siphoning it into other Girardi Keese accounts;

(b)     laundering the stolen funds through the firm's payroll account and American Express Cards, on which Erika, Tom, and/or Lira each charged personal expenses for tens of millions of dollars;

(c)     covering up the Ponzi scheme by commingling money from Tom and lenders into the client trust account to pay off long-delinquent payments to clients;

(d)     paying non-attorneys, like case runners, illegal *cash bonuses* for referring clients, in addition to committing to pay them illegal shares of the ultimate recovery;

(e) over-subscribing the total amount of fees between lenders, non-attorneys, and co-counsel, and hiding that fact from the clients;

(f) falsifying case expenses to justify stealing more money from clients;

(g) defrauding clients by claiming to "self-insure" for the firm's malpractice policy—when no legitimate insurer would touch the firm in light of the dozens of malpractice suits filed against them—though there was no actual money to back claims against the firm;

(h) bribing former judges responsible for allocating settlement money between plaintiffs in order to produce a result the firm wanted;

(i) using the clients' settlement money to fund their lifestyle and business, while "loaning" the clients small amounts (of their own money) in order to keep them at bay; and

(j) lying to, threatening, and/or bribing clients and attorneys to keep them quiet and prevent the scheme from collapsing.

15. But the scheme eventually collapsed. In December 2020, after uncovering that Girardi Keese appeared to have stolen the settlement monies of the families who lost loved ones in the tragic crash of Lion Air Flight JT 610, Plaintiff Edelson PC filed a motion seeking contempt. (Edelson later found out the lengths to which Tom, Lira, and Griffin lied to keep the fraud from being found out.)

16. Within days of Edelson filing the contempt petition, the firm collapsed. Creditors put Tom and Girardi Keese into involuntary bankruptcy. The federal court overseeing the *Lion Air* action held a three-day evidentiary hearing as to whether Lira and Griffin should be held in contempt and took the matter under advisement. Finally, the State Bar issued disciplinary charges against Tom in March 2021, and Tom was recommended for disbarment in January 2022.

17. But even after Edelson brought this scheme to light, Tom, Erika, Lira and Griffin continued to run the same playbook that they always have: bribe, lie, and/or kick up as much dust as possible in order to hide their decades-long fraud. After Edelson's December 2020 filings, Tom

tried to convince Edelson that things weren't as bad as they appeared and that it was all just a big misunderstanding.

18.    And even now, when so much unethical and unlawful conduct has been brought to light, the members of the scheme continue to try to protect themselves and what remains of the enterprise. Lira and Griffin flatly lied at the evidentiary hearing on whether they should be held in contempt, as documents now show. As just one example, Lira falsely claimed that he lacked knowledge about why a client had received a "loan," which documents have since revealed Lira fully knew was her own money. And Griffin asserted that he had not engaged in "lulling" Multi Rizki, one of the Lion Air Clients, into waiting for his settlement money, when emails with Multi show plainly that he did.

19.    To this day, Erika uses her significant public platform to lie about her own involvement, and to try to assist Tom and the others in getting away with it. Erika continuously doubles down in her efforts to mislead the public, including her recent jaw-dropping claim on *Housewives* that the victims whose money Tom stole might be lying about the theft—despite the findings of a federal judge to the contrary. Evidently in response to a publicly-filed draft version of this Complaint, Erika was proud of allegations that she used Tom's tactics, taking it as a "badge of honor."

20.    Incredibly, Lira and Griffin continue to practice law. While the State Bar, under pressure from the *LA Times* and *Law360*, has finally appointed an independent investigator, it continues to limit its investigation of the others involved in the Girardi Keese fraud to the *Lion Air* case, and has threatened retaliation against lawyers that have questioned its impartiality.

21.    The following pages contain a detailed and exacting account of what Plaintiff Edelson has learned in the year and a half since it first blew the whistle on the Girardi Keese firm, including how its attorneys cut illegal fee deals with non-lawyers, hid those facts from their own clients and co-counsel, and drew down—check by check—the clients' settlement money to their own ends. These actions are federal crimes, all of which were carried out in furtherance of an illegal enterprise (the "Girardi Family Enterprise").

22.    Accordingly, Plaintiff Edelson PC, as assignee of the Lion Air Clients, brings this

1   lawsuit against Defendants under the Racketeer Influenced and Corrupt Organizations Act

2   ("RICO"), 18 U.S.C. § 1961, *et seq.* for predicate acts in violation of 18 U.S.C. § 1341 (mail fraud),

3   18 U.S.C. § 1343 (fraud by wire, radio, or television), 18 U.S.C. § 1956 (money laundering), 18

4   U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful

5   activity), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 2314 (transportation of stolen

6   goods), as well as for violations of Cal. Penal Code § 496 and Cal. Bus. & Prof. Code § 17200.

7       23.      All told, the Girardi Family Enterprise stole over ██████████ dollars from the Lion

8   Air Clients through the scheme. Plaintiff seeks treble damages, attorneys' fees, and punitive

9   damages, for an amount in excess of $50 million.

10                                           **PARTIES**

11      24.      Plaintiff Edelson PC is an Illinois professional corporation operating as a law firm,

12  with its principal place of business located at 350 North LaSalle, 14th Floor, Chicago, Illinois

13  60654. Edelson PC also has an office located at 150 California Street, 18th Floor, San Francisco,

14  California 94111. The Lion Air Clients assigned their claims to Edelson PC, in an agreement

15  approved by Judge Thomas Durkin of the Northern District of Illinois presiding over the *Lion Air*

16  matter, so that Edelson PC could pursue this action.

17      25.      Defendant Erika Girardi, also known as Erika Jayne, is a natural person and citizen

18  of the State of California. Erika is the wife of Tom Girardi.

19      26.      Defendant EJ Global, LLC is a California limited liability company, with its

20  principal place of business located at 9200 Sunset Boulevard, Suite 600, Los Angeles, California

21  90069. The sole member of EJ Global, LLC is Erika Girardi, who is a natural person and a citizen

22  of the State of California. EJ Global was formed in 2008 and was at all times owned and controlled

23  by Erika. EJ Global acted as a shell entity with no capital, corporate books, or indicia of corporate

24  formality. EJ Global was created for the purpose of funneling money from Girardi Keese to benefit

25  Erika.

26      27.      Defendant David Lira is a natural person and citizen of the State of California. Lira

27  was a partner at Girardi Keese until May 2020 and is a Member of Engstrom, Lipscomb, & Lack.

28  Lira is also Tom's son-in-law.

28.     Defendant Keith Griffin is a natural person and a citizen of the State of California. At all relevant times, Griffin was an attorney at Girardi Keese. Defendant Griffin is an associate attorney at Dordick Law Corporation.

29.     Defendant Christopher Kamon is a natural person and citizen of the State of California. At all relevant times, Kamon served as Girardi Keese's Chief Financial Officer and had specific knowledge of its financial affairs. Kamon supervised the accounting department and prepared checks on behalf of Girardi Keese, including client trust account checks and those that were used to pay for expenses incurred by Erika and EJ Global. On March 31, 2021, Kamon filed papers in the Girard Keese bankruptcy proceeding indicating that he "intends to assert his rights under the Fifth Amendment to the U.S. Constitution and decline[s] to make a statement or answer any questions put to him by the Trustee, creditors, or anyone else associated with this action." *In re Girardi Keese*, No. 2:20-bk-21022-BR, dkt. 294 at 3 (Bankr. C.D. Cal. Mar. 31, 2021).

30.     Defendant George Hatcher is a natural person and citizen of the State of California.

31.     Defendant Wrongful Death Consultants, Inc. is a California corporation with its principal place of business located at 863 San Vicente Road, Arcadia, California 91007. Wrongful Death Consultants was formed in 2009 and is owned and controlled exclusively by George Hatcher.

32.     Defendant Joseph DiNardo is a natural person and citizen of the State of New York. DiNardo founded California Attorney Lending II, Inc.

33.     Defendant California Attorney Lending II, Inc. is a New York corporation with its principal place of business located at 500 Pearl Street, Suite 820, Buffalo, NY 14202. California Attorney Lending II, Inc. was incorporated specifically for the purpose of doing business in the State of California.

### JURISDICTION

34.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the jurisdictional amount exceeds $75,000 and Plaintiff Edelson PC does not share a state of citizenship with any Defendant. This Court also has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under the RICO, 18 U.S.C. § 1961, *et seq.*

35.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because

1  Plaintiff maintains an office and conducts business in this District and a substantial part of the

2  events giving rise to the claims alleged occurred in this District.

3     36.    Venue is also proper under 18 U.S.C. § 1965(a) and (b) because Lira and Griffin

4  transacted their affairs in this District, including by litigating cases in this District and by traveling

5  to this District for the purpose of conducting business.

6     37.    Lira traveled to this District to transact his affairs on or about March 19, April 19,

7  May 6, June 13, and August 9, 2019.

8     38.    Griffin traveled to this District to transact his affairs on or about October 26, 2019.

9  He also litigated *Licea v. Facebook*, No. 3:19-cv-00117 (N.D. Cal.) and *Adkins v. Facebook*, No.

10  3:18-cv-05982 (N.D. Cal.) in this District.

11     39.    On September 11, 2020, while physically present in this District, Griffin sent a

12  lulling email to Septiana Damayanti in furtherance of the conspiracy described in this complaint.

13

14                                **FACTUAL BACKGROUND**

15  **A.    Tom and Erika misappropriated client settlement money to project an image of wealth
        and prop up a lifestyle made for reality TV**

16     40.    Tom Girardi founded the Girardi Keese law firm in 1965. The firm served plaintiffs,

17  primarily in personal injury suits: people who needed representation because they'd been badly

18  injured or were the surviving family members of someone who had died.

19     41.    Plaintiffs' attorneys are typically paid fees from "contingent" arrangements with

20  their clients, in which the lawyer gets paid a percentage of the client's ultimate recovery (either a

21  settlement or a verdict). When the client gets compensated a significant amount, the lawyer takes a

22  percentage—which, if the case is successful, can be significant as well.

23     42.    Tom Girardi and the Girardi Keese firm presented themselves as a firm at the very

24  top of the plaintiffs' bar in injury cases. Girardi Keese took on major defendants, often representing

25  numerous injured people from large-scale disasters, and secured billions in settlements. In turn,

26  Tom—at least for a time—brought in extraordinary sums of money as an attorney and made sure

27  that everyone knew it.

28     43.    Tom and Erika Girardi purposefully portrayed themselves to the public as an

COMPLAINT                                      9

extremely wealthy Beverly Hills power couple. When Erika joined the cast of *The Real Housewives of Beverly Hills* in 2015, she dazzled viewers by showing off their extravagant lifestyle and her exorbitant spending habits, including her never-ending parade of designer clothes and high-end jewelry, her $250,000 Lamborghini Huracán, and her personal 24/7 "glam squad" team that she paid $40,000 per month to pick out her clothes and do her hair and makeup. Spending money was so much a part of Erika's personality on the show that she released a song called XXPEN$IVE, which features the refrain, "It's expensive to be me."

44.    In her 2018 memoir, *Pretty Mess*, Erika readily bragged that she has the advantage of a "strong checkbook" and even discussed her and Tom's finances:

> Now, the haters are always going to say, "All you do is spend your husband's money." First of all, it's *our* money. Know how I know? Because the IRS tells us that it is. My name is on the tax return, too.[2]

45.    The problem, though, was that the Girardi Keese firm was not actually making enough money to support Tom and Erika's outrageous lifestyle. This only worsened as Erika became a fixture on the *Housewives* show, which required the two to perform their wealth sufficient to keep Erika in the national limelight for seasons at a time. The problem though, was that Tom and Erika's lifestyle began to demand even more funds.

46.    So Tom began to turn to a different source of funds. The victims of horrific and tragic accidents would come to the Girardi Keese firm and put enormous trust in him. These individuals who became the firm's clients believed in Tom and the firm as he portrayed himself to the public: a fighter for their interests, and an enormously successful one. And Tom enjoyed a key information advantage when it came to the victims that he claimed to represent—he knew the legal world, and they did not.

47.    When a plaintiff's case settles, it is both typical and legal for the funds to be sent to an account where the lawyer holds the client's money in trust (known as a "client trust account"). From there, an attorney can deduct an agreed-upon fee, but the remainder is the client's money and

---

[2]    Nikki Schuster, *Erika Jayne Slammed For Saying Her Music Career Was 'Self-Funded' In 2018 Memoir Amid Claims She Took $25M From Tom Girardi's Law Firm*, OK! NEWS (Aug. 27, 2021), https://bit.ly/3a5aEne.

must be remitted immediately. It is a cardinal rule of any legitimate plaintiffs' firm that client money held in trust is sacrosanct. But Tom made the decision, years ago, that this rule did not apply to him. Instead, Tom made the shocking decision to treat the client trust account as a slush fund: for him, for Erika, and to keep the firm afloat.

48.     The plan shared many characteristics with a classic Ponzi scheme. As clients' cases settled, the firm would siphon off some of the client's money to Tom and Erika's benefit, to pay off old creditors, and to keep the firm running. The firm would then delay clients' settlement payments until new money came in. Tom had a number of tricks to fend off clients and explain these delays: the firm would claim there were unspecified "tax issues," that there were opaque legal problems that needed to be worked through, or merely an accounting mistake that was being slowly resolved. The firm got away with that, as clients trusted Tom and the firm, and had no visibility into what was actually going on inside the doors of Girardi Keese.

49.     But the scheme always needed new money to prevent collapse. And gradually, the firm began to throw all sense of ethics and legality out the window to make sure that new cases continuously came in, and correspondingly, that no one the firm owed money to would reveal the fraud to the world. Tom relied on lawyers within his firm, the firm's accountant, and non-lawyer case referrers—operating under illegal agreements—to run what quickly became a full-fledged criminal enterprise: the Girardi Family Enterprise.

