Anthony L. Lanza (Bar No. 156703)
Brodie H. Smith (Bar No. 221877)
LANZA & SMITH
A Professional Law Corporation
3 Park Plaza, Suite 1650
Irvine, California 92614-8540
Telephone (949) 221-0490
tony@lanzasmith.com
brodie@lanzasmith.com

Attorneys for George Hatcher
& Wrongful Death Consultants

# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EDELSON PC, an Illinois Professional corporation,<br><br>                Plaintiffs,<br><br>    vs.<br><br>DAVID LIRA, an individual, KEITH GRIFFIN, an individual, ERIKA GIRARDI a/k/a ERIKA JAYNE, an individual, EJ GLOBAL, LLC, a California limited liability company, CHRISTOPHER KAMON, an individual, GEORGE HATCHER, an individual, WRONGFUL DEATH CONSULTANTS, a California corporation, JOSEPH DINARDO, an individual, CALIFORNIA ATTORNEY LENDING II, INC., a New York corporation,<br>                Defendants | Case No.: 3:22-cv-03977<br><br>**DEFENDANT WRONGFUL DEATH CONSULTANTS' MOTION TO DISMISS**<br><br>Complaint Filed: July 6, 2022<br>Motion Date: November 7, 2022<br>Motion Time: 9:30 a.m.<br>Courtroom: C |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE THAT** on November 7, 2022 at 9:30 a.m., in Courtroom C in the United States District Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102-3489, the Honorable Sallie Kim presiding, Defendant Wrongful Death Consultants, a California Corporation ("WDC") will move the Court pursuant to Federal Rules of Civil Procedure 12(b)(6) and (7) to dismiss Plaintiff's complaint for failure to state a cause of action and failure to joint an indispensable party.

Specifically, Defendant requests that Plaintiff's:

1. First Claim for RICO violation of 18 U.S.C. § 1962(c) be dismissed for failure to state a claim as to Defendant Hatcher;

2. Second Claim for RICO Conspiracy pursuant to 18 U.S.C. § 1962(d) be dismissed for failure to state a claim as to Defendants Hatcher and WDC;

3. Third Claim for Receipt of Stolen Property under California Penal Code §496(c) be dismissed for failure to state a claim as to Defendants Hatcher and WDC;

4. Fourth Claim for Aiding and Abetting Concealment of Stolen Property under California Penal Code § 496(c) be dismissed for failure to state a claim as to Defendants Hatcher and WDC.

5. Sixth Claim for Conversion be dismissed for failure to state a claim as to Defendants Hatcher and WDC.

6. All Claims be dismissed for failure to join an indispensable party pursuant to Fed. R. Civ. Proc. 12(b)(7.)

Defendant WDC also joins in the Motion to Dismiss for Improper Venue filed by Defendant George Hatcher on this date.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Motion and Memorandum of Points and Authorities of George Hatcher field on this date, all pleadings and papers on file in this action, and such other matters as the Court may consider.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANZA & SMITH, PLC

Dated:  September 15, 2022

/s/ *Brodie H. Smith*
Anthony Lanza
Brodie H. Smith
Attorneys for George Hatcher
& Wrongful Death Consultants

DEFENDANT W.D.C.'S 12(B)(6) AND (7) MTD

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................8

II. RELEVANT FACTUAL ALLEGATIONS OF THE COMPLAINT............11

   A. GK's "Ponzi Scheme" Allegedly Involved *Many* Victims—
   Over More Than a Decade—Including the Lion Air Clients ......................11

   B. Edelson is Allegedly an Assignee of the Lion Air Clients' Claims ...........11

   C. Edelson Attempts to Minimize its Role ........................................12

   D. Edelson's Conclusory Allegations Against Hatcher...............................12

      1. Allegations not constituting any predicate act or legal violation ...........13

      2. Allegations of wire fraud ...................................................13

      3. Allegations of "transportation of stolen goods" .........................13

      4. No further factual allegations against Hatcher and WDC .....................13

III. ANALYSIS ..........................................................................14

   A. Plaintiff's First and Second Claims (RICO and RICO Conspiracy) fail .....14

      1. Edelson's RICO allegations lack a sufficient "pattern" .........................16

        a. Edelson fails to allege closed-ended continuity
        against Hatcher and WDC ...................................................16

        b. Edelson fails to allege open-ended continuity
        as against all Defendants ...................................................16

      2. Edelson fails to allege a viable RICO "enterprise"...............................18

        a. There is No 'enterprise' distinct from the pattern
        of racketeering activity ......................................................17

        b. There is No 'common purpose' among the members.........................18

      3. Edelson Fails to allege that Hatcher and WDC "conducted
      the affairs of" the alleged enterprise ......................................22

4. Edelson fails to allege RICO *mens rea* .................................................24

B.   The Third, Fourth, and Sixth Claims for Receipt of Stolen
Property, and Aiding and Abetting, Under Cal Penal Code 496(c),
and Conversion Fail ................................................................................25

C.   Edelson Fails to Allege Viable Damages .................................................27

D.   Edelson Fails to Join Required Parties Thomas Girardi and GK ............27

IV.   CONCLUSION .................................................................................................28

DEFENDANT W.D.C.'S 12(B)(6) AND (7) MTD

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) WDC _ Sept. 15, 2022.docx

1
2 **TABLE OF AUTHORITIES**
3 Federal Cases                                                                 Page
4
*Ashcroft v. Iqbal*, 556 U.S. 662, 678-680 (2009) ...............................................15, 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007).......................15, 21

*Boyle v. United States*, 129 S.Ct. 2237 (2009) ........................................................20

*Bridge v. Phoenix Bond & Indem. Co.* 128 S.Ct. 2134 (2008) ..............................24

*Crichton v. Golden Rule, Ins. Co.*, 576 F.3d 392 (7th Cir. 2009) ...........................23

*Duke v. Superior Court*, 18 Cal.App.5th 490, 508 (2017)........................................25

*Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F2d 873, 877 (10th Cir. 1981).........28

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998)................... 23-24

*Harrell v Peabody*, 546 Fed 2d 1227, 1229 (5th Cir 1977) ....................................29

*H.J. Inc. v. NW. Bell Tell Co.,* 492 U.S. 229, 237-38, 242 (1989) ................... 16-17

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
      431 F.3d 353, 361 (9th Cir. 2005) .................................................................14

*Local 1351 Int'l Longshoremens Ass'n v. Sea-Land Service Inc.*,
      214 F3d 566, 570 (5th Cir. 2000) .................................................................28

*Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987) ...............19

*Nastro v. D'Onofrio*, 542 F.Supp.2d 207 (D.Conn. 2008)......................................23

*Neely v. Campos,* 26 F.3d 131 (9th Cir. 1994; unpublished opinion) .....................17

*Nike v Commercial Iberica*, 20 Fed 3d 987, 991 (9th Cir 1994)............................29

*Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364 (9th Cir. 1992)........................17

*Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993) ......................................... 22-23