50.     Lira and Griffin managed the law firm side of the Girardi Family Enterprise, both handling legal work to ensure a supply of client settlement money and managing the clients whose money the Girardi Family Enterprise needed to steal. In particular, after a settlement came in, Lira and Griffin were responsible for lying to and misleading both Girardi Keese's clients and its co-counsel.

51.     When it seemed as though a client or co-counsel was getting too close to blowing the operation and could not otherwise be placated, Lira and Griffin turned the communications over to Tom, so that Tom could determine whether to pay the person or threaten them.

52.     At some point, the firm began to claim in its retention agreements with clients that it was "self-insured" for malpractice, misleading clients into believing that the firm had set aside

money to pay malpractice claims. In reality, there was no money to pay malpractice claims as all funds were dedicated to the fraud.

53.     Kamon was the bookkeeper for the Girardi Family Enterprise, managing the finances both for Girardi Keese and for Erika's businesses. Kamon was responsible for the mechanics of the day-to-day theft required to keep Girardi Keese appearing to operate as a legitimate law firm, while simultaneously funding Erika and Tom's ultra-luxury lifestyle. When money came into the client trust account, it was Kamon's job to siphon it off into Girardi Keese's other accounts, where it was used to pay salaries, pay off old creditors, and benefit Tom and Erika.

54.     The Girardi Family Enterprise's need for new clients was such that it also offered illegal fee agreements—including offering illegal *cash bonuses*—to non-lawyers in order to refer clients to the firm after a major catastrophe. These black-market service providers to unscrupulous plaintiffs' lawyers are known as "case runners," whose job it is to race to refer victims of a tragic accident to firms willing to strike illegal agreements that enrich the non-lawyer.

55.     Hatcher and his wholly-owned company, Wrongful Death Consultants, provided such a service. Hatcher is a convicted felon with a decades-long history of engaging in criminal behavior to supply unscrupulous lawyers with personal injury clients. In 1976, Hatcher was convicted of conspiracy, grand theft, unauthorized practice of law, and illegal solicitation of business for lawyers for a scheme in which he used a fraudulent charity to steer injured hospital patients to the attorneys who paid him. After Hatcher violated his probation for that conviction by passing bad checks and carrying a concealed weapon, the prosecutor told the Los Angeles County Superior Court, "The one thing above all others that George Hatcher's history teaches us is that so long as he is free in society, he will be seeking, and invariably finding, another hapless victim, be it a sophisticated businessman or a penniless widow and her orphaned children."

56.     On information and belief, Defendants Griffin, Lira, and Kamon, together with Tom and Girardi Keese, knew about Hatcher's criminal record. That is why they tuned to Hatcher to bring clients into the enterprise, and then to assist—as the clients' first-line point of contact—in lying to the clients and lulling them into thinking that all was well with their settlement money.

57.     Attorney ethical rules prohibit sharing of fees with non-lawyers. But the Girardi

Family Enterprise had long since dispensed with such niceties as professional ethics. Knowing that Hatcher had few compunctions about unlawful referral arrangements, the firm entered into an illegal contingency fee arrangement with Hatcher that entitled him to 25% of the attorneys' fees on all of the cases he generated. Given that new clients were the lifeblood of the scheme, the Girardi Family Enterprise also gave Hatcher numerous $50,000 payments. Tom offered the illegal contingency fee and cash bonus arrangement with Hatcher in order to ensure that Hatcher would refer clients *only* to Girardi Keese. Lira and Griffin have known and approved of the arrangement since before 2020.

58.     In Hatcher's own words, the contingency fee arrangement has proved to be extremely beneficial for Tom and the Girardi Family Enterprise:

> My job was exclusive [sic] new cases to GK and when possible, refer the case without a lawyer involved. Example of this, Galan and El Cajon, only person is me, GK saved 25% on each case, by not having a lawyer involved. There are others.

59.     While Tom, Kamon, Lira, Griffin, and Hatcher directed and managed the affairs of the Girardi Family Enterprise, Erika knew of the scheme, intended to participate in it and— critically—share in its profits, both directly and through her wholly-owned company, EJ Global.

60.     Despite her public claims that she and Tom were spending their own money, financial records show that more than $25 million of her own expenses were paid by Girardi Keese in furtherance of the Girardi Family Enterprise's illegal scheme. That includes more than $14 million in American Express charges that were made by Erika on a Girardi Keese card issued to her by the Girardi Family Enterprise, as well as more than $11 million in vendor payments that the Girardi Family Enterprise made for her benefit through the law firm.

61.     Erika was neither an owner nor employee of the law firm. None of the payments were legitimate law firm expenses. The $25 million in credit card charges and invoices that she sent to the firm for payment was used to hire her "glam squad," talent professionals, and image consultants, and to allow her to project an image of obscene wealth by spending massive amounts of money on clothes, purses, shoes, jewelry, and travel.

62.     Erika had actual and specific knowledge that the credit card bills and invoices that

she submitted to Girardi Keese related to her own personal expenses and had no connection

whatsoever with the law firm. Erika had actual and specific knowledge that for at least 12 years, all

her expenses were paid by the Girardi Family Enterprise through Girardi Keese as she was

generating them.

63.     Finally, Tom knew that he needed to protect himself and the Girardi Family

Enterprise from regulators, especially from the State Bar—the agency charged with regulating and

disciplining attorneys in California. To insulate the enterprise, Tom took State Bar officials and

employees to expensive restaurants and paid for meals, flew them around on his private jet, and

hosted them at extravagant parties.

64.     As a result, despite the numerous complaints that were filed against Tom over the

years (and the dozens of lawsuits that were filed against him and Girardi Keese in the courts), the

State Bar neglected to conduct a single investigation, allowing Tom to maintain a spotless record

before the Bar and enabling him to continue stealing from clients.

65.     With the State Bar firmly on his side and under his control, Tom had the freedom to

operate the Girardi Family Enterprise with impunity. Throwing all sense of ethics out the window,

Tom and other attorneys from his firm acted as though the professional rules of responsibility didn't

exist. [3]

**B.     Money begins to run out, and Erika obfuscates to the media**

66.     Even with Tom's influence, prestige, and conspicuous wealth on display, the Girardi

Family Enterprise began to flounder in 2019. Because the enterprise was always behind on

payments to clients and creditors, Tom and Girardi Keese routinely sought litigation funding to

bridge the gap. For years, this money flowed freely based on Tom's reputation. But eventually, the

---

[3]     Even after the Girardi Family Enterprise was uncovered in December 2020, the State Bar
has acted to hem in its investigation. Under pressure from the *LA Times* and *Law360*, the Bar finally
appointed an outside prosecutor to self-investigate the Bar's connections with Girardi Keese. But as
to the other members of the Girardi Family Enterprise, they have made clear that the Bar intends to
limit the investigation to only the acts underlying the *Lion Air* case. Even this work is limited: the
Bar ultimately secured an order of restitution (at that point duplicative) to some of the Lion Air
Clients, but they forgot about Mr. Multi. The State Bar has threatened retaliation against lawyers
that have questioned the Bar's impartiality.

Girardi Keese firm and Tom were routinely delinquent on debts to lenders, and the money dried up as lawsuits for payment began to increase.

67.     On January 17, 2019, Law Finance Group ("LFG"), a lender, filed a lawsuit against Tom and Girardi Keese that focused heavily on claims that Tom was misappropriating a loan to fund his "lavish lifestyle" and "keep his prominent law firm financially afloat."

68.     As cracks began to appear in the enterprise, Erika did her part to obfuscate. Erika was asked to comment on the lawsuit dozens of times by various media outlets. Initially, Erika tried to brush the LFG lawsuit off, saying "Listen, we're in the lawsuit business, baby. We sue and get sued."

69.     On March 27, 2019, Erika appeared on an episode of *Watch What Happens Live*. During that episode, a fan asked Erika if "she feels the need to cut back on her glam squad since her husband is being sued for a huge amount of money." The host of the show, Andy Cohen, acknowledged that they "get a lot of questions about this" and asked Erika if there's anything she would like to say. Erika replied "Uh, yeah, it's a lawsuit, and you can't comment on it," but then added, "I pay my own bills, so no, I don't."

70.     At this time, Erika knew that she did not "pay her own bills" and that her lifestyle was being funded entirely by Tom's law firm, which was exactly what the lawsuit was alleging.

71.     A few months later, on May 24, 2019, another lender, Stillwell Madison ("Stillwell"), filed its own lawsuit against Tom, Girardi Keese, and for the first time, Erika herself. The lawsuit was newsworthy both because it named Erika as a defendant and specifically alleged that Tom had misappropriated the loan to support his and Erika's "high-end lifestyle" and to "maintain their glamorous public image." Stillwell also alleged that Tom "transferred" more than $5 million of the loan to Erika for her and Tom's "personal use instead of business purposes."

72.     At that point, Erika began using her celebrity status and platform on *Housewives* to protect her and Tom's public image by lying about the true nature of their mounting legal and financial troubles. Two weeks later, during filming for the *Housewives* Season 9 reunion episode, the host, Andy Cohen, asked Erika if she was trying to stir up drama with her castmates to "bury negative stories" about her and Tom's legal problems. Erika responded by claiming that the legal

issues were "resolved and they apologized," indicating that the two lawsuits had been resolved and that both LFG and Stillwell have apologized for suing her, which was not true.

73.     As with her false statement about "paying her own bills" a few months earlier, Erika made this false statement to protect her and Tom's public image and to hold their countless other creditors at bay. This lie about the lawsuits being "resolved and they apologized," demonstrates that Erika had specific knowledge that her financial arrangement with Girardi Keese was inappropriate and needed to be hidden from creditors using any means necessary.

74.     Erika was fully aware of the breadth and power of her platform and knew that her false statements would further her and Tom's scheme by ensuring that their hordes of creditors continued to believe that they were wealthy and that clients would continue to hire Tom and trust him with their money.

75.     Erika continues to use her platform to deny evidence of the Enterprise's wrongdoing and to sow doubt as to the *Lion Air* families' losses. In an episode of *Real Housewives of Beverly Hills* broadcast in June 2022, Erika opined on national television that "We're not even sure that there were people that weren't paid." When asked if there was "a chance that they can be lying," Erika said that there was. Erika knows, and at the time of filming knew, that the United States District Court for the Northern District of Illinois determined that the families of Anice, Bias, Dian, and Septiana did not receive the amount due to them and entered judgment personally against her husband in the amount of $2,000,000.

## C.     The Lion Air Tragedy

76.     On the morning of October 29, 2018, Lion Air Flight 610, flying on a Boeing 737 Max 8 model aircraft, departed Jakarta, Indonesia. Shortly after takeoff, the flight crew contacted air traffic control and requested to return to Jakarta, but the flight never made it.

77.     After a series of chaotic maneuvers resulting from a fundamental system failure, Flight 610 plummeted into the ocean. All 189 passengers on board were killed on impact.

78.     Following the tragedy, government investigations determined that the aircraft's anti-stall system—the maneuvering characteristics augmentation system—caused the aircraft's nose to suddenly, and without warning, drop and dive steeply.

79.     Litigation ensued on behalf of those that had lost loved ones, and within a few days,
dozens of wrongful death cases had been filed against Boeing.

**D.     The Girardi Family Enterprise springs into action**

80.     To most people, plane crashes are horrible and devastating events. To the Girardi
Family Enterprise, plane crashes and other catastrophic events were golden opportunities to commit
crimes. This crash, in particular, came at just a time when the Girardi Family Enterprise was
growing more and more desperate for money.

81.     When news of the Lion Air crash hit the wires, the Girardi Family Enterprise sprung
into action to immediately begin soliciting the surviving family members.

82.     As Hatcher had done for the Girardi Family Enterprise before, he set out to recruit
victims' families from the Lion Air plane crash to refer them to Girardi Keese and act as a liaison
between them and the attorneys.

83.     When a catastrophic event takes place in a foreign country, Hatcher typically must
reach out to his network to find somebody that can help him locate and solicit potential clients on
the ground. Without any contacts of his own in Indonesia, Hatcher reached out to an individual
named Mohamed Eltaher ("Eltaher") to fill that role. Like Hatcher, Eltaher is not licensed to
practice law in the United States or Indonesia, and entering into an agreement to pay him a cash
bonus for referred clients is illegal. So is offering him a cut of attorneys' fees. But the Girardi
Family Enterprise nevertheless offered Eltaher 25% of the attorneys' fees and $3,000 bonuses.

84.     In the end, Eltaher successfully delivered the Lion Air Clients to Girardi Keese, and
pursuant to the terms of their referral agreement, was entitled to a 25% contingency fee when the
cases settled.

**E.     Tom and Erika go to DiNardo and his companies for litigation funding**

85.     Armed with a slate of new clients with high-value claims, Tom sought yet another
round of litigation funding to fuel the Girardi Family Enterprise. The problem, as discussed above,
was that by 2019, no legitimate lender wanted to do business with Tom. As such, Tom turned to his
close friend Joseph DiNardo and company, California Attorney Lending, for help—likely because
he still owed them millions of dollars on loans he had taken out several years earlier. DiNardo and

his companies, therefore, had a personal interest in the longevity and continued success of the Girardi Family Enterprise.

86.     DiNardo founded Counsel Financial and its sister company, California Attorney Lending, and at relevant times, sat on the Board of Directors of both companies. The only difference is that when Counsel Financial finances law firms in California, it does so through the California Attorney Lending entity.

87.     DiNardo was indicted in 1997 for tax evasion and for bribing and tampering with government witnesses. According to federal prosecutors, DiNardo conspired to pay upwards of a hundred thousand dollars in kickbacks to a union leader in exchange for case referrals of union members injured on the job. In a brazen and convoluted scheme, DiNardo then tried to write the kickbacks off as a tax-deductible business expense. Ultimately, DiNardo was convicted of filing a false income tax return in violation of 26 U.S.C. § 7206(1) on a guilty plea, which required him to admit that he signed his name to an income tax return for his law firm that he knew was not true. The New York State Bar subsequently suspended him from the practice of law for three years.