*Sedima, S.P.R.L v. Imrex Co.* 473 U.S. 479 (1985)...............................................14
28

6
X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) WDC _ Sept. 15, 2022.docx

*Shearin v. E.F. Hutton Group, Inc.* 885 F.2d 1162 (3d Cir. 1989) .........................15

*Ticor Title Ins. Co. v. Florida*, 937 F.2d. 447 (9th Cir. 1991)....................................18

*United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993)..............................................15

*United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) .............16

*United States v. Indelicato,* 865 F.2d 1370, 1381-1384 (2nd Cir. 1989)..................18

*United States v. Turkette*, 452 U.S. 576, 583 (1981)..................................................19

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003)....................16

*Walk v. Baltimore & Ohio R.R.*, 890 F. 2d 688, 690 (4th Cir. 1989) .......................17

*In Re WellPoint, Inc.,* 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) .....................17


Statutes

18 U.S.C. §1343.............................................................................................................13

18 U.S.C. § 1961............................................................................................................16

18 U.S.C. § 2314 ...................................................................................................... 13-14

Cal. Penal Code § 496...................................................................................................25

Cal. Rule of Professional Conduct 1.15(d)(3),(5) .....................................................26

Federal Rule of Civil Procedure 9(b)....................................................................16, 21

Federal Rule of Civil Procedure 12(b)............................................................. 15-16, 28

Federal Rule of Civil Procedure 19 .............................................................................28

RICO § 1962 ........................................................................................... 14-15, 23-24

DEFENDANT W.D.C.'S 12(B)(6) AND (7) MTD

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.  <u>INTRODUCTION</u>

Plaintiff Edelson PC ("Edelson") and the now-infamous law firm Girardi Keese ("GK") were co-counsel in a case that resulted in one of the most high-profile thefts of client money by a law firm in history. As co-counsel, Edelson and GK represented the families of the 2018 Lion Air crash of a Boeing 737 Max aircraft in Indonesia, against The Boeing Company. The case settled; and the settlement funded in early 2020. For nine months in 2020, Edelson did very little knowing that its clients' settlement money had been paid by the Boeing to its co-counsel, GK, and yet not distributed to its clients.

This case represents Plaintiff Edelson's attempt to deflect the impending legal and media storm—trying now to pass itself off as a victim rather than a liable party. Edelson, as co-counsel with GK, knew that the settlement was fully funded by Boeing for nine months while its own clients remained unpaid. Complaint, ¶¶ 96, 101 (settlement money received in March, 2020) and ¶¶228-229 (Edelson finally moves for contempt against GK in December). Edelson admits that it *knew* that the settlement agreement with Boeing required the plaintiff's legal team—which included Edelson—to "wire the [settlement] funds to a specific account 'as soon as practicable' after they were received" in March, 2020. Complaint, ¶ 100. Edelson even states that it was aware that something was wrong during this nine-month period; that it doubted GK's excuses for the delay. Complaint, ¶51.

By early 2022, both GK and its founder Thomas Girardi had long since filed bankruptcy and Edelson realized that it would be the one left "holding the bag," both legally and in the eyes of the public. Edelson would be the logical first named defendant in any inevitable lawsuit to recover the unpaid settlement. Thus, with its back against the wall, Edelson devised the cleverly malevolent plan that is manifested in this case: It "purchased" the victims' claims. See, Request for Judicial Notice (RFJN), Ex. 1.

After a pair of JAMS mediations sessions between Edelson and its own clients, the

1  Lion Air families, in early 2021, Edelson "purchased" their claims and took an

2  assignment. *Id.* By purchasing this assignment from its own victims, Edelson

3  accomplished four valuable goals simultaneously: (1) Edelson took exclusive control

4  over the inevitable fallout litigation, giving the firm the power to conveniently *omit* itself

5  as a defendant and magically appear as "Plaintiff" instead; (2) the assignment stipulated

6  that any further disputes between Edelson and its Lion Air clients would be sent to

7  private arbitration, out of the public spotlight; (3) it allowed Edelson to play the part of

8  the "good guy" to the public and media, whose interest in the Girardi fallout was

9  escalating; and (4) it gave Edelson a vehicle to potentially turn its own malfeasance into

10  *profit* via the magic of "treble damages."

11  But every plan has its flaws. Back in December, 2020, Edelson had already begun

12  to tell the story of the key nine-months (March to December, 2020) to courts in the

13  Northern District of Illinois, both in the underlying case against Boeing, and in a new

14  lawsuit similar to this case against Tom Girardi and GK. See, RFJN, Ex. 2. In these

15  initial versions of its story, Edelson was, fittingly, a central figure—as one would expect.

16  However, after Edelson purchased its own clients' claims, Edelson re-drafted the

17  story in the Complaint in this case. Suddenly Edelson's involvement in the key nine-

18  month period was *erased*. Edelson thus changed venues, seeking a do-over, and now tells

19  the story to a different court, with itself almost totally omitted. But therein lies one of the

20  problems for Edelson. Its efforts to rewrite the story without a central figure—itself—

21  creates holes and plausibility problems that Edelson struggles to fill with a patchwork of

22  boilerplate allegations overlapping with lies (contradicting its earlier versions of the

23  story, which are judicially noticeable).

24  With itself largely erased, Edelson undertakes to fill the gaps by portraying sundry

25  spouses, lenders, associate attorneys, vendors and consultants of Girardi and GK,

26  implausibly, as all conspiring together with Thomas Girardi to defraud the Lion Air

27  families. But the more Edelson tries to paint a picture of a cohesive "enterprise" among

28  the unrelated defendants, the more it turns the spotlight back on itself—co-counsel of

GK, at the center of it all and with *power to do something about it*. There is no closer connection to GK than its own co-counsel. Edelson shared jointly in GK's fiduciary duties to their mutual clients, and was the only one who could stand up in court and do something about it. Edelson owed *exactly the same duties* to the Lion Air clients as Girardi Keese. Edelson cannot say the same of George Hatcher or his company, WDC.

Edelson's Complaint, its omission of Edelson itself, and its consequent gap-filling efforts, belie the flaws in its arduously manufactured causes of action, which contradict Edelson's submissions in the courts of the Northern District of Illinois. The Complaint's tabloid style hides deficient claims, failing to plausibly allege the required elements of civil RICO, Receipt of Stolen Property, and Conversion against Defendants Hatcher and WDC. Among many other deficiencies, Edelson:

1.      Fails to allege a RICO scheme with sufficient "continuity" of predicate acts. Continuity must be judged as to each RICO Defendant individually. Edelson alleges that RICO predicate acts by Hatcher took place over, at most, eight months, from March to November, 2020.  *Yet, eight months is insufficient under Ninth Circuit law*;

2.      Fails to allege a valid RICO enterprise. For an association-in-fact enterprise, Plaintiff must allege an enterprise that exists separate and apart from the pattern of racketeering activity. Yet, Edelson alleges the enterprise as one-and-the-same with the pattern of racketeering activity;

3.      Fails to allege that Hatcher/WDC "managed or conducted" the affairs of the enterprise. Each RICO defendant must be alleged to have taken a managerial role in the alleged enterprise. A specific line of cases deal with fact patterns—as here—where the center of an alleged enterprise is a business organization, with vendors and outside consultants alleged to be part of the "enterprise." Except in rare circumstances, courts in these cases have ruled that outside vendors are not part of the enterprise. *The facts of this case are nearly identical to many other cases where outside consultants were dismissed because they could not have "managed or controlled" the affairs the enterprise*.