88.     By 2019, DiNardo had actual knowledge that the Girardi Family Enterprise was stealing money from Tom's clients. The prior loans that his companies had given Girardi Keese imposed strict financial reporting obligations on the firm, requiring the firm to provide one of DiNardo's companies with copies of its monthly bank statements and numerous other financial records that would have demonstrated that the firm was misappropriating client settlement funds and improperly exercising control over funds held in its client trust account.

89.     Nonetheless, DiNardo agreed to provide the Girardi Family Enterprise with *additional* loans in 2019 in the hopes of keeping the scheme going for long enough to recoup the money his companies were owed.

90.     Four months later, on September 17, 2019, Erika personally signed an agreement, a first lien on her and Tom's assets, with DiNardo's company, California Attorney Lending. The agreement stated:

> I am married to Thomas V. Girardi. We have been together for more than 20 years. I agree that California Attorney Lending II, Inc. has a first lien on any assets owned by Thomas V. Girardi and any assets which are community property.

91.     Just a month later, on October 25, 2019, Erika personally signed *another* agreement, this time with California Attorney Lending's sister company—Counsel Financial—stating:

> It is agreed that any obligation from the law firm to Thomas Girardi, the Estate of Thomas Girardi, is waived until Counsel Financial is paid off in full. I am the sole heir.

92.     The fact that Erika personally signed these agreements proves that at least as early as September 17 and October 25, 2019, Erika had actual and specific knowledge that she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese.

93.     In exchange for the additional loans, Tom agreed that California Attorney Lending would receive 50% of the attorneys' fees from various cases when they settle, including from the Lion Air Clients. And in apparent recognition that Tom was misappropriating settlement funds received by Girardi Keese, DiNardo included terms in the 2019 loan documents that required the settling defendants in the covered cases to wire their 50% portion of the attorneys' fees *directly* to California Attorney Lending.

94.     This fact again demonstrates that DiNardo knew or should have known that Girardi Keese's finances were not adding up. A law firm focused on mass accidents like Girardi Keese could legitimately operate only with a network of referring attorneys—each of whom would be entitled to a portion of the fee—as well as significant payments to co-counsel that are actually working in the local court on cases across the nation with the Girardi Keese firm. DiNardo thus knew, or should have known based on his intimate understanding of the firm, that Girardi Keese was not actually entitled to 50% of the fees. Or if Girardi Keese was somehow entitled to 50% of the fee, nothing would be left to actually fund the firm after DiNardo was paid—again demonstrating that money was coming from somewhere else.

**F.     The Lion Air Litigation and Settlement**

95.     When the Lion Air Clients retained Tom and his firm, they believed that he would represent their best interests and timely deliver the proceeds of any settlement to them.

96.     Given that the cases were to be filed in the Northern District of Illinois, Tom and his partners, David Lira and Keith Griffin, brought in Plaintiff Edelson PC to act as local counsel for

the Lion Air Clients, as well as to assist in the litigation and settlement process. The terms of their co-counsel agreement, which was signed by Griffin, provided that Edelson would receive 50% of the total fees recovered on behalf of the Lion Air Clients.

97.     But the Girardi Family Enterprise had already illegally committed more than 50% of attorneys' fees to non-lawyers: Eltaher was told he would receive 25% of the fees and Hatcher a third (33.3%).

98.     And after recruiting Edelson with fees it knew it had already overcommitted, the Girardi Family Enterprise arranged for 50% of the fees to be paid *directly* to California Attorney Lending as discussed above.

99.     Overcommitting the fees on the *Lion Air* case shows that the Lion Air Clients' money had already been sucked into the Ponzi scheme: before money ever came in, more than 100% of the fees had been promised to go out, meaning that money was either going to come from someone's share of the fees, or—far worse—the clients' money.

100.    The case proceeded on behalf of the Lion Air Clients. In the end, Boeing reached individual settlements with each of the clients and families represented by Girardi Keese and Edelson. The main terms of the settlements were reached in early 2020 and finalized thereafter. For many of the Lion Air Clients (all but Multi Rizki), the settlements required approval by Court order because they settled a case brought on behalf of a minor. The Court's order approving each of those settlements required Girardi Keese to wire funds to a specific account "as soon as practicable" after they were received by Girardi Keese from Boeing.

101.    During March 2020 and, in Multi Rizki's case, June 9, 2020, Boeing wired the entire amount of the Lion Air Clients' settlements into the Girardi Keese client trust account. But as set forth below and in violation of federal law, ethical rules, and court order, Girardi Keese did not send the clients their portion of the money.

**G.     The Girardi Family Enterprise Steals the Lion Air Clients' Settlement and Commits Hundreds of Federal Crimes in the Process.**

102.    The Girardi Family Enterprise never intended to safeguard the Lion Air Clients' settlement funds in the Girardi Keese client trust account.

103.     Instead, the Girardi Family Enterprise agreed to systematically steal the funds and use them to cover payroll, firm expenses, payments to clients whose money the firm had previously stolen, outstanding bills to lenders, and Erika's credit cards and invoices.

104.     To accomplish this goal, the Girardi Family Enterprise had to deploy a smokescreen of lies to the clients about why their money was not coming. Meanwhile, the Girardi Family Enterprise methodically doled out those clients' money to keep the scheme afloat. In doing so, they committed hundreds of criminal acts.

105.     What follows is a detailed—though non-exhaustive—list of the crimes committed by the Girardi Family Enterprise in furtherance of this scheme, including the particular individuals involved, the sums of money that were stolen, and the fraud that was committed by each member of the Girardi Family Enterprise in order to prevent the scheme from being found out.

**March 4, 2020 through September 24, 2020 – Theft of Settlement Money to Girardi Keese Account**
*Wire Fraud (18 U.S.C. § 1343)*

106.     Between March 4, 2020 and May 22, 2020, Girardi Keese issued the checks listed in Table 1 from its client trust account at Torrey Pines Bank on or about the dates shown, which total $1,677,000. All were made payable to Girardi Keese.

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| 3/4/20 | 125000 | Case # 2018251 Fees $20,000.00 | $20,000.00 |
| 3/4/20 | 125002 | Case #2018251 Fees $25,000.00 | $25,000.00 |
| 3/5/20 | 125014 | Case # 2018251 Fees $125,000.00 | $125,000.00 |
| 3/10/20 | 125017 | Case # 2018251 Fees $500,000.00 | $500,000.00 |
| 3/16/20 | 125075 | Case # 2018251 Fees $160,000.00 | $160,000.00 |
| 3/17/20 | 125078 | Case # 2018251 Fees $52,000.00 | $52,000.00 |
| 3/18/20 | 125081 | Case # 2018251 Fees $25,000.00 | $25,000.00 |
| 3/19/20 | 125082 | Case # 2018251 Fees $80,000.00 | $80,000.00 |
| 3/20/20 | 125089 | Case # 2018251 Fees $185,000.00 | $185,000.00 |
| 3/24/20 | 125095 | Case # 2018251 Fees $50,000.00 | $50,000.00 |
| 3/25/20 | 125120 | Case # 2018251 Fees $45,000.00 | $45,000.00 |
| 3/31/20 | 125133 | Case # 2018251 Fees $260,000.00 | $260,000.00 |
| 4/1/20 | 125134 | Case # 2018251 Fees $100,000.00 | $100,000.00 |
| 5/22/20 | 125383 | Case # 2018251 Costs $50,000.00 | $50,000.00 |

**Table 1**

107.     2018251 was Girardi Keese's internal case number for the *Lion Air* matters.

108.     Lira personally signed checks 125017 and 125383.

109.     At the time the checks listed in Table 1 were deposited, both Kamon and the persons signing the checks knew that Girardi Keese was not entitled to attorneys' fees from the *Lion Air* matters in the amount listed on the checks. Each knew that the entire amount of attorneys' fees owed to Girardi Keese had already been transferred directly from Boeing to California Attorney Lending.

110.     On March 10, 2020, when check 125017 in the amount of $500,000 was signed, Lira, Girardi, and Kamon all knew that the only *Lion Air* client for which Girardi Keese had received settlement funds was Anice Kasim. They also each knew that the total amount of attorneys' fees payable in Anice Kasim's case was $███████, of which $███████ had already been paid to California Attorney Lending. This left $███████ of attorneys' fees, on which were remaining obligations to plaintiff Edelson as well as illegal obligations to Hatcher and Eltaher. They each therefore knew that Girardi Keese could not be entitled to $500,000 of Anice Kasim's settlement.

111.     Between April 8, 2020 and September 24, 2020, the Enterprise issued the checks listed in Table 2, below, from the Girardi Keese client trust account at Torrey Pines Bank on or about the dates shown, which total $2,598,000. All were payable to Girardi & Keese and deposited into Girardi Keese's operating account at Nano Banc.

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| **4/8/20** | 125140 | Case # 10219 Fees $115,000.00 | $115,000.00 |
| **4/9/20** | 125261 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| **4/9/20** | 125264 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| **4/13/20** | 125265 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| **4/14/20** | 125277 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| **4/15/20** | 125278 | Case # 10219 Fees $150,000.00 | $150,000.00 |
| **4/23/20** | 125317 | Case # 10219 Fees $120,000.00 | $120,000.00 |
| **4/24/20** | 125318 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| **4/27/20** | 125319 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| **4/28/20** | 125321 | Case # 10219 Fees $45,000.00 | $45,000.00 |
| **4/30/20** | 125337 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| **4/30/20** | 125338 | Case # 10219 Fees $75,000.00 | $75,000.00 |
| **5/12/20** | 125358 | Case # 10219 Fees $35,000.00 | $35,000.00 |

| | | | |
|---|---|---|---|
| **5/13/20** | 125359 | Case # 10219 Fees $30,000.00 | $30,000.00 |
| **5/19/20** | 125381 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| **5/21/20** | 125382 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| **5/22/20** | 125385 | Case # 10219 Fees $40,000.00 Sovereign Towers | $40,000.00 |
| **5/27/20** | 125407 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| **6/2/20** | 125410 | Case # 10219 Fees $60,000.00 | $60,000.00 |
| **6/3/20** | 125421 | Case # 10219 Fees $35,000.00 Sovereign Towers | $35,000.00 |
| **6/4/20** | 125423 | Case # 10219 Fees $20,000.00 | $20,000.00 |
| **6/5/20** | 125425 | Case # 10219 Fees $15,000.00 Sovereign Towers | $15,000.00 |
| **6/9/20** | 125435 | Case # 10219 Fees $30,000.00 Sovereign Towers | $30,000.00 |
| **6/11/20** | 125436 | case # 10219 Fees $160,000.00 | $160,000.00 |
| **7/13/20** | 125501 | Case # 10220 Fees $300,000.00 | $300,000.00 |
| **7/16/20** | 125509 | Case # 10220 Fees $17,000.00 | $17,000.00 |
| **9/22/20** | 125562 | Case # 10220 Fees $65,000.00 | $65,000.00 |
| **9/23/20** | 125563 | Case # 10220 Fees $ 36,000.00 | $36,000.00 |
| **9/24/20** | 125564 | Case # 10220 Fees $20,000.00 | $20,000.00 |

**Table 2**

112.    Case 10220 was designated internally by Girardi Keese as "Miscellaneous Case Cost for 2020." On information and belief, Case 10219 was designated in a similar manner for 2019. The Girardi Family Enterprise used memo lines with these two case numbers to make draw checks on Girardi Keese's client trust accounts that appeared to be for attorneys' fees but were in fact embezzlement.

113.    In furtherance of the Enterprise's fraudulent scheme, Lira personally signed check number 125321.

114.    Kamon deposited each of the checks listed in Tables 1 and 2 into Girardi Keese's operating account at Nano Banc on or about the date the check was written. Kamon deposited the checks via an internet-based merchant capture deposit system by which he used wires to transmit check information to Nano Banc in interstate commerce.

115.    At the time the checks listed in Tables 1 and 2 were deposited, both Kamon and the persons signing the checks knew that the money used to pay the checks would come from the *Lion Air* settlement funds.

116.    The Enterprise issued, signed, and deposited the checks listed in Tables 1 and 2 as

part of their scheme to defraud the Lion Air Clients out of their settlement money and to benefit the Enterprise. For each check, the persons issuing, signing, and depositing the check had specific intent to defraud the Lion Air Clients and did so in furtherance of the Enterprise's fraudulent scheme.

**March 5, 2020 through October 5, 2020 – Laundering of Illicit Proceeds**
*Money Laundering (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957)*

117.    After embezzling the *Lion Air* settlement funds, the Enterprise used those funds both to dole out profits to the members of the Enterprise and to keep the Enterprise functioning.