4.      Fails to allege valid RICO damages. Edelson allegedly "stands in the shoes"

10

of the Lion Air Clients, yet Edelson admits the Lion Air Clients have been fully paid and made whole. The Lion Air clients no longer have any damages and thus Edelson, as assignee, has no damages. Edelson confuses the concepts of assignment, subrogation, contribution and equitable indemnity. This case is not, in substance, an "assignment" case.

5.   <u>Fails to allege receipt of stolen money</u>. In a case where Edelson admits that the alleged stolen funds were comingled with the fund of "hundreds" of other clients, dating back "over a decade," Edelson, without "tracing" or some other unusual set of circumstances (not alleged here), cannot establish that (a) Hatcher or WDC *intended* to receive stolen funds, nor (b) that they *did* receive stolen funds.

6.   <u>Fails to name indispensable parties</u>. Edelson alleges a scheme at the center of which is Thomas Girardi and his law firm, Girardi Keese. Regardless of the status of those parties in the Illinois cases, nothing relieves Edelson of the duty to add indispensable parties.

## II. REVEVANT FACTUAL ALLEGATIONS OF THE COMPLAINT

For the purposes of this Motion to Dismiss only, Defendants will assume, as they must by rule, that the allegations of the Complaint can be proven. As to Hatcher and WDC, the allegations are:

### A. GK's "Ponzi Scheme" Allegedly Involved *Many* Victims—Over More Than a Decade—Including the Lion Air Clients

Although the majority of Edelson's allegations relate to the Lion Air crash case, Edelson begins by alleging that, by the time Tom Girardi and GK accepted the Lion Air case, they had already established a "Ponzi scheme" for "over a decade." Complaint ¶¶ 11, 46-49, 262. Under this Ponzi scheme, Girardi would pay older settlements with the funding from newer settlements, and so forth. Complaint ¶¶ 11, 46-49. The pre-existence of this scheme—and the allegations that *many* clients' funds were co-mingled in GK's IOLTA account—is important because it undercuts Edelson's legal claims (as

1   explained herein). In every Ponzi scheme, there are of course one or more persons who

2   are eventually left uncompensated when the scheme finally collapses. Edelson describes

3   its own Lion Air clients as among those victims. But key here are the allegations that

4   GK had been allegedly operating this Ponzi scheme for over a decade. *Id.*

5   **B. Edelson is Allegedly an Assignee of the Lion Air Clients' Claims**

6   Edelson is very clear throughout the Complaint that it stands in the shoes of its

7   clients—the Lion Air clients—from whom the firm obtained an assignment of claims.

8   Although Edelson obliquely hints that it could have its own claims against Girardi for

9   failure to honor their (illegal) fee-splitting agreement between the two firms (not timely

10  approved by the clients), Edelson is very clear that *all of the claims* in the Complaint are

11  derivative of the Lion Air clients'' alleged claims (even though the Lion Air clients

12  have been made completely whole, and have *no damages*.) Complaint, p.1, ln. 19, and

13  ¶¶ 22, 24, 281, 288, 299, 305, 316, 325, 337, 350, 357, 363. Edelson does not allege *any*

14  direct claims or damages in this lawsuit. See, e.g. Complaint, p. i ("Plaintiff Edelson PC

15  as assignee of the bereaved families whose Lion Air settlement monies were stolen

16  through the fraudulent scheme described below, brings this lawsuit…")

17  **C. Edelson Attempts to Minimize its Role**

18  Edelson next alleges that after GK acquired the Lion Air case, GK "brought in

19  Plaintiff Edelson PC to act as local counsel for the Lion Air clients." Complaint ¶ 96. In

20  a complete reversal from its otherwise similar complaint in the Northern District of

21  Illinois, Edelson now almost totally eliminates all references to its role in this process,

22  and describes what little remains as passive and minimal. Edelson still alleges, however,

23  that "the terms of their co-counsel agreement…provided that Edelson would receive

24  50% of the total fees recovered on behalf of the Lion Air Clients." *Id.* Edelson later

25  alleges that it was not paid this 50% share by Girardi and became a creditor in the

26  Girardi bankruptcy case. Complaint, ¶ 231.

27  **D. Edelson's Conclusory Allegations Against Hatcher**

28

Edelson alleges that Hatcher and his company, Wrongful Death Consultants (WDC) were "case runners"—obtaining clients for GK. Complaint, ¶ 55. Such alleged conduct is *not* a RICO predicate act.

The claim-relevant allegations against Defendant Hatcher are largely limited to a 7-page section of the Complaint entitled "**March 26, 2020 to November 12, 2020**…" Complaint ¶¶ 171-200, pp. 33-37. The sub-title to this section reveals that the RICO predicate acts alleged against Hatcher are (1) wire fraud under 18 U.S.C. §1343, and (2) Transportation of Stolen Goods, 18 U.S.C. § 2314. Complaint, p. 33. There are 7-8 other earlier paragraphs where Hatcher is mentioned, which attempt to sling mud but ultimately are not incorporated into Edelson's legal claims and do not constitute predicate acts. Complaint, ¶¶ 55-59, 135, 137. The Hatcher/WDC section of the Complaint at pages 33-37 alleges:

1.  Allegations not constituting any predicate act or legal violation

First, Edelson alleges that in the year 2020, Hatcher, *like Edelson itself*, was not being paid by GK in a timely manner. Complaint, ¶ 172. Therefore, Hatcher emailed the company's CFO, Kamon, asking for payment. Edelson alleges that Hatcher was "…not legally entitled to be paid from any client trust account." (This is an incorrect statement of the law—there is no prohibition against a law firm paying vendors from an IOLTA account. See below, and Cal. R. Prof. Conduct 1.15(c)(2). Edelson, however, never ties this allegation to any recognized RICO predicate act. It is not a predicate act nor the basis of any cause of action.)

2.  Allegations of wire fraud

Second, Edelson quotes from WhatsApp transcripts between Hatcher and the Lion Air clients from March to November, 2020, discussing why the clients had not been paid their settlement shares yet. Edelson finally concludes that these communications "were intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make

1   discovery of the Enterprise's criminal scheme less likely." Complaint, ¶ 191. These so-

2   called "lulling" communications constitute Edelson's allegations of "wire fraud."