118.    The Enterprise issued the checks listed in Table 3, which total $3,914,295.67, from the Girardi Keese operating account at Nano Banc on or about the dates shown. All were made payable to "Girardi Keese Payroll Account" and signed by Tom.

| Date | Check Number | Amount |
|---|---|---|
| 3/5/20 | 010476 | $42,026.91 |
| 3/9/20 | 010483 | $20,117.56 |
| 3/12/20 | 010509 | $280,577.46 |
| 3/19/20 | 010581 | $43,855.70 |
| 3/20/20 | 010587 | $139,149.01 |
| 4/1/20 | 010673 | $35,901.79 |
| 4/14/20 | 010752 | $260,440.19 |
| 4/15/20 | 010756 | $38,072.72 |
| 4/21/20 | 010799 | $92,070.95 |
| 4/30/20 | 010834 | $318,548.44 |
| 5/14/20 | 010949 | $315,814.52 |
| 5/19/20 | 010973 | $92,763.23 |
| 5/28/20 | 011024 | $310,766.23 |
| 5/28/20 | 011025 | $3,833.33 |
| 6/11/20 | 011118 | $292,268.99 |
| 6/25/20 | 011159 | $38,158.42 |
| 6/29/20 | 011160 | $208,884.90 |
| 7/9/20 | 011274 | $36,958.34 |
| 7/9/20 | 011275 | $3,623.71 |
| 7/10/20 | 011276 | $197,551.59 |
| 7/23/20 | 011374 | $38,186.33 |
| 7/30/20 | 011434 | $191,839.26 |
| 7/31/20 | 011446 | $3,177.08 |
| 8/5/20 | 011476 | $41,146.87 |
| 8/20/20 | 011552 | $34,890.58 |
| 8/28/20 | 011599 | $170,932.82 |
| 9/3/20 | 011611 | $38,847.55 |
| 9/14/20 | 011631 | $169,661.35 |

| 9/18/20 | 011673 | $39,561.50 |
| 9/28/20 | 011691 | $170,481.06 |
| 9/30/20 | 011697 | $39,996.84 |
| 10/13/20 | 011756 | $170,044.51 |
| 10/14/20 | 011762 | $34,145.93 |

**Table 3**

119.   On behalf of the Enterprise, Kamon deposited each of the checks listed in Table 3 into Girardi Keese's payroll account held at Torrey Pines Bank on or about the date listed. Kamon deposited the checks via a remote deposit system by which he used wires to transmit check information to the Torrey Pines Bank in interstate commerce.

120.   Each deposit of a check listed in Table 3 was a financial transaction representing, in whole or in part, the proceeds of the Enterprise gained by wire fraud as described in detail above.

121.   Kamon deposited each check with the intention of using the funds to promote the carrying on of specified unlawful activity. Specifically, the Enterprise needed to keep operating Girardi Keese as an apparently legitimate law firm so that it would have settlement monies coming in that it could embezzle. In order to do so, it had to pay the wages of secretaries, intake personnel, and other non-lawyer staff that kept the firm running. Kamon deposited the checks with the specific intent of paying those wages.

122.   During the period of time that they worked at Girardi Keese, Lira, Griffin, and Kamon each drew a biweekly salary, which was paid to them via direct deposit from the Girardi Keese payroll account held at Torrey Pines Bank.

123.   Lira and Griffin each were paid a gross salary of greater than $10,000 every two weeks during the period they worked at Girardi Keese. After March 5, 2020, each paycheck was derived from the Enterprise's proceeds of the embezzlement of the *Lion Air* settlement funds.

124.   Lira received his direct deposits at Bank of America, an FDIC-insured financial institution engaged in interstate commerce.

125.   Griffin received his direct deposits at JPMorgan Chase Bank, an FDIC-insured financial institution engaged in interstate commerce.

126.   Kamon also used the funds transferred to the Nano Banc account to pay the balance of American Express credit or charge cards. These payments covered expenses charged to those

cards by Tom, Erika, and Erika's companies. The payments are set forth in detail in lines 4.1 through 4.339 of the Statement of Financial Affairs filed by Girardi Keese Chapter 7 Trustee Elissa Miller on August 24, 2021. *In re Girardi Keese*, No. 2:20-bk-21022-BR, dkt. 620 at 17-66 (Bankr. C.D. Cal.). As an example:

    (a) As of March 3, 2020, the Girardi Keese client trust account at Torrey Pines Bank contained only $85,118.57. The only credit to that account between March 4, 2020 and March 10, 2020 was a wire transfer for $█████ from Perkins Coie (counsel for Boeing), representing the settlement funds for Anice Kasim's case.

    (b) Between March 4, 2020 and March 10, 2020 in five separate checks, Girardi Keese transferred $810,000 from the client trust account to the Nano Banc operating account with memo lines reading "Fees" followed by the amount of the check and "Case #2018251"—Girardi Keese's internal case number for *Lion Air.* But the amount properly deductible from Anice Kasim's settlement for fees, costs, and an advance only totaled $████.

    (c) On March 4, 2020, the balance of the Nano Banc operating account was only $1,570.62. Between March 4, 2020 and March 12, 2020, the only deposits into the account were the five checks above. On March 10, 2020, the Nano Banc operating account made payments to American Express of $211,441.46 and $238,833.77.

    (d) Thousands of dollars of those payments were for Erika's company, EJ Global, *see id.*, and could only have come from Anice Kasim's settlement.

127.    American Express is a financial institution engaged in interstate commerce.

**March 24, 2020 through April 20, 2020 – █████ Fee Fraud**
*Wire Fraud (18 U.S.C. § 1343); Money Laundering (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957)*

128.    On March 24, 2020, Lira received an email from ██████████ of ██████████. ████ had represented the plaintiff in ████████████████, but the plaintiff switched counsel midway through the lawsuit to Girardi Keese. No. 37-2018-00012397-CU-PL-CTL (S.D. Sup. Ct.). The plaintiff settled with the defendant, represented by Lira.

129.     According to ██████, Lira agreed to pay ██████ 20% of his fees plus his out-of-pocket costs. In a declaration executed under penalty of perjury and filed in the Superior Court of California, County of San Diego, Lira represented that ██████ firm had incurred costs in the amount of $67,292.03 and sought court approval of those costs. However, according to ██████ email, Lira did not pay as agreed. ██████ email further demanded payment in full.

130.     Within minutes of receiving ██████ email, Lira forwarded it to Chris Kamon and Tom Girardi. Kamon responded, solely to Lira, asking "How much do we owe him?" Lira responded with another question: "Have we wired any money to Lion air clients (the 2)?" Kamon responded, "Nope."

131.     On April 20, 2020, on behalf of the Enterprise, Kamon prepared and Lira signed check number 125286, which was drawn on the Girardi Keese client trust account at Torrey Pines Bank and made payable to ████████████████████. The check was in the amount of $125,567.03 and the memo line read "Case # ██████ Fees $58,275.00; Costs $67,292.03."

132.     Kamon and Lira thus intended for that check to be covered by the proceeds of the money embezzled from the *Lion Air* settlement funds by way of wire fraud. The check was indeed paid using those proceeds.

133.     Kamon and Lira sent the check to ██████ to promote the continuation of the Enterprise's fraudulent scheme. They were concerned that if ██████ made their failure to pay him public, the Enterprise would be found out and they would not be able to continue.

**April 2-6, 2020 and December 9, 2021 – Dian Daniaty Loan Scam**
*Wire Fraud (18 U.S.C. § 1343); Obstruction of Justice (18 U.S.C. § 1503)*

134.     On or about April 2, 2020, *Lion Air* client Dian Daniaty sent David Lira and Keith Griffin an email that read:

Dear Mr David and Mr Lira

Mr. David and Mr. Keith, can you lend me 40,000 dollars?  I really need it right away.  I have a business, if waiting for liquid boeing money there is still no certainty.

Thank you very much.

135.    Using interstate wires, Lira forwarded the email to George Hatcher approximately four minutes after receiving it, with the notation "FYI." Hatcher quickly responded, to Lira, Griffin, and Kamon, "My recommendation, if Dian is funded, get an okay and send her the money. If you don't have the money, advance her the 40, the repayment is solid." Kamon replied to Hatcher later that day, again copying Griffin and Lira, "Tom just gave the ok to advance the $40,000.00.  It's too late to process today, so I will process this wire first thing Monday."

136.    The following Monday, April 6, 2020, Kamon caused Girardi Keese to wire $40,000 to Dian Daniaty from Girardi Keese's client trust account at Torrey Pines Bank. The wire was sent in interstate commerce to PT Bank Rakyat Indonesia with Wells Fargo in New York acting as the intermediary bank.

137.    Lira and Griffin both knew that the $40,000 was not a loan. It was Dian Daniaty's own money, which Girardi Keese had received into its client trust account a month earlier on March 11, 2020. Lira, Griffin, Girardi, Kamon and Hatcher intended for Hatcher to falsely represent to Dian Daniaty that the $40,000 was a loan from Girardi Keese, so that she did not question why she had not received her settlement funds. On information and belief, Hatcher did so by WhatsApp or email, which constitute international wire communications.

138.    The Girardi Family Enterprise sent Dian Daniaty the $40,000 "loan" for the purpose of buying time to replace the settlement funds it had already stolen from her.

139.    On December 9, 2021, during an evidentiary hearing on whether he should be held in contempt of court, Lira gave the following false testimony in the United States District Court for the Northern District of Illinois before Hon. Thomas M. Durkin:

Q. Why was $40,000 sent to Ms. Dian on April the 6th?

A. I have no knowledge why.

Q. Did you know at the time that $40,000 had been wired to Ms. Dian?

A. I did not.

140.    As the above emails show, Lira knew this testimony was false at the time he gave it. Lira intended for his false testimony to influence Judge Durkin's resolution of the contempt motion pending against him and fellow Enterprise member Griffin.

**April 8, 2020 – TXI Riverside Cement Fraud**
*Mail Fraud (18 U.S.C. § 1341); Money Laundering (18 U.S.C. § 1956)*

141.    On April 8, 2020, on behalf of the Enterprise, Kamon prepared and Lira personally signed 115 checks drawn on the Girardi Keese client trust account at Torrey Pines Bank payable to Girardi Keese clients who were owed money in relation to their settlements in a mass tort case against TXI Riverside Cement and related entities. The checks, detailed in Appendix A, totaled $150,942.65.

142.    Kamon and Lira intended for the money used to cover those checks to be covered by the proceeds of the money embezzled from the *Lion Air* settlement funds by way of wire fraud. The checks were indeed paid using those proceeds.

143.    The memo line of each check listed in Appendix A refers to a "Partial Disbursement for TXI Settlement." Lira and Kamon used this memo line to conceal the fact that these funds were not from the TXI settlement at all but had been stolen from the *Lion Air* plaintiffs by way of wire fraud.

144.    Further, by participating in the issuance of the checks listed in Appendix A, Lira and Kamon intended to promote the carrying on of the Enterprise's fraudulent scheme. The scheme worked because Girardi Keese clients were paid eventually, from other people's money, once the Enterprise had managed to put together other clients' settlements to embezzle. By paying off all or part of the money owed to clients whose money had been stolen earlier, Kamon and Lira intended to ensure that those clients did not go to the authorities and alert them to the scheme.

145.    Those clients included Catherine J. Hollis, the daughter of Ramone Whitesock and an heir to Ms. Whitesock's estate. Ms. Whitesock's estate finalized its wrongful death claim against Riverside Cement Holdings and related entities on or about December 17, 2018.

146.    However, the Girardi Family Enterprise stole Ms. Hollis's settlement funds instead of holding them in trust.

147.    On or about April 8, 2020, the Girardi Family Enterprise mailed a letter to Catherine J. Hollis. Specifically, Tom Girardi's secretary Kim Cory took dictation of the letter from Tom, printed it out, and then deposited it in the United States Mail, postage prepaid and addressed to the Post Office Box printed on the letter.

148.    Enclosed with the letter was check 125234 from Girardi Keese's client trust account at Torrey Pines Bank, which Kamon prepared and Lira personally signed.

149.    The statements in the letter to Ms. Hollis are part of a fraudulent scheme. The letter stated:

> I have never been involved in a matter which has been more frustrating than the TXI case. Making sure to satisfy the liens, getting medical evaluations, etc., have been very difficult. Further, Judge Pratt wanted large groups of clients to be paid [at] the same time. We are, however, doing pretty well in doing so. We don't have final clearance for this particular group, but to show my good faith, we are sending out 50% of what you are entitled to right now. I believe we will send the other 50% in 30 days.

As of the date of the letter, there were no legitimate delays in sending out the TXI settlement money. Rather, the Girardi Family Enterprise had previously stolen Ms. Hollis's money and needed to wait for other clients' money to come in before it could pay Ms. Hollis.

150.    Lira and Girardi each knew that the money used to fund the check to Ms. Hollis did not belong to Ms. Hollis but to the Lion Air Clients.

151.    The letter to Ms. Hollis claiming to pay 50% of the amount owed is a communication intended to lull her into a false sense of security, postpone any complaint to the authorities, and therefore make the discovery of the criminal scheme less likely.

152.    Substantially identical letters with accompanying checks were sent to Blanche Banuelos and Loretta Joyce Fowler, two other TXI plaintiffs, on the same day via United States Mail, also with checks enclosed.

153.    On information and belief, Lira and Griffin directed all 115 checks to TXI plaintiffs to be sent by United States Mail, and each such check was accompanied by a substantially identical fraudulent letter.

**April 18, 2020 – Lira Lies to Bias, Anice, Septiana, and Dian**
*Wire Fraud (18 U.S.C. § 1343)*

154.    On April 18, 2020, David Lira sent the following email to Bias, Anice, Septiana, and Dian using wire communications in interstate and foreign commerce:

> Good morning Bias, Septi, Dian and Ani:
> First, I want to thank you for your patience during this unfortunate pandemic. Our office has been closed since  March 16th as a result of government mandates. It has

been extremely difficult to run the day-to-day law office operations without employees present. Rest assured we are doing everything we can with limited staff. Tom Girardi  has final say as to all wire transfers. It is "on his to do list." Our office is closed today due to a massive sanitation/disinfectant effort due to a COVID scare this week. I will keep you advised I hope you and your families are safe and sound. David

155.    This email was substantially false. Lira knew both that the fact that the Lion Air Clients hadn't received their funds had nothing to do with Covid-related closures and that transferring their money was not on Girardi's to-do list. Lira sent this email intending to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely.

**May 13 and 14, 2020 – False Letters to Bias, Septiana, and Dian**
*Wire Fraud (18 U.S.C. § 1343)*

156.    On May 13, 2020, Tom Girardi's secretary sent Griffin a draft of a letter from Girardi to Bias Ramadhan, which Griffin forwarded to Lira with the instruction to "take a look." About half an hour later, the secretary sent both Griffin and Lira a draft of a letter from Girardi to Dian.