3                   3.   Allegations of "transportation of stolen goods"

4        Third, Edelson alleges that between March and August, 2020, GK issued a series

5   of six monthly checks from two GK bank accounts—three from the operating account

6   and three from the client trust account, to WDC. Complaint, ¶¶ 173-178. Plaintiff

7   alleges that "at the time Hatcher deposited each of the checks listed in paragraphs 170-

8   175 [sic], Hatcher knew and intended for it to be paid with money stolen from the Lion

9   Air Clients." Complaint. ¶ 182. This depositing of checks, Edelson alleges, was an act

10  of "transportation of stolen goods" pursuant to 18 U.S.C. § 2314.

11                  4.   No further factual allegations against Hatcher and WDC

12       In Edelson's five causes of action against Hatcher and WDC (First Claim for

13  RICO; Second Claim for RICO Conspiracy; Third Claim for Receipt of Stolen

14  Property; Fourth Claim for Aiding and Abetting Concealment of Stolen Property; and

15  Sixth Claim for Conversion), Edelson fails to allege any additional facts. See,

16  Complaint beginning at p. 48, ¶ 258. The only references to Hatcher and WDC in these

17  five claims are (1) conclusory recitations of statutory elements and (2) incorporation of

18  earlier factual allegations summarized above. See, e.g., Complaint, ¶¶262, 274, 278.

19  Thus, the claim-relevant factual allegations against Hatcher and WDC are contained at

20  pages 33-37.

21                              III.   **ANALYSIS**

22       **A. Plaintiff's First and Second Claims (RICO and RICO Conspiracy) Fail.**

23       To adequately plead a RICO § 1962(c) claim, a plaintiff must plead: (1) conduct,

24  (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as

25  "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the

26  conduct constituting the violation. See, *Living Designs, Inc. v. E.I. Dupont de Nemours* &

27  *Co.*, 431 F.3d 353, 361 (9th Cir. 2005); *Sedima, S.P.R.L v. Imrex Co.* 473 U.S. 479

28

(1985). Each of these elements includes several sub-elements have extensive bodies of case law interpreting them. *Id.* Additionally, because the RICO statute "borrows" from certain federal criminal statutes (i.e., the "predicate acts") each element of each predicate act alleged must also be adequately alleged, including *mens rea*. *United States v. Blinder*, 10 F.3d 1468 (9ᵗʰ Cir. 1993).

  To plead a RICO *conspiracy* claim (RICO § 1962(d)), a plaintiff must allege:

    1. that a person,

    2. conspired to violate section 1962(a), (b), or (c) of the RICO statute. To plead conspiracy adequately, the plaintiff must allege:

      a. the period of the conspiracy,

      b. the object of the conspiracy,

      c. the overt acts taken in furtherance of the conspiracy,

      d. the agreement to commit predicate acts, and

      e. the knowledge that the acts were part of a pattern of racketeering activity. *Shearin v. E.F. Hutton Group, Inc.* 885 F.2d 1162 (3d Cir. 1989).

  To survive a motion to dismiss, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-680 (2009). The court must determine whether the evidentiary facts alleged in the complaint support a plausible right to relief that rises above the "speculative level." *Bell Atlantic Corp. v. Twombly, supra*, 550 U.S. at 570.

  This plausibility standard requires the factual allegations of the complaint to reveal more than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, supra*, 556 U.S. at 678. As the Supreme Court explained in *Iqbal*, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action

will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. (internal quotes and citations omitted.)

In ruling on a motion to dismiss, the Court may consider materials attached to and submitted with the complaint. *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). The Court may also take judicial notice of, and consider unattached evidence on which the complaint relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document. *Id*. A motion to dismiss a complaint or claim "grounded in fraud" under Rule 9(b) for failure to plead with particularity "is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim":

> "If insufficiently pled averments of fraud are disregarded, as they must be, in a complaint or claim grounded in fraud, there is effectively nothing left of the complaint. In that event, a motion to dismiss under Rule 12(b)(6) would obviously be granted."

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).

### 1. Edelson's RICO allegations lack a sufficient "pattern"

Under 18 U.S.C. § 1961(1), a "pattern" of racketeering activity must consist of "[a]t least two [predicate] acts of racketeering activity" within ten years of one another. 18 U.S.C. § 1961(5).  Courts have interpreted this language as including a requirement of "continuity"—that the acts of malfeasance were part of a long-term practice and pattern of the enterprise. See, *H.J. Inc. v. NW. Bell Tell Co.,* 492 U.S. 229, 237-38 (1989).  The Supreme Court in *H.J. Inc.* stated that "[t]o prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued activity." *Id.,* at 239.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."  *Id.,* at 242.

Importantly, the pattern of racketeering activity, including "continuity," *must be*

1  *established separately for each individual defendant*.  The "Plaintiff must allege at least

2  two predicate acts by each defendant." *In Re WellPoint, Inc.,* 865 F. Supp. 2d 1002, 1035

3  (C.D. Cal. 2011).

4     Courts have recognized two types of "continuity" sufficient to establish the

5  "pattern" of racketeering activity:  Closed-ended and open-ended. *H.J. Inc. v. NW. Bell*

6  *Tell Co.,* 492 U.S. 229, 237-38 (1989)

7  ### a. Edelson fails to allege <u>closed-ended</u> continuity against Hatcher

8  ### and WDC

9     In *H.J., Inc.*, the Supreme Court stated that closed-ended continuity requires proof

10  of "[a] series of related predicates extending over a substantial period of time."  *H.J.,*

11  *Inc.*, *supra,* at 242.  Generally, "what constitutes a substantial duration must of course

12  remain a matter for case-by-case determination."  *Walk v. Baltimore & Ohio R.R.*, 890 F.

13  2d 688, 690 (4th Cir. 1989).

14     However, the Ninth Circuit has stated "[w]e have found *no* case in which a court

15  has held the 'closed-ended continuity' to be satisfied by a pattern of activity lasting *less*

16  *than a year*."  *Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364 (9th Cir. 1992)

17  (emphasis added).  This was echoed in *Neely v. Campos,* 26 F.3d 131 (9th Cir. 1994;

18  unpublished opinion), holding "[t]he predicate acts in this case occurred *over a period of*

19  *nine months*.  This period of time is *not sufficient* to establish continuity over a closed

20  period of time." *Id.,* at 4.  Although courts have ostensibly declined to create a bright

21  line rule for the duration of closed-ended continuity, defendants are unaware of any case

22  that has found closed-ended continuity where the acts span less than a year—certainly

23  nothing close to six or eight months.

24     In this case, Edelson alleges two types of predicate acts against Hatcher and WDC.

25  The first is a series of WhatsApp communications—which Edelson claims constitute

26  wire fraud—spanning eight months beginning in April and ending in November, 2020.

27  Complaint, ¶¶ 184-197. Even an email allegedly sent by Hatcher mentioned earlier in the

28  Complaint also occurred within this eight month period. Complaint, ¶ 135. Emails

1    occurring over eight months time simply are insufficient to establish closed-ended RICO

2    continuity (in not only the Ninth Circuit but in every federal circuit court).