157.    The draft letter to Dian read: "We made an agreement with Boeing that all of the cases would be resolved.  They gave us special authorization to distribute 50%.  I feel fairly confident the balance will be done within 30 days. There was also a tax issue that came up that I am trying to resolve. Thank you for your nice note[.]"

158.    Nearly every sentence in this draft letter is false. While there was an agreement with Boeing to resolve all of the cases, that agreement had nothing to do with the status of Dian's wire. There was no special authorization from Boeing to distribute half of Dian's settlement proceeds. There was no tax issue.

159.    The draft letter to Bias read: "I got enough of the problem taken care of so we were able to release 50% of the settlement.  I feel pretty good about the next payment.  There are tax issues etc.  I am working very hard."

160.    Nearly every sentence in this draft letter is false. The only "problem" that Girardi needed to "take[] care of" was that the Enterprise had stolen so much of Bias's money that it couldn't pay him. There was no tax issue.

161.     In response to receiving these drafts, Lira sent an email to Griffin and Girardi's secretary on May 13, 2020, that read: "These are smart people. There are no tax issues." Lira sent this email to advise Girardi on how he could better craft the false letters so that they would be believed by the clients.

162.     The next day, May 14, 2020, Girardi's secretary emailed Lira and Griffin three more draft letters in separate emails, one each to Dian Daniaty and Bias Ramadhan, and another to Septiana Damayanti. In each email, the secretary wrote: "David: Is this ok?"

163.     The draft letters to Dian Daniaty and Bias Ramadhan were identical to the previous day's drafts, except with the sentences referring to tax issues deleted.

164.     The draft letter to Septiana read: "There are many confidential issues that I am solving.  While I agree with two of the plaintiff's lawyers, we will not distribute until they settle because they knew our cases were settling higher than theirs.  I need about 30 days.  Believe me, I am working very hard."

165.     There were no "confidential issues," and the reason that the Enterprise wasn't distributing the settlement to Septiana had nothing to do with other people's settlements. The only reason the Enterprise needed "30 days" was to hope that enough money came in belonging to other clients that they could steal and use to pay back Septiana for the money they had stolen from her.

166.     In response to each of the secretary's emails, Lira responded, "Ok." Lira sent those responses with the specific intent that the secretary would then send the fraudulent letters to Bias, Dian, and Septiana via email using wire communications in interstate commerce.

167.     The secretary then sent the letters to Bias and Dian via email.

168.     The letters that the secretary sent to Bias and Dian were communications that Griffin and Lira intended to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely.

169.     A few minutes later, Lira wrote to the secretary again, saying "I wouldn't send any of these letters. They are lies and can come back to haunt Tom." He did not instruct her not to send the letters. When the secretary informed him that two had already gone out, Lira responded, "Tom

will have to be ready for an onslaught on inquires. They all talk and all other victims have received their compensation." Lira took no action to correct the lies in the letters.

170.    Lira's belated emails to the secretary were designed to conceal the fraud and make it appear to anyone reviewing the emails later that he had attempted to stop Girardi from lying to the clients. In fact, Lira was aware that the information in the letters would be shared among all of the Lion Air Clients, and he had the specific intent that the lulling lies in those letters would cause them all not to take action.

**March 26, 2020 to November 12, 2020 – Hatcher Lies to the Clients and Takes His Cut**
*Wire Fraud (18 U.S.C. § 1343); Transportation of Stolen Goods (18 U.S.C. § 2314)*

171.    Although Hatcher had agreed to receive 10% of the total recovery in the *Lion Air* matters as an illegal fee, that wasn't the only way he shared in the profits of the Girardi Family Enterprise. Tom also allocated him additional $50,000 payments, unconnected to work on any specific case, as a bonus for associating with the Girardi Family Enterprise to the exclusion of other law firms.

172.    On March 5, 2020, Hatcher emailed Kamon, using wire communications in interstate commerce, to request one of these $50,000 payments explicitly from client trust accounts. In the email, Hatcher told Kamon, "It would be smarter, maybe, if you paid me like I used to be paid, *right from trust*, that way I don't have to rely on the general account. Of course, I don't care LOL just suggesting" (emphasis added). At the time he sent that email, Hatcher knew that he was not legally entitled to $50,000 of any Girardi Keese client's money, and was therefore not legally entitled to be paid from any client trust account. He also knew that the payment he was requesting from the client trust was *in addition* to the illegal one-third cut of the fee that he was promised.

173.    On or about March 24, 2020, Kamon prepared check 10602 drawn on the Girardi Keese operating account at Nano Banc, payable to Wrongful Death Consultants, Inc. in the amount of $50,000. While in the State of California, Hatcher deposited the check on March 25, 2020 to his account at First Bank ending in -5538 using wire communications.

174.    On or about April 6, 2020, Kamon prepared check 10715 drawn on the Girardi Keese operating account at Nano Banc, payable to Wrongful Death Consultants, Inc. in the amount

of $50,000. While in the State of California, Hatcher deposited the check on April 14, 2020 to his account at First Bank ending in -5538 using wire communications.

175.    On or about May 22, 2020, Kamon prepared check 10979 drawn on the Girardi Keese operating account at Nano Banc, payable to Wrongful Death Consultants, Inc. in the amount of $50,000. While in the State of California, Hatcher deposited the check on or about May 27, 2020 to his account at First Bank ending in -5538 using wire communications.

176.    On or about June 19, 2020, Kamon prepared check 125460 drawn on the Girardi Keese client trust account at Torrey Pines Bank, payable to Wrongful Death Consultants, Inc. in the amount of $50,000. While in the State of California, Hatcher deposited the check on June 19, 2020 to his account at First Bank ending in -5538 using wire communications.

177.    On or about July 24, 2020, Kamon prepared check 125511 drawn on the Girardi Keese client trust account at Torrey Pines Bank, payable to Wrongful Death Consultants, Inc. in the amount of $50,000. While in the State of California, Hatcher deposited the check on July 24, 2020 to his account at First Bank ending in -5538 using wire communications.

178.    On or about August 21, 2020, Kamon prepared check 125550 drawn on the Girardi Keese client trust account at Torrey Pines Bank, payable to Wrongful Death Consultants, Inc. in the amount of $50,000. While in the State of California, Hatcher deposited the check on August 21, 2020 to his account at First Bank ending in -5538 using wire communications.

179.    First Bank is headquartered and chartered in the State of Missouri.

180.    Each of the checks listed in paragraphs 173-178 were paid with money stolen from the Lion Air Clients.

181.    At the time Kamon prepared each of the checks listed in paragraphs 173-178, Kamon knew and intended for it to be paid with money stolen from the Lion Air Clients.

182.    At the time Hatcher deposited each of the checks listed in paragraphs 170-175, Hatcher knew and intended for it to be paid with money stolen from the Lion Air Clients.

183.    While accepting funds stolen from the Lion Air Clients, Hatcher was simultaneously communicating with them via a WhatsApp group chat that included Hatcher, Bias, Septiana, Anice, Dian, Eltaher, and an Indonesian interpreter.

184.    On April 18, 2020, Hatcher and Septiana had the following colloquy in the group chat:

[4/18/20, 12:12:28 AM] George Hatcher: Yes, I read the email from Lira.
[4/18/20, 12:12:36 AM] George Hatcher: He knows I wrote Tom, he got a copy.
[4/18/20, 12:13:34 AM] Septi: Is it the wire transfer waiting Tom instruction ?
[4/18/20, 12:15:29 AM] George Hatcher: What Lira is saying that Tom has to approve the wires, he does.  Look, all of you have Lira, Keith attention now.  Wait on Tom, if he doesn't reply soon, I will write him again.
[4/18/20, 12:17:50 AM] Septi: How long we have to be waiting from tom reply
[4/18/20, 12:17:55 AM] Septi: This week
[4/18/20, 12:18:40 AM] George Hatcher: I checked all the paperwork for distribution from each of you that you sent to Jody and Keith with wire instructions.  GK has everything. I found out today from Lira that the families that GK has that accepted money from LionAir, their cases settled but Boeing hasn't sent releases yet. I assume that Boeing and their lawyers are also off.  Anyway, that has nothing to do with your cases.
[4/18/20, 12:19:43 AM] George Hatcher: You don't have to wait, write him yourself, Septi, look at my email, the address is there.  I copied even the accounting department, Kamon.  I
[4/18/20, 12:20:22 AM] George Hatcher: When I say, wait, I'm suggesting but all of you have the absolute right to communicate with your attorneys, at any time.
[4/18/20, 12:20:51 AM] Septi: Ok.I Will reply that mail
[4/18/20, 12:21:00 AM] George Hatcher: ☺
[4/18/20, 12:21:16 AM] George Hatcher: be happy, don't what you have to do...
[4/18/20, 12:21:23 AM] George Hatcher: do what you have to do
[4/18/20, 12:21:28 AM] George Hatcher: I wrote don't
[4/18/20, 12:23:05 AM] George Hatcher: This is the reason I don't get involved with the compensation payments to clients unless a mistake is made then I am asked to verify or confirm, not often. I like to be in a position where I can answer questions.  All of you should know this by now
[4/18/20, 12:25:19 AM] Septi: U are the saviour when David and lira doesnt reply our mail
[4/18/20, 12:25:21 AM] Septi: 😘
[4/18/20, 12:25:56 AM] George Hatcher: I promised all of you, I will be here for you, and I keep my promises.

185.    By this exchange, Hatcher intended to build trust with the Lion Air Clients, so that he could assist the Girardi Family Enterprise in its fraudulent scheme.

186.    On May 13, 2020, Hatcher and Anice had the following colloquy in the group chat:

[5/13/20, 12:23:23 AM] Ani Kasim Lion Air: Are you read my email?
[5/13/20, 12:23:33 AM] Ani Kasim Lion Air: Or septi's?
[5/13/20, 12:29:56 AM] George Hatcher: I read, good email.  You need to give lawyers time to reply.  As far as I know they are not working, hard to believe the office has been closed almost two months.
[5/13/20, 12:29:59 AM] George Hatcher: Never before

187.     Hatcher knew the statement "As far as I know they are not working" to be false. At the time he made that statement, Hatcher knew that Girardi Keese's office was open, that the accounting department was processing payments—including to him—and that Lira and Griffin were continuing to finalize other settlements with Boeing.

188.     Between May 14 and 16, 2020, Hatcher received copies of the three letters that Girardi and Lira sent to Bias, Dian, and Septiana. On May 16, 2020, he emailed Kamon and Lira a copy of the letter to Bias with the note, "Here is email from Bias with an attachment. This letter is about as close to an admittance of wrong as you can get."

189.     Yet to the Lion Air Families, Hatcher made no reference to any admittance of wrong. Instead, he told them on their WhatsApp chat:

> [5/20/20, 10:40:43 AM] George Hatcher: I know everyone is going to sleep now but I want to say two things, one, I make no excuses for GK's delay in disbursing your money, two, in all the years I know the firm and Tom, I've never known a client who has not gotten their money. I had one single case, one person case that was 47 million. Mohamed will tell you that he's had cases with us that disburse slow and Mohamed has been known to get crazy during the wait 🙂 but, like I write above, clients got paid.
> ***
> [5/21/20, 1:54:37 PM] George Hatcher: Tom is controversial and he's grumpy like most of us who are old but he's my friend.  He's your friend, too.

190.     Hatcher also repeatedly blamed the delays on Covid, falsely suggesting via the WhatsApp group chat that the firm was closed and unable to process payments on June 12, July 6, July 7, July 10, and July 20, 2020. In fact, Hatcher knew that the firm was open enough to make payments to him.

191.     These WhatsApp messages were intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely.

192.     Over the following months, Hatcher also intervened to talk the Lion Air Clients into repeatedly raising their concerns with members of the Enterprise instead of speaking to someone outside the Enterprise.

193.     On August 13, 2020, Hatcher convinced Septiana to send an email to Tom instead of sending one to Boeing's attorneys at Perkins Coie. Hatcher then sent an email to Tom advising Tom that he had done so.

194.     Similarly, in October 2020, Hatcher convinced Anice to agree to wait until November 29, 2020 to receive her payment. On October 30, 2020, Hatcher wrote to Tom via email, "You cannot imagine what it took to get [Anice] to agree to the November date."

195.     Hatcher also withheld pertinent information from the Lion Air Clients, despite specifically telling them he would not do so. On October 27, 2020, Hatcher sent an email to Kamon regarding Hatcher's request for a check from Girardi Keese. The email read, in relevant part:

> I hope I didn't press the wrong button when I asked for a check today, you should know that's just me.   I never leach, but I push to get paid.  You've done a lot in getting me paid and I appreciate.  Don't let my actions drive you to dislike me.  I figure when I didn't get the five thousand, Tom is pissed and told you not to pay me or it's just a bad money time.  IF IT'S JUST A BAD MONEY time I can deal with it.

196.     Kamon replied by email the next day, recounting his mother's sickness and then writing in relevant part:

> In regards to the payments, it was not Tom saying no, it's because I have payroll Friday and I need to make sure that is covered. Things are tight and I just had to make sure that's handled. Please bare with me. Fingers crossed mom will eat and I can get her outta here, and hopefully we get a few bucks in so I can get you paid.