3         Edelson also alleges a second predicate act of Transportation of Stolen Goods—

4    referring to six payments, from two separate GK accounts, from March to August, 2020,

5    from GK to WDC. Complaint, ¶173-178. This six-month period (which overlaps the

6    alleged wire fraud period) is even more inadequate and simply cannot constitute closed-

7    ended continuity.

8              **b.** ***Edelson fails to allege <u>open-ended</u> continuity as against <u>all</u>***

9                   ***Defendants***

10        While duration is the key to closed-ended continuity, open-ended schemes may

11   satisfy the RICO continuity requirement regardless of their brevity. The question is

12   whether the predicate acts project a threat of *continuing* misconduct in the future. *United*

13   *States v. Indelicato,* 865 F.2d 1370, 1381-1384 (2nd Cir. 1989). Open-ended continuity is

14   established if the alleged enterprise, by its nature, would be expected to continuity its

15   activities into the future. *Ticor Title Ins. Co. v. Florida*, 937 F.2d. 447 (9th Cir. 1991).  In

16   this case, however, Edelson takes great pains to allege that the "enterprise" was centered

17   around Tom Girardi and his law firm, GK, and yet Tom Girardi is bankrupt and has lost

18   his license to practice law, and GK is defunct. Throughout the complaint, Edelson refers

19   to the "scheme" and "enterprise" in the *past tense*. See, e.g., Complaint, ¶¶ 1, 15, 16.

20   Edelson alleges that "the scheme eventually collapsed." Complaint, ¶¶ 16. It had a

21   "downfall." ¶ 1. Ironically, the apparent reason Edelson focuses so much on the past-

22   tense status of this scheme is because Edelson credits *itself* with supposedly terminating

23   the scheme. Complaint, ¶ 17 ("But even after Edelson brought the scheme to light…")

24   (In reality, it was the Judge in the underlying case in the Northern District of Illinois who

25   finally forced Edelson to act after nine months of inaction and breaches of its fiduciary

26   duties to its clients.)

27        With Edelson's allegations so deliberately focused on the "collapse" of the

28   scheme, there is no realistic possibility the alleged scheme could qualify as an open-

ended scheme. Edelson's allegation thus fail to establish a sufficient "pattern"—that is, sufficient RICO "continuity"—as against Hatcher and WDC. The RICO claims should be dismissed based on this defect alone.

2. Edelson fails to allege a viable RICO "enterprise."

Plaintiff's RICO claims fail to plausibly allege the "enterprise" element. Edelson's allegations fail to both allege an enterprise (1) *distinct from the pattern of racketeering activity*, and (2) where all members have a *common purpose*.

**a. There is *No 'enterprise' distinct from the pattern of racketeering activity*.**

A RICO enterprise must have a purpose, structure, and activities separate and apart from the alleged racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "The enterprise is not the 'pattern of racketeering activity,' it is an entity separate and apart from the pattern in which it engages." *Id.* at 583.

When an alleged enterprise is a "partnership, corporation, association, or other legal entity," the enterprise element typically is satisfied. *Id.* at 583. The courts do, however, recognize that it is possible to allege an "association-in-fact" enterprise, but such enterprises must have an *ascertainable structure that is distinct from the pattern of racketeering activity*. *Id.* The "plaintiff must plead facts that establish an association that exists other than merely to commit the predicate acts forming the pattern." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987).

In this case, Edelson's alleged "enterprise"—in their fictitious telling of the story—exists solely to commit the pattern of racketeering activity. The alleged "enterprise" is described in paragraph 49 of the Complaint:

> 49.   But the scheme always needed new money to prevent collapse. And gradually, the firm began to throw all sense of ethics and legality out the window to make sure that new cases continuously came in, and correspondingly, that no one the firm owed money to would reveal the fraud to the world. Tom relied on lawyers within his firm, the firm's accountant, and non-lawyer case referrers—operating under illegal agreements—<u>to run</u>

19

what quickly became a full-fledged criminal enterprise: the Girardi Family Enterprise. (Complaint, ¶ 49, emphasis added.)

Edelson makes attempts to define the "enterprise" in other paragraphs of the Complaint, but always in the same manner: the enterprise existed to commit the predicate acts. See, e.g. Complaint, ¶¶ 1-2, 21. Edelson thus describes the "enterprise" as one-and-the-same with the alleged "pattern of racketeering" activity. The Complaint thus fails one of the most basic tests of a valid RICO enterprise.

### b.  There is *No 'common purpose' among the members*.

The U.S. Supreme Court explained, in *Boyle v. United States*, 129 S.Ct. 2237 (2009), that an association-in-fact enterprise must have an "ascertainable structure," and that such a "structure" must have at least three components. *Boyle* resolved a circuit split, holding that "an association-in-fact enterprise must have: (1) a purpose, (2) a relationship among those associated with the enterprise, [and] (3) longevity sufficient to permit those associates to pursue the enterprise's purpose." *Id.*

The element of "commonality of purpose" (prong one) became a point of contention in multiple RICO cases following *Boyle*. The significance of the "commonality of purpose" requirement is that, because the RICO Act potentially renders each member of the enterprise liable for acts of any other member of the enterprise, the U.S. Constitution and basic notions of fairness dictate that all members of the alleged enterprise *must* have known about and intended to advance the general purpose of the enterprise. *Id.*

In this case, Edelson fails to allege a "common purpose" among the defendants alleged to constitute the Enterprise. Edelson alleges that Girardi and Erika "misappropriated client settlement money to project an image of wealth and to prop up a lifestyle made for reality TV." See, Complaint, heading at p. 9. Edelson revisits this "lifestyle" theme over and over when describing the motivations and "purpose" of Girardi and Erika. Complaint, ¶¶ Factual Background Sections B, E, G(1), H, J and K. However, the other alleged enterprise participants are *not* alleged to have participated in

1    the stealing of client money or "lavish lifestyle" goals.

2           More broadly, the Complaint alleges that the purpose was to operate a Ponzi
3    scheme. But it fails to join Hatcher and WDC in this purpose either. Notably, the
4    Complaint does *not* allege that Hatcher or WDC knew that Girardi was operating a Ponzi
5    scheme. While the Complaint accuses Hatcher and WDC of engaging in "capping" and
6    being a "client runner," which is *not* alleged to be (and clearly does not constitute) RICO
7    predicate acts, those allegations relate to GK's *acquisition* of clients, which is presented
8    merely as background.

9           The actual alleged RICO predicate acts relate to the Ponzi scheme and failure to
10   transmit settlement funds to clients. Nowhere does the Complaint allege that Hatcher or
11   WDC knew that Tom Girardi was operating a Ponzi scheme—and perhaps this is for
12   good reason. This assertion would have been inconsistent with allegations that the Ponzi
13   scheme was operated in a specific way from *within GK*. Complaint, ¶¶ 47, 53, 184, 212.
14   Rather, the allegations against Hatcher are that he (1) allegedly sought to be paid and was
15   paid for his services to the firm from the GK's bank accounts—first its operating
16   account, then its client trust account—*both* of which Edelson alleges somehow contained
17   Lion Air settlement funds, and (2) that Hatcher supposedly sent "lulling" communication
18   to buy "the Enterprise" more time. Complaint, ¶¶ 33-38, 173-178.