197.     Yet on November 11, 2020, Hatcher and Bias had the following colloquy in the WhatsApp group chat:

> [11/11/20, 10:58:09 PM] bias lion air: … still no news from GK? He did not answer my email.
> [11/11/20, 11:00:21 PM] George Hatcher: Hi Bias.  Don't take it personal that he didn't reply, he's that way. Your email was no doubt printed and on his desk. I'm guessing. I haven't talked to Tom since I learned about the divorce. You did get email with a date on it and it came from him, I received a copy. I promise to get right back to you if I hear something before.  That goes for all of you.
> [11/11/20, 11:07:46 PM] bias lion air: I will send another email today.
> [11/11/20, 11:08:10 PM] George Hatcher: Do it, copy Keith.
> [11/11/20, 11:41:11 PM] George Hatcher: Thanks, Bias, I read copy of your mail to GK
> [11/11/20, 11:46:59 PM] George Hatcher: In my own life I have always found that when I'm nice and especially patient, I get more accomplished.  I wish I had an answer for all of you about the delays but I don't. Once again I say, I don't know

of a any client represented by GK that came through me or my worldwide associates who did not get their money.
[11/11/20, 11:48:04 PM] George Hatcher: If it was me, I would ask GK to pay you interest for the delays. I'm not telling you to do it, I'm saying, if it was me.
[11/11/20, 11:50:30 PM] bias lion air: I doubt that they will pay the interest they don't even explain where the money is

198.    By suggesting that Bias be patient, Hatcher intended to convince him not to take any action that would result in the discovery of the Enterprise's crimes.

199.    On November 17, 2020, again in the WhatsApp group chat, Hatcher told the group, "If I knew anything or when i know anything, I will immediately communicate it to you."

200.    This was a lie. Nearly a month before in the emails with Kamon described above, Hatcher learned that Girardi Keese was having money problems and struggling to make payroll, but he purposefully withheld that fact from the Lion Air Clients for the purpose of perpetuating the Enterprise's fraudulent scheme.

**September 9, 2020 to November 11, 2020 – Griffin's Lulling Communications to Multi Rizki**
*Wire Fraud (18 U.S.C. § 1343); Obstruction of Justice (18 U.S.C. § 1503)*

201.    Boeing wired the entirety of the settlement funds due to Multi Rizki into Girardi Keese's client trust account on June 9, 2020.

202.    On September 2, 2020, Multi emailed Griffin and Hatcher to ask about the status of his settlement and when it could be wired to him.

203.    On September 9, 2020 Griffin responded to Multi via email, using wire communications in interstate and foreign commerce. Griffin's email said: "Multi, I am doing ok. Thanks for asking. Hope you are staying safe as well. I have sent this to our accounting department and Mr. Girardi. I will let you know as soon as I have an estimate for you. Best, Keith[.]"

204.    On that date, Griffin knew that the Enterprise had stolen a substantial portion of Multi's settlement. However, because Multi's settlement had come in later than the other four Lion Air Clients, the Enterprise did not yet need to take the step of sending Multi money to keep him from going to the authorities.

205.    Multi emailed Griffin again to check the status of his settlement funds on September 24, October 1, and October 2, 2020.

206.     On October 2, 2020, Griffin responded to Multi via email, using wire communications in interstate and foreign commerce. Griffin's email read: "Multi[,] I am the only one in the office right now. As soon as I hear from Mr. Girardi and the bookkeeper I will advise. Best, Keith."

207.     Multi emailed Griffin again to check the status of his settlement funds on October 8 and 13, 2020.

208.     On October 13, 2020, Griffin responded to Multi via email, using wire communications in interstate and foreign commerce. Griffin's email read: "Multi[,] I have placed the request for status and will respond to you immediately once I have the information on disbursement. Keith"

209.     Multi emailed Griffin again to check the status of his settlement funds on October 26, 2020.

210.     On October 29, 2020, Griffin responded to Multi via email, using wire communications in interstate and foreign commerce. Griffin's email read: "Hi Multi: I am sorry that I don't have a firm answer for you yet. I am sending your request again to our accounting department and Mr. Girardi. Keith[.]"

211.     Multi emailed Griffin again to check the status of his settlement funds on November 6, 2020. This time, he included a citation to California Bar Rule 4-100, noting both that Griffin had failed to advise him of whether Girardi Keese had received his settlement funds and that his request for disbursement of those funds had not been processed, without an explanation.

212.     On November 6, 2020, Griffin responded to Multi via email, using wire communications in interstate and foreign commerce. Griffin's email read: "Hi Multi[,] I hope you are well. Unfortunately, I do not have access to the banking and account information.  However, I am personally asking our bookkeeper about whether your funds have been received by the firm.  I should know by Monday. As far as disbursements, Mr. Girardi is the only one who controls the wires and disbursements going out. I have made sure that he is aware of your inquiry. Best, Keith[.]"

213.    Multi responded to Griffin on November 9, 2020. This time, he said, "Hi Keith Thanks for your reply. I know that your firm has received the money from Boeing, and somehow you are using my money for something else. For your own benefit. That's why you guys keep silent all this time. Please convey my message to Mr. Girardi:  If I haven't received the money by the end of this week, I will notify The State Bar's office about this misconduct. http://www.calbar.ca.gov/Public/Complaints-Claims/How-to-File-A-Complaint  Regards, Multi[.]"

214.    Griffin knew that Multi's accusations were true. However, he did not say so. Instead, he responded to Multi's email on November 10, 2020 via email, using wire communications in interstate and foreign commerce. Griffin's email read, "Multi[,] I understand and I have printed your message for Mr. Girardi. I also told you that I would confirm with the accounting department that your funds were received into Girardi trust and I have received confirmation that the funds were received. I can also assure you that I have asked Mr. Girardi to send you the funds to which you are entitled. I will update you as soon as I have any further information. Best, Keith."

215.    However, Griffin didn't stop there. On or about November 11, 2020, Griffin also called Eltaher, the individual who had signed up Multi with Girardi Keese. During this phone call, Griffin was in California and Eltaher was in Virginia. On the call, Griffin asked Eltaher to speak to Multi and convince him to wait until the end of November before taking any action to report the Girardi Family Enterprise to the authorities. Griffin intended for Eltaher to do so.

216.    In the evening of November 11, 2020, Eltaher sent an email to Griffin and Hatcher that read, "Hi George, I spoke to Multi a little ago and he agreed to wait till the end of the month to receive his money and not to take any actions till then. Thank you[.]" A few hours later, Griffin forwarded the email to Tom's brother John Girardi and Girardi Keese associate Chris Aumais with the note, "FYI. Boeing client has agreed to hold off until end of month."

217.    Each of Griffin's emails to Multi after September 9, 2020, and his telephone call to Eltaher were part of the Enterprise's scheme to defraud Multi out of his settlement money. When he sent those emails, Griffin knew that some of Multi's money had already been stolen and that the Enterprise was stealing more of it every day. He was also drawing a paycheck from Girardi Keese, which represented his share of the profits from stealing Multi's settlement funds.

218.    Griffin specifically intended his emails to Multi and his phone call to Eltaher to lull Multi into a false sense of security, postpone his ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely.

219.    On December 9, 2021, during an evidentiary hearing on whether he should be held in contempt of court, Griffin gave the following false testimony in the United States District Court for the Northern District of Illinois in response to questions posed to him directly by Hon. Thomas M. Durkin from the bench:

> Q. Were any of your answers lulling in the sense you told [Multi Rizki] "Don't worry, it's on the way"?
>
> A. No. No. I was direct with him. He asked if the money had come in. I told him it did. He asked when it would be wired, and I told him as soon as Girardi approved it, and I did not lull him.

220.    Griffin knew this testimony was false at the time he gave it. Griffin intended for his false testimony to influence Judge Durkin's resolution of the contempt motion pending against him and fellow Enterprise member Lira.

## H.    Erika uses her platform to protect the Girardi Family Enterprise, and the "divorce"

221.    While the core members of the Girardi Family Enterprise were defrauding the clients and stealing their money, Erika became increasingly aware that the money was drying up and that creditors were circling her.

222.    On May 22, 2020, Erika was personally served with a subpoena to produce documents related to her assets by Joe Ruigomez, a burn victim that was suing Tom for stealing $11 million from his settlement through the Ponzi scheme.

223.    A few months later, on August 31, 2020, Erika appeared on Marie Claire's *Precious Metals* series to show off her jewelry collection. Unprompted, she bizarrely remarked, "People ask me, will you give your jewelry away? I'm like to who? No one deserves these?" She also showed off an "evil eye" necklace that she says she bought for herself, claiming it was "to me from me," when in reality, all of her spending money came from Girardi Keese through the Ponzi scheme.

224.    On September 28, 2020, Erika was personally served for the second time with a subpoena in the *Ruigomez* case requiring her "to furnish information to aid enforcement of a money judgement against you."

225.    Despite the mounting lawsuits and collection efforts, Erika continued to both defend Tom and project an image of wealth and frivolous spending when the *Housewives* cameras were rolling. But that changed on October 19, 2020, when a court entered an attachment order against Erika and Tom's property for $6 million, which marked the first time that any court in any of the cases filed against Tom over the years entered an attachment order against him.

226.    At that point, Erika knew that that the ruse was over, and it was only a matter of time before their assets were seized. She filed for divorce just two weeks later, on November 2, 2020, in a sham attempt to protect her assets from creditors. The "divorce" was timed perfectly, as just a few weeks later, the scheme was uncovered, and Tom and his firm were forced into bankruptcy by an avalanche of creditors, including clients such as the widows and orphans of the Lion Air crash, as well as lenders, and other lawyers.

227.    Erika and Tom were married for 21 years before she filed for "divorce."

**I.    The scheme is uncovered**

228.    On December 2, 2020, Plaintiff Edelson PC filed a motion for rule to show cause in the *Lion Air* case, as to why Girardi Keese should not be held in contempt of court for violating the Court's orders regarding approval of the settlement and the disbursement of the settlement funds. *See* Mot. for Rule to Show Cause, *In re Lion Air Flight JT 610 Crash*, No. 18-cv-07686, dkt. 842 (N.D. Ill. Dec. 2, 2020).

229.    On December 14, 2020, the District Court entered a civil contempt Order against Tom and Girardi Keese for violating its order to disburse settlement funds and entered a $2 million judgment against Tom, ordered his assets frozen, and referred him to the United States Attorney's Office for criminal investigation. *See id.*, dkts. 872, 879.

230.    Four days later, on December 18, 2020, involuntary bankruptcy proceedings were initiated for both Tom and Girardi Keese. *In re Thomas Vincent Girardi*, No. 2:20-bk-21020-BR (Bankr. C.D. Cal. Dec. 18, 2020); *In re Girardi Keese*, No. 2:20-bk-21022-BR (Bankr. C.D. Cal.

Dec. 18, 2020).

231.    The bankruptcy filings indicate that Girardi Keese owes more than $100 million to creditors, including Tom's personal injury clients, lenders, and other attorneys.

**J.      Erika's defense of Tom and the bizarre shifting stories about his car accident**

232.    Erika embarked on a campaign to defend Tom after the revelations of the scheme were uncovered.

233.    During the filming of the *Housewives* Season 11 Reunion episodes, Erika made several statements intended to create uncertainty about whether Tom stole money from his clients, including "I think there is a chance it is not true. Only one side of the story has been told," and "We are a long way from finding out what really happened here."[4]

234.    Erika made these statements on national television, despite knowing that Tom had already admitted to stealing the money in federal court and the State Bar of California had stripped him of his law license for misappropriating client funds.

235.    During that episode, Erika also answered a question about whether she was ever suspicious of Tom by saying "Erika was making her own money. I was doing fine." This answer is remarkable because it implies that Erika was spending her own money, rather than money given to her through Girardi Keese, which was not true.

236.    Incredibly, Erika also used her platform on the Season 11 Reunion episode to insult the victims of the scheme. When asked if she felt remorse for the victims, Erika responded by saying:

> Well, they're alleged at this point, so you still have to get to that. That's why that word is thrown around . . . This monstrosity of fuck shit is going to take a very long time. So that's all I asked for is patience . . . It will land when these people are properly compensated if they should be. You cannot just jump on the conclusion. You cannot just take one article and say "this must be gospel," we have a long way to go.

237.    While the administration of the bankruptcy estate may take "a very long time" to sort out, the issue of whether Tom stole from his personal injury clients is not an open question. Tom

---

[4]      Around this time, Erika defended Tom on social media, in one instance tweeting "Believe me, as many people say he's a villain, there are as many people that reach out to me and tell me what a great job he did for them."

1  admitted that he did, the accounting records prove that he did, and the State Bar has finally

2  recommended he be stripped of his law license. Erika, by contrast, is still trying to denigrate the

3  victims of the scheme by pretending that a court has yet to determine if they are owed any money.

4    238.   Immediately after the scheme was uncovered, Erika also began parroting a story

5  about Tom's supposed mental decline that his attorneys were advancing.

6    239.   To that end, Erika began attempting to explain away the decade-long Enterprise on

7  *Housewives* by blaming Tom's supposed mental decline on a traumatic brain injury that she says

8  Tom suffered from a 2017 car accident. She goes on to tell her castmates that "Part of true brain

9  trauma is making decisions that you wouldn't normally make."

10    240.   But the 2017 car accident was covered on *Housewives* in Season 8 and was described

11  by Erika much differently than the way she is describing it now. At that time, Erika explained on

12  the show that Tom got into a car accident and broke his ankle, adding "it was fine" and "could have

13  been so much worse." She then repeated "it could have been worse" multiple times while shaking

14  her head.

15    241.   Erika would go on to confirm this version of the story several times. For example, in

16  January 2018, a few months after the accident, Erika spoke with Michael Rapaport on the *I Am*

17  *Rapaport: Stereo Podcast*. When asked how Tom was doing, Erika replied "Perfectly healed; he's

18  great. He's good. Tom is a little superhuman in a way. He healed and he's back at it, so there you

19  go!" Two months later, in March 2018, Erika was interviewed by Jenny McCarthy on her

20  podcast *The Inner Circle*. During the interview, Jenny asked about Tom's broken ankle, and Erika

21  nonchalantly replied, "He broke his ankle, he's fine, he had three pins. He healed up so well he

22  broke the pins so he's good."

23    242.   But after the scheme was uncovered, Erika's story about the accident changed

24  dramatically. In Season 11, Episode 10 of *Housewives*, which was filmed on or around December

25  14, 2020, Erika tells a new story about Tom's 2017 car accident: that Tom drove off the side of a

26  cliff behind his home in Pasadena, was ejected from his car and rolled down a hill, causing him to

27  break his ankle, shoulder, and clavicle, lose consciousness for 12 hours, and suffer a traumatic brain

28  injury.