19          The "lulling" allegations are unbelievable on their face and fail to pass the
20   *Twombly/Iqbal* plausibility standard. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545
21   (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-680. Because these "lulling" allegations, at
22   their core, are fraud allegations, they must be alleged with particularity and plausibility.
23   Fed. R. Civ. Proc. 9(b).

24          The Complaint describes a Ponzi scheme that had been perpetrated "successfully"
25   by Tom Girardi for "*over a decade*" before it finally unraveled in 2020. If true, it
26   probably would be one of the longest-running Ponzi schemes in history. It would mean
27   that a very long chain of clients dating back over ten years had been fully *paid* their
28   settlements by Girardi. From Hatcher's vantage point in 2020, it would be logical to

21

conclude that the Lion Air clients would also be paid—just as all these other clients had been paid over the past 10 years.

However, Edelson tries to apply the advantage of retrospect to Hatcher while hypocritically *not* applying the same advantage to itself (Edelson's inaction for nine months.) In reality, perhaps for the *same reason it took Edelson nine months to file a motion against GK,* Hatcher had absolutely no reason to believe that the Lion Air clients would not be paid. Why would he? Plaintiff admits Girardi had been paying its settlements (albeit through a secret Ponzi scheme) for "over a decade." See, Complaint ¶¶ 11, 46-49, 262.[1] Viewed in that light, every allegedly "lulling" statement the Complaint attributes to Hatcher is more plausibly read as a sincere reflection of Hatcher's thoughts. Even Edelson's highly curated WhatsApp excerpts paint a picture of Hatcher as frustrated by the delay and trying to help the GK/Edelson clients. Edelson's allegation that these communications were in reality, lies, consists of nothing more than a conclusory statement to that effect. This is insufficient.

When viewed as a whole, under the *Twombly* standard, Edelson's Complaint simply fails to plausibly allege that Hatcher and WDC were working to fund Girardi's lavish lifestyle or further his Ponzi scheme. As such, Edelson has not alleged that Hatcher or WDC had a common purpose or were part of a RICO enterprise. The RICO claims thus should be dismissed as to Hatcher and WDC.

       3. <u>Edelson fails to allege that Hatcher and WDC "conducted the affairs of"</u> <u>the alleged enterprise</u>.

In *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993), the U.S. Supreme Court clarified that the RICO Act's phrase "conduct or participate…in the conduct" of an enterprise means that the defendant must have been involved in the *management* of the enterprise. *Id.* "Once we understand the word 'conduct' to require some degree of

---

[1] But see, contradictory allegations in paragraph 6: "Once a client's settlement money was funneled into the black hole that was the Girardi Keese scheme, Lira and Griffin were tasked with fending off inquiries from clients and other lawyers about why that money *never* came back out." Complaint, ¶ 6 (emphasis added). Edelson never resolves this contradiction.

direction and the word 'participate' to require some part in that direction, the meaning of § 1962(c) comes into focus." *Id.* at 179.

In *Reves*, the plaintiff alleged that the outside accountants of a RICO enterprise were in fact part of the RICO enterprise because they allegedly knew about the enterprises activities and nevertheless performed accounting work which the accounts allegedly knew would further the RICO enterprise's goals. Despite these allegations, the Supreme Court ruled that the outside accounts' role was *not* managing or conducting the enterprise. The accountants were thus dismissed from the RICO claims. The lower courts followed with similar rulings. See, e.g., *Crichton v. Golden Rule, Ins. Co.*, 576 F.3d 392 (7th Cir. 2009)"

> "Allegations that the defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice…Here, [plaintiff] has done little more than suggest the existence of the marketing relationship between Federal and Golden Rule. Assisting in the setting and collection of membership dues on the Federation's behalf and controlling the content of its own insurance promotional materials are activities <u>consistent with the existence of a business partnership, not a prototypical RICO violation</u> in which the defendant <u>seizes control of</u> an enterprise to accomplish an illegal purpose." (*Id.* at 392, emphasis added.)

In *Nastro v. D'Onofrio*, 542 F.Supp.2d 207 (D.Conn. 2008) the court held that "the Plaintiff has failed to put forth any evidence that…Defendants, in their roles as an attorney and law firm [conducted the enterprise]… [T]he performance of these duties would not make the Defendants liable even if they had knowledge of the alleged enterprise's illicit nature. Thus there was *no evidence they operated or managed* the alleged RICO enterprise." *Id.* [emphasis added.]

In cases like *Reves* and *Crichton* and *Nastro*, the courts draw a distinction between "insiders" to the organization, and "outsiders"—with the latter typically not being found to have managed or "conducted" the enterprise.

In *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998), the court

held that non-employees hired by a corporation "cannot be said to conduct the affairs of the enterpriser." *Id.* Rather, such outsiders are "best characterized as contractors hired by the enterprise." *Id.* The Goren court further explained that "simply performing services for an enterprise, *even with the knowledge of the enterprise's illicit nature, is not enough* to subject an individual to RICO liability under § 1962(c); instead *the individual must have **participated** in the **operation and management*** of the enterprise itself." *Id.* at 728 (emphasis added).

In this case there is a clear disconnect between Edelson's allegations against Hatcher/WDC compared to its general factual allegations. The former alleges Hatcher exercised some sort of control (see, ¶¶ 260, 283); but the latter clearly alleges that the "enterprise" and its Ponzi scheme was an in-house affair at the GK law firm. (see, ¶¶ 53, 109-110, 121-126). In fact, the Complaint alleges that Hatcher was an *outsider* to the firm who had no control over the affairs of the firm and had to "get in line" with the other creditors of the firm and beg for payment. Complaint, ¶ 195. In its Illinois Complaint, Edelson alleged, "On information and belief, Girardi, who exercises *exclusive and total control* over all bank accounts for GK, embezzled the settlement proceeds transferred by Boing, for his own personal use…" RFJN, ¶ 2, Illinois Complaint, ¶ 63 (emphasis added). The Complaint in *this* case thus is either or both a "sham Complaint," or fails to allege plausibly that Hatcher/WDC controlled the enterprise in any way—and should be dismissed at least as to those two Defendants.

4. Edelson fails to allege RICO *mens rea*

The RICO Act is fundamentally a criminal statute. Although section 1964(c) creates a civil cause of action, the racketeering activity giving rise to RICO liability is criminal in nature. *Bridge v. Phoenix Bond & Indem. Co.* 128 S.Ct. 2134 (2008). To be criminal, conduct must be committed with *mens rea* appropriate to the offense. *Id.*

Plaintiff's RICO claims fail to plausibly allege the *mens rea* element of a RICO claim. The "racketeering activity" allegedly committed by Hatcher is described in the Complaint as various receipt of stolen funds and wire fraud.