COMPLAINT                                    44

243.    Of course, if these new details about the car accident were true, it may have been understandable for Erika to keep them private. But by all accounts, Erika's new story appears to be fabricated. Just weeks after the accident, Tom and Erika filmed a scene in their kitchen for Season 8, Episode 9 of *Housewives*. Though his shoulder and clavicle were supposedly broken at that time, Tom was not wearing any casts, slings, or harnesses of any kind and appeared to be moving his arms and shoulders normally. Further, the Pasadena Police have no record of Tom's accident taking place and have no evidence whatsoever of the crash.

244.    Erika's bizarre new version of events made her castmates—who were still trying to make sense of the revelations—uncomfortable. For example, after the episode aired, castmate Sutton Stacke said:

> I just didn't know why we were all the sudden talking about this accident and why we're talking about this head injury. It was a confusing story. I got a little uncomfortable, I'm not gonna lie. And then I think the rest of the girls who knew this story about some car accident were hearing new information from Erika this time around.

245.    Regardless of whether her new version of the 2017 car accident is true or not, the timing of Erika's decision to provide the new details when she did—while filming on December 14, 2020—reveals that she is using her platform on *Housewives* to assist with Tom's defense.

246.    Indeed, *on the exact same day* that Erika's new version of events was filmed for *Housewives*—and months before it was aired—Tom's lawyers appeared for a hearing in the *Lion Air* case and raised issues about his mental competency for the very first time in court. When asked what happened to the Lion Air widows' and orphans' settlement money, Tom's attorneys stated that "Mr. Girardi is 81 years of age and has had issues regarding his mental competence" and requested "an opportunity to have a mental evaluation of Tom Girardi prepared."[5]

247.    The timing of Erika's decision to reveal the supposed new details about the 2017 car accident—which occurred *on the same day* that Tom's lawyers raised a mental incompetency defense for the first time—shows that Erika is colluding with Tom and likely coordinating directly with his lawyers to assist with his defense.

---

[5]    *See In re Lion Air Flight JT 610 Crash*, No. 18-cv-07686, dkt. 852 at 16:13-14; 34:23-24 (N.D. Ill. Dec. 15, 2020).

248.     In this way, Erika's participation in the scheme is ongoing and continues to this day as she colludes with Tom and uses her celebrity platform to disseminate false facts to the public, including by suggesting that the Ponzi scheme—which has been going on since at least 2010—can be blamed on a supposed traumatic brain injury that Tom sustained in 2017.

**K.     Erika leverages the scandal to further her career and stay relevant in the tabloids**

249.     Erika was in the middle of filming for *Housewives* Season 11 as news of the Ponzi scheme came to light. Though it would have been understandable for Erika to withdraw from the show, or at least choose not to talk about her legal problems on national television, she instead made the decision to leverage the scandal to further her career and stay relevant in the tabloids, meaning more exposure and a larger paycheck for her next season of performing on *Housewives*.

250.     To that end, Erika is relishing the attention, even as she is being criticized for her lack of sympathy for the victims of the Enterprise whose money she flaunted on national television as her own.

251.     On the same day that her involvement in the scheme was exposed in court filings, Erika tweeted a picture of herself to her nearly 500,000 Twitter followers captioned "High Drama." After a federal judge found that Tom had "misappropriated" at least $2 million from his Lion Air Clients, she posted a scantily clad picture of herself on Instagram for her 2.5 million followers captioned, "*Got buffoons eatin' my pu\*\*y while I watch cartoons*."

252.     In response to all the negative comments she was receiving on social media, she posted another provocative photo on Instagram captioned, "I thought about disabling comments, but you all are so gullible I just can't." At this point, Erika knows that public response to her posts is negative, but she is leveraging even the negative press to continue her career as a reality television star.

253.     As Season 11 progressed, record numbers of viewers were tuning into *Housewives* each week to watch Erika's real-life turmoil unfold on the show and she soon became the focal point of each episode. When Bravo announced that it would air a four-part reunion show for this season of *Housewives*, she tweeted: "Now what would make it 4 parts?? Me."

254.     But rather than show any remorse or compassion for the victims, she used her

platform to attack their credibility, question whether any money was actually stolen from them (even though this is an admitted fact by Tom and others), vehemently deny that she had anything to do with the scheme, and portray herself as the only true victim.

255.    Though Erika has published numerous posts making light of the Ponzi scheme, none are more insensitive that the cartoon of herself hanging on a cross that she posted on Instagram, which mocks the Lion Air victims with earrings that display the words "WIDOWS" and "ORPHANS" and a caption declaring herself the "Scapegoat":



256.    The depiction of the "WIDOWS" and "ORPHANS" earrings in the cartoon satirized the real-life $750,000 diamond earrings that Erika often flaunted on *Housewives*, and was meant to mock the idea that she ever received money stolen from Tom's clients. Though intended as a cruel joke, the Girardi Keese Bankruptcy Trustee recently discovered that the funds used to purchase Erika's $750,000 diamond earrings were, in fact, funded from a trust account holding settlement money belonging to Tom's personal injury clients. Tellingly, when the Trustee demanded that Erika turn them over to the estate so they can be used to help compensate the victims of the scheme, she initially refused to give them up.

257.    Though her social media posts are insensitive and shameful on their own, the reason that Erika continues to draw attention to this scandal is far more nefarious. Erika understands that in the world of reality television, she can leverage this scandal to stay in the tabloid press, meaning

more exposure and a larger paycheck for her next season of performing on *Housewives*. She is also in talks for a role on another reality show, *Celebrity Big Brother*, and announced that she started a hair extensions product line on the same social media channels that she is using to mock the legal proceedings and insult the victims.

**FIRST CAUSE OF ACTION**
**RACKETEERING**
**18 U.S.C. § 1962(c)**
**(Against Lira, Griffin, Kamon, and Hatcher)**

258.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

259.    The Girardi Family Enterprise is a group of individuals that was and is associated in fact for the common and shared purposes of 1) operating Girardi Keese in a manner that appears to be a legitimate plaintiffs' law firm but in fact is a vehicle to obtain settlements on behalf of injured clients then steal the settlement funds; and 2) funneling those into ventures that increased Tom and Erika's public profiles thereby permitting Girardi Keese to retain more clients and steal more money.

260.    Defendants Lira, Griffin, Kamon, and Hatcher operated (and continue to operate) the Girardi Family Enterprise together with others, including former employees of Girardi Keese.

261.    Each has participated in the operation and management of the Girardi Family Enterprise with the goal of accomplishing the same common and shared purpose.

262.    The Lion Air Clients' cases were far from the first to be fuel for the Ponzi scheme. The Girardi Family Enterprise operated in this manner for over a decade, embezzling funds from clients who settled cases against Dole, TXI Riverside Cement, Boeing, EgyptAir, Pacific Gas & Electric, Risperdal, Lockheed and others.

263.    For example, the following allegations in paragraphs 264-270 are derived from the contempt motion filed by the plaintiffs in *Allen v. Girardi Keese*, No. 2:14-cv-02721, dkts. 194-98 (C.D. Cal.) on December 9, 2015, together with supporting documents. Some of the supporting documents are redacted, but Edelson reasonably believes that these allegations will be supported by admissible evidence.

264.    On July 19, 2011, Girardi Keese settled a case on behalf of 139 women who

developed breast cancer after taking hormone replacement therapy ("HRT Claimants").

265.    On June 27, 2012, a large tranche of settlement funds for the HRT Claimants was transferred to Girardi Keese's client trust account at Torrey Pines Bank.

266.    Between June 27, 2012 and January 23, 2013, the Girardi Family Enterprise misappropriated more than $10.5 million of that money by transferring those funds from the client trust account to themselves without authorization. More than $5.8 million of those transfers occurred even before Girardi Keese told the HRT Claimants that the settlement funds had come in.

267.    Between August 24 and 27, 2012, Girardi Keese sent "interim payments" to the HRT Claimants in amounts far below what the claimants were owed. The payments came together with a letter signed by former Enterprise member James O'Callahan (now deceased), in which he falsely stated that retired California Supreme Court Justice Edward A. Panelli had approved the payments.

268.    Justice Panelli testified that he had not approved the payments. He did, however, personally accept a check for $50,000 from Girardi Keese on July 12, 2012, even though he had been hired through JAMS. On information and belief, Girardi Keese intended for that payment to be a bribe.

269.    By January 23, 2013, Girardi Keese should have been holding $11,845,210 in trust for the HRT Claimants. However, the balance of the Torrey Pines trust account was below that figure.

270.    Between January and May 2013, Girardi Keese sent out about $5.7 million worth of checks to the HRT Claimants from the Torrey Pines client trust account. However, based on the balance available in the account immediately before these checks went out, at least $4.3 million appear to have come from funds misappropriated from the proceeds of other clients' settlements.

271.    The contempt motion was denied, without prejudice, and the case settled soon thereafter. Although the motion raised well documented and serious breaches of ethical duties, as well as crimes, Plaintiff is not aware of any resulting criminal or state bar investigation.

272.    Nearly 10 years later, the Lion Air Clients were victims of the same pattern of activity as the HRT Claimants. The Girardi Family Enterprise stole their money, used it to pay themselves and former clients, and lulled them into not reporting the missing funds by sending

1  partial payments along with letters containing lies.

2  273.   As alleged in detail above, the Girardi Family Enterprise engaged in a pattern of

3  racketeering activity that included wire fraud, mail fraud, money laundering, engaging in monetary

4  transactions in property derived from specified unlawful activity, interstate transportation of stolen

5  goods, and obstruction of justice.

6  274.   As alleged in detail above, Lira, Griffin, Kamon, and Hatcher each had their own

7  roles in the Girardi Family Enterprise and maintained those roles over the years and from scheme to

8  scheme.

9  275.   Lira personally conducted the affairs of the Girardi Family Enterprise by committing

10  over a hundred predicate acts, including acts of wire fraud, mail fraud, money laundering, engaging

11  in monetary transactions in property derived from specified unlawful activity, interstate

12  transportation of stolen goods, and obstruction of justice.

13  276.   Griffin personally conducted the affairs of the Girardi Family Enterprise by

14  committing dozens of predicate acts, including acts of wire fraud, money laundering, engaging in

15  monetary transactions in property derived from specified unlawful activity, and interstate

16  transportation of stolen goods.

17  277.   Kamon personally conducted the affairs of the Girardi Family Enterprise by

18  committing hundreds of predicate acts, including acts of wire fraud, mail fraud, money laundering,

19  engaging in monetary transactions in property derived from specified unlawful activity, and

20  interstate transportation of stolen goods.

21  278.   Hatcher personally conducted the affairs of the Girardi Family Enterprise by

22  committing dozens of predicate acts, including acts of wire fraud, engaging in monetary

23  transactions in property derived from specified unlawful activity, and interstate transportation of

24  stolen goods.

25  279.   As a foreseeable and natural consequence of the Girardi Family Enterprise's

26  fraudulent scheme described above, the Anice Family, the Bias Family, the Dian Family, and the

27  Septiana Family each lost at least $500,000 of the amounts that should have been paid to them

28  under their settlements with Boeing. The Multi Family lost at least $████████.

280.     Each of the Lion Air Clients suffered other damages to their property as a result of the Girardi Family Enterprise's fraudulent scheme, including the $██████ in legal fees they paid to Girardi Keese for the privilege of being defrauded and $█████ in legal fees to their attorney Floyd Wisner incurred as a result of the fraudulent scheme.

281.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff, as assignee of the Lion Air Clients, is entitled to an award of three times the damages sustained, or no less than $██████, the costs of this action, and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**CONSPIRACY TO COMMIT RACKETEERING**
**18 U.S.C. § 1962(d)**
**(Against Lira, Griffin, Kamon, Hatcher, Wrongful Death Consultants, EJ Global, and Erika)**

282.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

283.     Even if they did not direct or manage the affairs of the Girardi Family Enterprise, Lira, Griffin, Kamon, Hatcher, Wrongful Death Consultants, EJ Global, and Erika agreed that someone would commit predicate acts as detailed above.

284.     Lira, Griffin, Kamon, Hatcher, and Erika were each aware of the essential nature and scope of the Girardi Family Enterprise, and they intended to participate in it and share in its profits.

285.     The Lion Air Clients were deprived of money that they would not otherwise have lost. As a direct and proximate result of the Defendants' racketeering activities, the Lion Air Clients have been injured through the theft of their settlement monies and payment of illegitimate attorneys' fees.

286.     As a foreseeable and natural consequence of the Girardi Family Enterprise's fraudulent scheme described above, the Anice Family, the Bias Family, the Dian Family, and the Septiana Family each lost at least $500,000 of the amounts that should have been paid to them under their settlements with Boeing. The Multi Family lost at least $██████.

287.     Each of the Lion Air Clients suffered other damages to their property as a result of the Girardi Family Enterprise's fraudulent scheme, including the $██████ in legal fees they paid to Girardi Keese for the privilege of being defrauded and ██████ in legal fees to their attorney Floyd Wisner incurred as a result of the fraudulent scheme.

288.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff, as assignee of the Lion Air Clients, is entitled an award of three times the damages sustained, or no less than $█████, the costs of this action, and reasonable attorneys' fees.

**THIRD CAUSE OF ACTION
RECEIPT OF STOLEN PROPERTY
Cal. Penal Code § 496(c)
(Against Griffin, Lira, Kamon, Hatcher, Wrongful Death Consultants, Erika, and EJ Global)**

289.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

290.    Girardi Keese embezzled a large portion of the Lion Air Clients' Boeing settlement funds from its client trust account in violation of Cal. Penal Code § 484(a).

291.    Between March and December 2020, Griffin received a salary from Girardi Keese. The money used to fund Griffin's salary was obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft, which fact Griffin knew at all relevant times.