Sometimes what a complaint *doesn't* allege is as important as what it does. As stated above, Edelson never alleges that Hatcher knew about the Ponzi scheme—because he didn't.  Edelson seems to realize that any allegation that Hatcher knew about the Ponzi scheme wouldn't make sense in the context of the rest of the Complaint, where it is alleged that Tom Girardi was (a) in complete and exclusive control of the bank accounts, and (b) secretive about the Ponzi scheme and keeping everyone, including Hatcher and Edelson, guessing about when they might be paid. See, e.g., Complaint, ¶¶ 184, 212. The *mens rea* allegations as to the firm's financial situation are contained in paragraphs 53 and 109 and do *not* mention Hatcher or WDC. Complaint, ¶ 109.

Yet the Complaint paradoxically alleges that Hatcher sought to "postpone…[the Lion Air Clients'] discovery of the Enterprise's criminal scheme." How could Hatcher help hide a scheme he didn't know about? The answer is that Edelson variously uses the word "scheme" to refer to different acts and omissions throughout the Complaint without plausibly connecting them into a cohesive "scheme," and obfuscating its intended meaning of the word "scheme." With respect to allegations against Hatcher and WDC, the "scheme" Hatcher supposedly helped protect is limited to Hatcher being paid by GK at a time when the Lion Air clients were not paid. But the problem for Edelson is that this is simply not a recognized RICO predicate act. To the extent Edelson alleges that the mere act of accepting money from Edelson constitutes acceptance of "stolen goods"— this fatally flawed argument is addressed below.

### B. The Third, Fourth, and Sixth Claims for Receipt of Stolen Property, and Aiding and Abetting, Under Cal Penal Code 496(c), and Conversion Fail.

Plaintiff's Third, Fourth, and Sixth Claims all have at least one common element: they require that the Defendant "knew" he/she was in receipt of money or property belonging to someone else. See, Cal Penal Code § 496; *Duke v. Superior Court*, 18 Cal.App.5th 490, 508 (2017) ("to prove a cause of action for conversion, the plaintiff must show that the defendant acted intentionally to wrongfully dispose of the property of

1    another.")

2         Edelson's allegations of "knowingly" receiving stolen money are fatally deficient.

3    Paragraph 182 alleges Hatcher "intended for it [the money he received] to be paid with

4    money stolen from the Lion Air Clients." Complaint, ¶ 182. Yet this conclusory

5    allegation contradicts both logic and everything Edelson wrote both before and after it

6    about how the two GK bank accounts operated, particularly the client trust account.

7         Edelson's own allegations admit that GK had "hundreds" of clients whose

8    settlements and judgments fed money into the GK client trust account. Complaint, ¶¶

9    103-104. Nowhere in the Complaint does Edelson allege that Hatcher or WDC requested

10   that the money paid by Boeing to the Lion Air Clients be transferred to them—as if that

11   were possible with money that was *comingled* with other Clients' settlements in a single

12   account.

13        While a law firm is required to keep an accounting of the client trust account (Cal.

14   Rule of Professional Conduct 1.15(d)(3),(5)) a non-lawyer vendor of the firm has no such

15   obligation. In fact, Edelson alleges that only Tom Girardi and, arguably, Kamon,

16   controlled the client trust account. Complaint, ¶¶ 47, 53, 184, 212. The Complaint quotes

17   an excerpt from an email from Hatcher to Kamon in which Hatcher demonstrates

18   ignorance of GK's financial status (*asking* whether it's a "bad money time" for the firm.)

19   Complaint, ¶ 195. Edelson's own allegations demonstrate the implausibility of the

20   conclusory allegation that Hatcher supposedly "knew" the origin of the co-mingled,

21   electronic funds he received from GK, even if he did inquire at one point whether an

22   overdue invoice could be paid from the client trust account (which is not illegal.)

23        Moreover, even if Edelson could plausibly allege that WDC *intended* to be paid

24   from stolen funds, Edelson fails to plausibly allege that it *was*. Instead, Edelson offers

25   Paragraph 180, a single sentence which states: "Each of the checks listed in paragraphs

26   173-178 were paid with money stolen from the Lion Air Clients." Complaint, ¶ 180. This

27   lone conclusory statement is unsupported.

28        Edelson fails to explain how it could possibly reach the conclusion that the *specific*

*funds WDC actually received* originated from Boeing. This would require an explanation from Edelson describing how it traced the source of the GK funds. No tracing is explained or alleged—so "clean" funds have *not* been separated from "dirty" funds. Without tracing, paragraph 180 of the Complaint is nothing more than a conclusory and implausible allegation which this court may ignore. And without paragraph 180, both of Plaintiff's RICO predicate acts fail along with its other claims against Hatcher and WDC. The court should dismiss the Third, Fourth, and Sixth Claims as unsupported by adequate factual allegations.

### C.      Edelson Fails to Allege Viable Damages

All five of the Claims alleged against Hatcher and WDC require "damages" as an element. Yet Plaintiffs' conclusory damages allegations are contradicted by its own allegations in related cases.

Edelson alleges that it is entitled to recover damages "as the assignee of the Lion Air Clients." See, e.g., ¶¶ 281, 288. With respect to its *clients'* damages, which Edelson now purportedly asserts as assignee, Edelson recites:

> "As a foreseeable and natural consequence of the Girardi Family Enterprise's fraudulent scheme described above, the Anice Family, the Bias Family, the Dian Family, and the Septiana Family **each lost at least $500,000** of the amounts that should have been paid to them under their settlements with Boeing. The Multi Family lost at least $[redacted]." See, Complaint, ¶¶ 279, 286 (emphasis added.)

These allegations cannot be reconciled with the information Edelson submitted in the Northern District of Illinois stating that the Lion Air clients will be compensated these missing $500,000 amounts in exchange for Edelson's purchase of their claims. See, RFJN Ex. 1. Every penny of their settlements have now been paid by a combination of insurance and Edelson's purchase of their claims. *Id.* The Lion Air clients thus no longer have any damages, and as such, no longer have any claims. See, Request for Judicial Notice ("RFJN") Ex. 1, Motion for Conditional Approval of Settlement in *Edelson v. Girardi et al*, 1:20-cv-07115 (N.D. Ill), and attached Assignment Agreement.

Edelson's assignment agreement contains a choice of law clause selecting California law. See, RFJN, Ex. 1, p. 6 of Assignment Agreement. Under California law, assignment, subrogation, contribution, and equitable indemnity are four separate concepts. *Bush v. Superior Court*, 10 Cal. App. 4th 1375 (1992). The "primary rights" theory is used to distinguish between these four doctrines. *Id.* at 1384. If a Plaintiff's right has been extinguished it cannot be pursued vicariously "in the shoes of" the plaintiff as through an assignment. *Id.* Rather, because it apparently paid the $500,000 sums to its Lion Air clients, Edelson's claim, if any, would lie under a different primary right pursued on its own behalf. But Edelson makes clear in this Complaint that it brings the suit only as an assignee. See, Complaint, p. 1. For that reason, the Complaint is insufficient and fails to state a claim for lack of damages, or because the Complaint alleges an extinguished claim.