292.    Between March and June 2020, Lira received a salary from Girardi Keese. The money used to fund Lira's salary was obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft, which fact Lira knew at all relevant times.

293.    Between March and December 2020, Kamon received a salary from Girardi Keese. The money used to fund Kamon's salary was obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft, which fact Kamon knew at all relevant times.

294.    Between March and October 2020, Wrongful Death Consultants received checks from Girardi Keese, typically in the amount of $50,000 or $5,000. The money used to fund the checks to Wrongful Death Consultants was obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft, which fact Wrongful Death Consultants knew at all relevant times.

295.    On information and belief, Wrongful Death Consultants transferred the money it received to George Hatcher or otherwise used it for the benefit of George Hatcher. When he

received the money from Wrongful Death Consultants, Hatcher knew that it was obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft.

296.   Between March and November 2020, Kamon used money obtained from funds held in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft to pay the balances of American Express credit cards or charge cards used by Erika and EJ Global.

297.   On information and belief, when they accepted payment of the American Express balances, Erika and EJ Global did so with the knowledge that the funds used to make those payments had been obtained in a manner constituting theft.

298.   The Lion Air Clients were injured by Griffin, Lira, Kamon, Wrongful Death Consultants, Hatcher, Erika, and EJ Global's receipt of the money that had been stolen from them.

299.   As assignee of the Lion Air Clients' claims, Plaintiff is entitled to three times the amount of actual damages to be proved at trial, costs of the suit, and reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING CONCEALMENT OF STOLEN PROPERTY**
**Cal. Penal Code § 496(c)**
**(Against Griffin, Lira, Kamon, Hatcher, and Wrongful Death Consultants)**

300.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

301.   Girardi Keese embezzled a large portion of the Lion Air Clients' Boeing settlement funds from its client trust account in violation of Cal. Penal Code § 484(a).

302.   Griffin, Lira, Kamon, Hatcher, and Wrongful Death Consultants each aided Girardi Keese in concealing and withholding the settlement funds from the Lion Air Clients.

303.   At the time that Griffin, Lira, and Kamon aided Girardi Keese in concealing and withholding the settlement funds from the Lion Air Clients, they knew both that Girardi Keese had embezzled the money and that their actions were unlawful.

304.   The Lion Air Clients were injured by Griffin, Lira, Kamon, Wrongful Death Consultants, and Hatcher's assistance to Girardi Keese in concealing and withholding the Boeing settlement funds.

305.   As assignee of the Lion Air Clients' claims, Plaintiff is entitled to three times the amount of actual damages to be proved at trial, costs of the suit, and reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION
### MONEY HAD AND RECEIVED
### (Against California Attorney Lending and DiNardo)

306.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

307.   California Attorney Lending and Girardi Keese entered into a promissory note on November 8, 2019 by which California Attorney Lending loaned Girardi Keese the principal amount of $8,000,000.

308.   The promissory note provided that Girardi Keese would "Execute an irrevocable letter of instruction authorizing payment directly to [California Attorney Lending] from the defendant and/or its insurer(s) of $3,500,000 from the Net Fees and Expenses due to [Girardi Keese] on the Lion Air Crash cases."

309.   The terms of this promissory note were never disclosed to the Lion Air Clients.

310.   The Lion Air Clients' settlement agreements with Boeing included terms by which a certain amount of the settlement funds would be wired directly to California Attorney Lending. Perkins Coie, as counsel for Boeing, wired portions of each settlement directly to California Attorney Lending.

311.   The entire amount of the Lion Air Clients' settlement agreements with Boeing were intended to be used for the benefit of the Lion Air Clients, either as a cash or as payment for the attorneys' fees and other costs required to obtain that cash.

312.   However, the money wired to California Attorney Lending was not used for Lion Air Clients' benefit.

313.   Although the money wired to California Attorney Lending was identified to Perkins Coie as attorneys' fees due to Girardi Keese, Girardi Keese forfeited any claim of entitlement to attorneys' fees from the Lion Air Clients by stealing their money.

314.   California Attorney Lending and DiNardo received monthly bank statements for all of Girardi Keese's bank accounts and had full access to all of Girardi Keese's books and records, and it therefore had actual or constructive knowledge of Girardi Keese's use of the Lion Air settlement funds.

315.    On information and belief, California Attorney Lending transferred some or all of the money it received from the Lion Air Clients' settlements to DiNardo.

316.    In equity and good conscience, all of the money received by California Attorney Lending and DiNardo with respect to the Lion Air Clients' settlements should be paid over to Plaintiff as assignee of the Lion Air Clients.

**SIXTH CAUSE OF ACTION**
**CONVERSION**
**(Against Kamon, Griffin, Lira, Hatcher, and Wrongful Death Consultants)**

317.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

318.    Boeing, through its counsel at Perkins Coie, wired money to Girardi Keese's client trust account at Torrey Pines Bank in the amounts and on the dates alleged above.

319.    The Lion Air Clients each own and at all times after the money was wired to Girardi Keese have had an absolute and unconditional right to possession of the amounts due to them as listed on their settlement closing statements prepared and provided by Girardi Keese.

320.    Kamon, Griffin, Lira, Hatcher, and Wrongful Death Consultants wrongfully and without authorization assumed control and ownership over all or part of the settlement monies.

321.    When they took actions to convert the Lion Air Clients' money, Kamon, Griffin, and Lira believed those actions to be unlawful.

322.    Hatcher and Wrongful Death Consultants aided and abetted Kamon, Griffin, Lira, Tom Girardi, and Girardi Keese in the unauthorized assumption of control and ownership of all or part of the settlement monies.

323.    Conversion is a strict liability tort. However, Defendants intentionally and maliciously deprived the Lion Air Clients of their property.

324.    As a direct, foreseeable, and proximate result of the conversion of the Lion Air Clients' settlement monies by the Defendants, the Lion Air Clients were damaged in an amount to be proven at trial.

325.    As assignee of the Lion Air Clients' claims, Plaintiff is entitled to an award of money damages.

326.    Kamon, Griffin, Lira, Hatcher, and Wrongful Death Consultants acted with fraud or malice, as defined by Cal. Civ. Code § 3294(c) when they assumed control and ownership over the settlement monies, and the Plaintiff is therefore also entitled to punitive and/or exemplary damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**UNLAWFUL AND UNFAIR BUSINESS PRACTICE**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(Against California Attorney Lending, Lira, and Griffin)**

327.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

328.    California's Unfair Competition Law ("UCL") prohibits both unfair and unlawful business practices and provides for restitution to any person who has lost money or property as a result of such practices.

329.    It is unlawful for an attorney or law firm to share attorneys' fees with a non-lawyer.

330.    California Attorney Lending is not an attorney or a law firm, and its CEO Paul Cody is not licensed to practice law in any jurisdiction.

331.    On January 31, 2020, Lira signed a letter that directed Perkins Coie to pay 50% of the attorneys' fees in the Lion Air Clients' cases directly to California Attorney Lending. Lira knew that this arrangement was unlawful at the time he signed the letter.

332.    Lira and Griffin then prepared the wire instructions for the Lion Air Clients' settlement agreements with Boeing that directed a portion of the settlement to be wired directly to California Attorney Lending's bank account. Lira and Griffin each failed to provide a full and fair explanation of these provisions to the Lion Air Clients.

333.    Perkins Coie wired 50% of the attorneys' fees due in the Lion Air Clients' cases directly to California Attorney Lending.

334.    Lira and Griffin then stole a substantial portion of the Lion Air Clients' recovery.

335.    California Attorney Lending received monthly bank statements for all of Girardi Keese's bank accounts and had full access to all of Girardi Keese's books and records, and it therefore had actual or constructive knowledge of Lira's theft of the Lion Air settlement funds.

336.    As a result of California Attorney Lending and Lira's unfair and unlawful business practices, the Lion Air Clients have suffered an injury in fact and lost money.

337.    As assignee of the Lion Air Clients' claims, Plaintiff is entitled to restitution and disgorgement of California Attorney Lending and Lira's profits.

**EIGHTH CAUSE OF ACTION**
**CONSUMERS LEGAL REMEDIES ACT**
**Cal. Bus. & Prof. Code § 1780**
**(Against California Attorney Lending, Griffin, and Lira)**

338.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

339.    The Lion Air Clients sought to acquire legal services from Griffin and Lira for personal and family purposes, not for any business purpose.

340.    Lira and Griffin provided legal services to the Lion Air Clients in exchange for payment.

341.    California Attorney Lending and Girardi Keese entered into a promissory note on November 8, 2019 by which California Attorney Lending loaned Girardi Keese the principal amount of $8,000,000.

342.    The promissory note provided that Girardi Keese would "Execute an irrevocable letter of instruction authorizing payment directly to [California Attorney Lending] from the defendant and/or its insurer(s) of $3,500,000 from the Net Fees and Expenses due to [Girardi Keese] on the Lion Air Crash cases."

343.    The terms of this promissory note were never disclosed to the Lion Air Clients.

344.    On January 31, 2020, Lira signed a letter that directed Perkins Coie to pay 50% of the attorneys' fees in the Lion Air Clients' cases directly to California Attorney Lending and returned it to Kelly Anthony of California Attorney Lending. That day, Anthony emailed the letter to Mack Schultz of Perkins Coie, counsel for Boeing in the *Lion Air* matters.

345.    Lira knew that this arrangement was unlawful at the time he signed the letter.

346.    On February 8, 2020, Lira and Griffin presented settlement agreements with Boeing to the Lion Air Clients for signature. Those agreements each provided that money, representing Girardi Keese's portion of attorneys' fees, would be wired directly to California Attorney Lending.

In doing so, Griffin and Lira represented to the Lion Air Clients that the transaction conferred rights upon California Attorney Lending that are prohibited by law.

347. On February 11, 2020 and again on February 28, 2020, Anthony emailed Schultz to confirm that California Attorney Lending would receive a portion of the Lion Air Clients' settlement funds.

348. The provisions in the settlement agreement and in the promissory note that provide for direct payment of a portion of the Lion Air Clients' settlement funds to California Attorney Lending are unconscionable.

349. As a result of California Attorney Lending, Griffin and Lira's use of practices described as unlawful by Cal. Civ. Code § 1770, the Lion Air Clients suffered damages.

350. As assignee of the Lion Air Clients' claims, Plaintiff is entitled to an award of actual damages, restitution, punitive damages, and any other relief the Court deems proper.

**NINTH CAUSE OF ACTION**
**DECEIT**
**(Against Griffin and Lira)**

351. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

352. Griffin and Lira represented the Lion Air Clients and owed them a duty to provide accurate information about their settlement funds.

353. Griffin and Lira knew that the Girardi Family Enterprise was systematically stealing the Lion Air Clients' settlement funds and intentionally concealed that fact from them for the purpose of continuing to defraud them.

354. Griffin and Lira also falsely stated that any delay in wiring the Lion Air Clients' funds was due to Covid, office closures, or other issues when they knew that it was, in fact, because the Girardi Family Enterprise was stealing the settlement funds.

355. The Lion Air Clients justifiably relied on Griffin and Lira's representations and omissions.

356. The Lion Air Clients have been damaged by their reliance on Griffin and Lira's representations and omissions.

357.     As assignee of the Lion Air Clients' claims, Plaintiff is entitled to damages in an amount to be proved at trial.

**TENTH CAUSE OF ACTION**
**DECEIT**
**(Against Griffin)**

358.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

359.     Griffin engaged Mohamed Eltaher to induce the Lion Air Clients into signing settlement agreements with Girardi Keese.

360.     The representation agreements provided that Girardi Keese would use their best efforts to obtain recoveries for the Lion Air Clients. Griffin intended for the Lion Air Clients to rely on Girardi Keese's promise to provide legal representation in a manner consistent with the accepted standards of the legal profession in the United States.

361.     On information and belief, at the time that Griffin engaged Eltaher to sign up clients, Griffin intended for the Girardi Family Enterprise to steal any potential settlement and attempt to pay it back later by stealing a future client's settlement. Accordingly, Griffin never intended to provide legal representation consistent with the accepted standards of the legal profession in the United States.

362.     The Lion Air Clients have been damaged by their reliance on Griffin's fraudulent promise.

363.     As assignee of the Lion Air Clients' claims, Plaintiff is entitled to damages in an amount to be proved at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Edelson PC prays for the following relief:

(a)  An award of actual damages, in an amount no less than $█████;

(b)  An award of treble damages as permitted or required by law, in an amount no less than $█████;

(c)  An award of restitution for Defendants' wrongful conduct;

(d)  An award of reasonable attorneys' fees and costs;

(e)  An  award  of  punitive  or  exemplary  damages  in  an  amount  no  less  than

1           $55,000,000;

2           (f)  An award of interest;

3           (g) The creation of a constructive trust; and

4           (h) Such other and further relief that the Court deems reasonable and just.

5

6                                   **REQUEST FOR JURY TRIAL**

7       Plaintiff demands trial by jury for all issues so triable.

8

9

10                                   Respectfully submitted,

11                                   EDELSON PC

12 Dated: July 6, 2022            By: /s/ Rafey S. Balabanian

13                                   Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com

14                                   EDELSON PC

15                                   150 California Street, 18th Floor
San Francisco, California 94111

16                                   Tel: 415. 212.9300
Fax: 415.373.9435

17                                   Jay Edelson (*pro hac vice* to be sought)
jedelson@edelson.com

18                                   J. Eli Wade-Scott (*pro hac vice* to be sought)
ewadescott@edelson.com

19                                   Alexander G. Tievsky (*pro hac vice* to be sought)
atievsky@edelson.com

20                                   EDELSON PC

21                                   350 North LaSalle, 14th Floor
Chicago, Illinois 60654

22                                   Tel: 312.589.6370
Fax: 312.589.6378

23

24

25

26

27

28