### D.      Edelson Fails to Join Required Parties Thomas Girardi and GK

Federal Rule of Civil Procedure 12(b)(7) provides that a complaint may be dismissed for "failure to join a party under Rule 19." Fed. R. Civ. Proc. 12(b)(7). Rule 19(a) in turn provides, in part:

> "(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties…" Fed. R. Civ. Proc. 19(a).

Non-named parties should be joined in a case where a judgment rendered in their absence might "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the [non-named party's] interest." *Local 1351 Int'l Longshoremens Ass'n v. Sea-Land Service Inc.*, 214 F3d 566, 570 (5th Cir. 2000). The risk involved must ordinarily be "substantial," which courts have interpreted to mean more than theoretical risk. *Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F2d 873, 877 (10th Cir. 1981).

Joint obligees are indispensable parties in an action to enforce the joint obligation.

*Nike v Commercial Iberica*, 20 Fed 3d 987, 991 (9th Cir 1994); *Harrell v Peabody*, 546 Fed 2d 1227, 1229 (5th Cir 1977). Plaintiff claims that Tom Girardi and GK are responsible for the malfeasance and the debts alleged in the complaint, and thus they are supposedly joint obligees.

There is already a similar legal action, with similar claims, pending against Thomas Girardi, GK, Lira, Griffin, and others in the Northern District of Illinois. RFJN ¶ 2, Complaint in *Edelson v. Girardi, et al*.  As the Complaint in *this* case states, Thomas Girardi and GK filed bankruptcy (Complaint, ¶¶ 230-231) and, on information and belief, there are efforts underway in these bankruptcy matters to have the debts deemed nondischargeable. Yet, regardless of the outcome of non-dischargability motions, there is a significant danger of inconsistent outcomes and obligations between the two cases.

## IV.  <u>CONCLUSION</u>

Edelson cannot seem to help dunking the ball on its own basket, alleging: "These clients didn't think they were purchasing an asset, risky or otherwise; *they thought there were buying competent legal representation* to redress a horrific injury or death of a loved one." Complaint, ¶ 10. Indeed they did, and Edelson failed to deliver. This case is nothing more than an attempt to deflect that blame. But, in trying to rewrite the story of the key nine months, now in a different District, Edelson suddenly omits itself and in the process creates a void that it struggles to fill. Edelson's half-baked void-filling efforts are at the center of the many plausibility and missing element problems in its deficient Complaint. For the foregoing reasons, the Court should grant Wrongful Death Consultant's motion to dismiss, joined by George Hatcher, and dismiss both.

LANZA & SMITH, PLC

Dated:  September 15, 2022          By:    */s/Brodie H. Smith*
                                                     Brodie H. Smith
                                                     Anthony Lanza
                                                     *Attorneys for Defendants*
                                                     *George Hatcher and W.D.C.*

**PROOF OF SERVICE**
*Edelson PC v. Lira, et al.*
USDC Case No.:  3:22-cv-03977-SK

1
2

I am a citizen of the United States, over the age of 18 years, employed in the County of Orange in the State of California, and not a party to this cause.  My business address is 3 Park Plaza, Suite 1650, Irvine, CA, 92614.

3
4
5

On **September 15, 2022**, I served a true copy of the: **DEFENDANT WRONGFUL DEATH CONSULTANTS' MOTION TO DISMISS and [PROPOSED] ORDER,** by delivering it to the person(s) indicated below in the manner as provided in FRCivP 5(b) by:

6
7
8
9

**SEE ATTACHED SERVICE LIST**

10
11
12
13

**_X    BY CM/ECF E-MAIL:** Through use of the Federal CM/EFC electronic filing system, I caused a courtesy copy of the above documents to be served by e-mail to the offices of the addressee(s).

14
15

**_____   BY E-MAIL**:  I caused the above documents to be served by e-mail to the offices of the addressee(s).

16
17

I hereby certify that I am employed in the office of a member of the Bar of this Court, United States District Court, Northern District of California.

18
19

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

20
21

Executed **September 15, 2022**, at Irvine, California.

22
23
24

*/s/ Leona Smialek*
Leona Smialek

25
26
27
28

X:\D\767-01\Pleadings\POS.doc

1

2

**SERVICE LIST**

3    Rafey Sarkis Balabanian                    *Counsel for Plaintiff Edelson PC*
     Edelson PC
4    150 California Street, 18th Floor
5    San Francisco, CA 94111
     rbalabanian@edelson.com
6

7    Alexander Glenn Tievsky                    *Counsel for Plaintiff Edelson PC*
     J. Eli Wade-Scott
8    Jay Edelson
9    Edelson PC
     350 North LaSalle, 14th Floor
10   Chicago, IL 60654
11   atievsky@edelson.com
     ewadescott@edelson.com
12   jedelson@edelson.com

13

14   Rachel Marilyn Lannen                      *Counsel for Defendant David Lira*
     Engstrom, Lipscomb & Lack
15   10100 N Santa Monica Boulevard,
     12th Floor
16   Los Angeles, CA 90067
17   rlannen@elllaw.com

18   Evan Christopher Borges                    *Counsel for Defendants Erika Girardi*
     Greenberg Gross LLP                        *aka Erika Jayne and EJ Global, LLC*
19   650 Town Center Drive, Suite 1700
20   Costa Mesa, CA 92626
     eborges@ggtriallaw.com
21

22   Jeff Wiley Poole                           *Counsel for Defendant Joseph DiNardo*
     Hamrick & Evans LLP
23   2600 West Olive Avenue, Suite 1020
24   Burbank, CA 91505
     jpoole@hamricklaw.com
25

26

27

28

X:\D\767-01\Pleadings\POS.doc

1
2
3
4
5

Richard M. Scherer , Jr.                    *Counsel for Defendant Joseph DiNardo*
Lippes Mathias Wexler Friedman LLP
50 Fountain Plaza, Suite 1700
Bufalo, NY 14202
rscherer@lippes.com

6
7
8
9

Sean Eric Ponist                            *Counsel for Defendant California*
Ponist Law Group, P.C.                      *Attorney Lending II, Inc.*
100 Pine Street, Suite 1250
San Francisco, CA 94111
sponist@ponistlaw.com

10
11
12
13
14

William F. Savino                           *Counsel for Defendant California*
Woods Oviatt Gilman LLP                     *Attorney Lending II, Inc.*
1900 Main Place Tower
350 Main Street
Buffalo, NY 14202
wsavino@woodsoviatt.com

15
16
17
18

William E Brueckner , III                   *Counsel for Defendant California*
Woods Oviatt Gilman LLP                     *Attorney Lending II, Inc.*
1900 Bausch & Lomb Place
Rochester, NY 14604
wbrueckner@woodsoviatt.com

19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE

X:\D\767-01\Pleadings\POS.doc