1  Rafey S. Balabanian (SBN 315962)
   rbalabanian@edelson.com
2  EDELSON PC
   150 California Street, 18th Floor
3  San Francisco, California 94111
   Tel: 415.212.9300
4  Fax: 415.373.9435

5  *Counsel for Plaintiff Edelson PC*

6  *[additional counsel listed on signature page]*

7

8

9               **IN THE UNITED STATES DISTRICT COURT**

10           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                    **SAN FRANCISCO DIVISION**

12

13  EDELSON PC, an Illinois professional          Case No.: 3:22-cv-03977-JSC
    corporation,
14                                                **PLAINTIFF'S CONSOLIDATED**
              *Plaintiff,*                        **OPPOSITION TO DEFENDANTS' RULE**
15                                                **12(b)(6) AND RULE 12(b)(7) MOTIONS TO**
          *v.*                                    **DISMISS**
16
    DAVID LIRA, an individual, KEITH
17  GRIFFIN, an individual, ERIKA GIRARDI         Hearing Date: December 22, 2022
    a/k/a ERIKA JAYNE, an individual, EJ          Time: 9:00 a.m.
18  GLOBAL, LLC, a California limited             Place: Courtroom 8
    liability company, CHRISTOPHER                Judge: Hon. Jacqueline Scott Corley
19  KAMON, an individual, GEORGE
    HATCHER, an individual, WRONGFUL
20  DEATH CONSULTANTS, a California
    corporation, JOSEPH DINARDO, an
21  individual, CALIFORNIA ATTORNEY
    LENDING II, INC., a New York
22  corporation,

23            *Defendants.*

24

25

26

27

28

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED ........................................................... 1

PLAINTIFF'S CONSOLIDATED OPPOSITION MEMORANDUM ....................... 2

I.    INTRODUCTION ........................................................................................... 2

II.   RELEVANT ALLEGATIONS ....................................................................... 3

III.  ARGUMENT IN OPPOSITION TO RULE 12(b)(6) MOTIONS ................ 6

      A.  Legal Standards ..................................................................................... 6

      B.  Plaintiff Adequately Alleges RICO Claims Against Hatcher and WDC. .......... 6

            1.  Enterprise ..................................................................................... 7

            2.  Participation in the Conduct of the Enterprise ........................ 9

            3.  Pattern ........................................................................................ 11

            4.  Racketeering Activity ................................................................ 13

      C.  Plaintiff Adequately Alleges RICO Conspiracy Claims Against the EG
          Defendants. ........................................................................................... 15

      D.  Plaintiff Adequately Alleges Receipt of Stolen Property Claims Against
          Hatcher, WDC, and the EG Defendants. ............................................ 17

      E.  Plaintiff Adequately Alleges Conversion Claims Against Hatcher and
          WDC. ..................................................................................................... 20

      F.  Plaintiff Adequately Alleges an Unfair Business Practices Claim Against
          CAL II. .................................................................................................. 20

      G.  Plaintiff Adequately Alleges a CLRA Claim Against CAL II. ............ 22

      H.  Plaintiff Adequately States a Claim for Money Had and Received. ...... 25

      I.   Assignment of Claims Does Not Extinguish Them. ............................ 27

IV.   ARGUMENT IN OPPOSITION TO RULE 12(b)(7) MOTIONS ............... 28

      A.  Thomas Girardi and GK are Not Necessary Parties Under Rule 19(a). ........ 29

            1.  The Court Can Accord Complete Relief Among Existing Parties
                Without Joining Tom and GK. ................................................... 29

            2.  There is No Risk of Impairing the Interests of Absent Parties, Nor is
                There a Risk of Exposing an Existing Party to Inconsistent

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Obligations.** ..................................................................................31

**B.  It is Not Feasible to Join Tom and GK to this Action Due to the 11 U.S.C. § 362(a) Automatic Stay.** ..........................................................32

**C.  Rule 19(b) Supports Allowing This Action to Proceed Among the Existing Parties.** ............................................................................32

**D.  This Action Should Not Be Stayed Pending Completion of the Bankruptcy Proceedings.** ......................................................................33

**V.      CONCLUSION** ............................................................................34

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ......................................................................6

*Beck v. Prupis,*
    529 U.S. 494 (2000) ........................................................................17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..........................................................................6

*Boyle v. United States,*
    556 U.S. 938 (2009) ..........................................................................8

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) ........................................................................12

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) .....................................................................9, 10

*Stewart Org., Inc. v. Ricoh Corp.,*
    487 U.S. 22 (1988) ..........................................................................22

**United States Appellate Court Cases**

*Allwaste, Inc. v. Hecht,*
    65 F.3d 1523 (9th Cir. 1995) ......................................................12, 13

*Baumer v. Pachl,*
    8 F.3d 1341 (9th Cir. 1993) ..................................................7, 15, 17

*Bitton v. Gencor Nutrientes, Inc.,*
    654 F. App'x 358 (9th Cir. 2016) ....................................................24

*Crichton v. Golden Rule Ins. Co,*
    576 F.3d 392 (7th Cir. 2009) ...........................................................10

*Dowie v. Fleishman-Hillard Inc.,*
    422 F. App'x 627 (9th Cir. 2011) ...............................................30, 31

*Eclectic Properties E., LLC v. Marcus & Millichap Co.,*
    751 F.3d 990 (9th Cir. 2014) ....................................................8, 14, 16

*Goren v. New Vision Int'l, Inc.,*
    156 F.3d 721 (7th Cir. 1998) .......................................................10, 11

*Howard v. Am. Online, Inc.*,
　　208 F.3d 741 (9th Cir. 2000) ...................................................................................... 7

*In re Hamilton*,
　　795 F. App'x 552 (9th Cir. 2020) ............................................................................. 33

*Janda v. T-Mobile USA, Inc.*,
　　378 F. App'x 705 (9th Cir. 2010) ............................................................................. 24

*Kearney v. Foley & Lardner, LLP*,
　　607 F. App'x 757 (9th Cir. 2015) ............................................................................. 12

*Klinkenborg Aerial Spraying & Seeding, Inc. v. Rotorcraft Dev. Corp.*,
　　690 F. App'x 540 (9th Cir. 2017) ............................................................................. 33

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
　　858 F.2d 509 (9th Cir. 1988) .................................................................................... 22

*Northrop Corp. v. McDonnell Douglas Corp.*,
　　705 F.2d 1030 (9th Cir. 1983) .................................................................................. 29

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
　　298 F.3d 768 (9th Cir. 2002) .............................................................................. 17, 29

*United States v. Bowen*,
　　172 F.3d 682 (9th Cir. 1999) .................................................................................... 31

*United States v. Christensen*,
　　828 F.3d 763 (9th Cir. 2015) ............................................................................ 7, 9, 10

*United States v. Fiander*,
　　547 F.3d 1036 (9th Cir. 2008) .................................................................................. 11

*United States v. Flores*,
　　901 F.3d 1150 (9th Cir. 2018) .................................................................................. 18

*United States v. Ritchie*,
　　342 F.3d 903 (9th Cir. 2003) .................................................................................... 21

*Verdugo-Gonzalez v. Holder*,
　　581 F.3d 1059 (9th Cir. 2009) .................................................................................. 18

*Walter v. Drayson*,
　　538 F.3d 1244 (9th Cir. 2008) .................................................................................. 10

*Ward v. Apple Inc.*,
　　791 F.3d 1041 (9th Cir. 2015) .................................................................................. 30

*Wasco Prod., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006) ............................................................................ 15

**United States District Court Cases**

*Andrade v. Station Casinos LLC*,
    No. 20-CV-06495-EMC, 2021 WL 4441990 (N.D. Cal. Mar. 22, 2021) ........................ 30

*Asis Internet Servs. V. Vistaprint USA, Inc.*,
    617 F. Supp. 2d 989 (N.D. Cal. 2009) ................................................................... 6

*Blech v. Gantman*,
    No. 18-CV-02086-JLS-JDE, 2019 WL 3240111 (C.D. Cal. Apr. 24, 2019) ................... 13

*Bokaie v. Green Earth Coffee LLC*,
    No. 18-CV-05244-JST, 2018 WL 6813212 (N.D. Cal. Dec. 27, 2018) .......................... 13

*ChinaCast Educ. Corp. v. Chen Zhou Guo*,
    No. 15-cv-05475-AB (EX), 2016 WL 6645792 (C.D. Cal. June 3, 2016) ...................... 27

*Coleman v. Sterling*,
    No. 09-cv-1594 W BGS, 2011 WL 1668956 (S.D. Cal. May 3, 2011) .......................... 26

*Drakeford v. Cap. Benefit, Inc.*,
    No. 20-CV-04161-WHO, 2022 WL 2643984 (N.D. Cal. July 8, 2022) ................... 20, 21

*Edelson PC v. Girardi*,
    No. 20 C 7115, 2021 WL 3033616 (N.D. Ill. July 19, 2021) .................................. 31, 34

*Givex USA Corp. v. Spaghetti Warehouse Rests., Inc.*,
    No. 17-cv-03730-BRO-SSX, 2017 WL 8183140 (C.D. Cal. Oct. 11, 2017) ................... 26

*Gross Belsky Alonso LLP v. Henry Edelson*,
    No. C 08-4666 SBA, 2009 WL 1505284 (N.D. Cal. May 27, 2009) .............................. 32

*Haas v. Travelex Ins. Servs. Inc.*,
    555 F. Supp. 3d 970 (C.D. Cal. 2021) ................................................................... 26

*Henderson v. J.M. Smucker Co.*,
    No. CV-10-4524-GHK-VBK, 2011 WL 1050637 (C.D. Cal. Mar. 17, 2011) ................. 23

*Huynh v. Walmart, Inc.*,
    No. 22-CV-00142-JSC, 2022 WL 3109562 (N.D. Cal. Aug. 4, 2022) ............................. 6

*Ikeda v. San Francisco Firemen Credit Union*,
    No. 20-CV-08071-TSH, 2021 WL 4776705 (N.D. Cal. Oct. 13, 2021) .......................... 29

*In re Crown Vantage, Inc.*,
    No. 02-3836-MMC, 2004 WL 1635543 (N.D. Cal. July 12, 2004) ................................ 11

*In re: Girardi*,
    No. 2:21-ap-01216-BR (Bankr. C.D. Cal. Jan. 24, 2022) .................................................. 32

*In re: Girardi Keese*,
    No. 2:21-ap-01039-BR (Bankr. C.D. Cal. May 11, 2021) ............................................... 34

*In re Lion Air Flight JT 610 Crash*,
    No. 18-cv-7686 (N.D. Ill. Apr. 5, 2022) .................................................. 2, 25, 28

*In re Nat. W. Life Ins. Deferred Annuities Litig.*,
    635 F. Supp. 2d 1170 (S.D. Cal. 2009) .......................................................... 9

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ............................................................ 17

*Jenkins v. j2 Glob., Inc.*,
    No. 13-cv-9226-DSF-MRW(x), 2014 WL 12687417 (C.D. Cal. May 23, 2014) ............. 23

*Kelley v. AW Distrib., Inc.*,
    No. 20-CV-06942-JSW, 2022 WL 1659119 (N.D. Cal. May 25, 2022) .......................... 31

*Kelmar v. Bank of Am. Corp.*,
    No. CV-12-6826-PSG, 2012 WL 12850425 C.D. Cal. Oct. 26, 2012) ........................... 10

*Logue v. Patient First Corp.*,
    No. 16-cv-1823, 2017 WL 11140438 (M.D. Pa. July 26, 2017) ................................... 22

*McVicar v. Goodman Glob., Inc.*,
    1 F. Supp. 3d 1044 (C.D. Cal. 2014) ............................................................ 23

*Nastro v. D'Onofrio*,
    542 F. Supp. 2d 207 (D. Conn. 2008) ........................................................... 10

*Nationstar Mortg. LLC v. Presley*,
    No. 20-CV-00620-JLT-BAK, 2022 WL 1616546 (E.D. Cal. May 19, 2022) ................... 7

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
    No. C 06-01686 SI, 2007 WL 205068 (N.D. Cal. Jan. 25, 2007) .................................... 32

*Parrish v. Volkswagen Grp. Of Am., Inc.*,
    463 F. Supp. 3d 1043 (C.D. Cal. 2020) .......................................................... 24

*Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*,
    No. 05-0951 PAM/RLE, 2005 WL 3526581 (D. Minn. Dec. 22, 2005) .......................... 11

*Ringler Ins. Agency v. Atlas Settlement Grp., Inc.*,
    No. 09-cv-597-DOC-MLGX, 2010 WL 11596114 (C.D. Cal. May 3, 2010) .................. 27

*Rotskoff v. Cooley*,
    No. 05-cv-0314-AG, 2008 WL 11342739 (C.D. Cal. Apr. 21, 2008) ........................25, 26

*Sandoval v. PharmaCare US, Inc.*,
    145 F. Supp. 3d 986 (S.D. Cal. 2015) ...............................................................................23

*SASCO v. Byers*,
    No. C 08-5641 JF (RS), 2009 WL 1010513 (N.D. Cal. Apr. 14, 2009) ........................30

*So v. HP, Inc.*,
    No. 22-cv-02327-BLF, 2022 WL 16925965 (N.D. Cal. Nov. 14, 2022) ........................24

*Tan v. Quick Box, LLC*,
    No. 3:20-CV-01082-H-DEB, 2021 WL 2473948 (S.D. Cal. June 16, 2021) ..................32

*Travelers Prop. Cas. Co. of Am. V. Levine*,
    No. 17-CV-07344-LB, 2018 WL 3377692 (N.D. Cal. July 11, 2018)............................30

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
    472 F. Supp. 3d 649 (N.D. Cal. 2020) ......................................................................28, 29

**State Court Cases**

*AMCO Ins. Co. v. All Sols. Ins. Agency, LLC*,
    244 Cal. App. 4th 883 (2016)..........................................................................................28

*Bush v. Superior Ct.*,
    10 Cal. App. 4th 1374 (1992)..........................................................................................28

*Duke v. Superior Ct.*,
    18 Cal. App. 5th 490 (2017)............................................................................................20

*First Nationwide Sav. V. Perry*,
    11 Cal. App. 4th 1657 (1992)..........................................................................................27

*Gutierrez v. Girardi*,
    194 Cal. App. 4th 925 (2011)..........................................................................................25

*Matter of Gordon*,
    No. 12-O-15516, 2018 WL 5801495 (Cal. Bar Ct. Oct. 31, 2018)................................22

*Siry Inv., L.P. v. Farkhondehpour*,
    13 Cal. 5th 333 (2022)....................................................................................................18

**Miscellaneous Authority**

18 U.S.C. § 1343 .........................................................................................................................14

18 U.S.C. § 1961 ...........................................................................................................................7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cal. Civ. Code § 1770 ........................................................................................ 22

Cal. Civ. Code § 1780 ...................................................................................23, 24

Cal. Lab. Code § 2802 ........................................................................................ 30

Civil L.R. 3-2.................................................................................................... 23

Fed. R. Civ. P. 9 ............................................................................................ 6, 15

Fed. R. Civ. P. 19 .....................................................................................29, 32, 33

1

**STATEMENT OF ISSUES TO BE DECIDED**

2

3   1.   Whether Plaintiff states a RICO claim against George Hatcher and RICO conspiracy claims

4        against Hatcher and Wrongful Death Consultants;

5   2.   Whether Plaintiff states a RICO conspiracy claim against Erika Girardi and EJ Global, LLC;

6   3.   Whether Plaintiff states a claim for Receipt of Stolen Property against Hatcher, Wrongful

7        Death Consultants, Erika Girardi, and EJ Global, LLC, and a claim for Aiding and Abetting

8        Concealment of Stolen Property against Hatcher and Wrongful Death Consultants;

9   4.   Whether Plaintiff states a claim for Conversion against Hatcher and Wrongful Death

10       Consultants;

11  5.   Whether Plaintiff states a claim for Unlawful and Unfair Business Practice against

12       California Attorney Lending II;

13  6.   Whether Plaintiff states a CLRA claim against California Attorney Lending II;

14  7.   Whether Plaintiff states a claim for Money Had and Received against California Attorney

15       Lending II and Joseph DiNardo;

16  8.   Whether Thomas Girardi or Girardi Keese are necessary parties such that their nonjoinder

17       requires dismissal of this action.

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S CONSOLIDATED OPPOSITION MEMORANDUM**

**I.   INTRODUCTION**

The Girardi Keese law firm was once one of the most prominent plaintiffs' firms in the country. Ultimately, it has been revealed that the true mission of the Girardi Keese firm and a number of people associated with it was not to represent clients, but to steal from them: raiding funds held in trust for clients to keep the firm afloat and to fund a larger-than-life image of wealth and power for the firm's founder and his wife, Thomas Girardi and Erika Girardi. The alleged Girardi Family Enterprise—consisting of a team of lawyers, the firm's accountant, the firm's case-runner, and the frontwoman—worked alongside lenders who also benefited from the scheme to misappropriate client funds and to defraud those clients, other lawyers, and the public. And it was incredibly successful: the criminal scheme appears to have stolen more than $100 million, and incredibly went undetected—despite *hundreds* of complaints against Girardi to the California State Bar dating back to 1982— until December 2020, when Plaintiff sought a contempt finding and filed suit against Girardi in the Northern District of Illinois. After an evidentiary hearing in December 2021, the court handling the *Lion Air* case noted that communications among other members of the Enterprise "referenced another previous instance of similar conduct," making it difficult to believe that those others were "unaware that Girardi was running a Ponzi scheme with client money, which in fact he was." *See* Dkt. 1450, *In re Lion Air Flight JT 610 Crash*, No. 18-cv-7686 (N.D. Ill. Nov. 2, 2022) ("Judge Durkin Order").

Defendants George Hatcher; Wrongful Death Consultants; Erika Girardi; EJ Global, LLC; Joseph DiNardo; and California Attorney Lending II, Inc. each move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. 41 (incorporating arguments in Dkt. 43); Dkt. 43; Dkt. 55 (in part); Dkt. 58; Dkt. 60. As discussed further below, Plaintiff's Complaint clearly details the existence of a criminal enterprise and a pattern of racketeering activity involving each Defendant who argues otherwise and alleges sufficient facts to support each of its other claims. The motions should be denied.

Defendants Keith Griffin, Erika Girardi, and EJ Global, LLC also move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(7) or, in the alternative, for a stay. *See* Dkt. 41; Dkt. 43;

Dkt. 49; Dkt. 60. These motions should likewise be denied because neither Tom Girardi nor Girardi Keese is a necessary party to this action, and Tom's and Girardi Keese's pending bankruptcy proceedings provide no basis for a stay in this action against other parties.[1]

## II.     RELEVANT ALLEGATIONS

The following paragraphs briefly summarize the allegations in the Complaint, focusing on those relevant to the motions discussed in this brief.

The "basic scheme" of the Girardi Family Enterprise was to "operat[e] Girardi Keese ("GK") in a manner that appears to be a legitimate plaintiffs' law firm but in fact is a vehicle to obtain settlements on behalf of injured clients then steal the settlement funds" and to "funnel[] those into ventures that increased Tom and Erika's public profiles thereby permitting Girardi Keese to retain more clients and steal more money." *See* Compl. ¶¶ 5, 259; *see also id.* ¶¶ 5-9 (describing the role of each Defendant). The team of case-referrer, lawyers, accountant, and frontwoman, along with the lenders who also benefited from the scheme, "maintained those roles over the years and from scheme to scheme," *id.* ¶ 274, resulting in a "decades-long fraud," *id.* ¶ 17, that "operated in a manner similar to a Ponzi scheme, but much worse" because it preyed not on investors but on injured clients seeking legal help, *id.* ¶ 10.

Hatcher and his wholly-owned company, Wrongful Death Consultants ("WDC"), knowingly entered into "unlawful referral arrangements" and "illegal contingency fee arrangements" with GK in exchange for referring clients exclusively to GK. *Id.* ¶ 57. Following the Lion Air crash, he recruited victims' families and engaged Mohamed Eltaher as a local contact, whom the Enterprise offered to pay an illegal cash referral bonus in addition to 25% of the attorneys' fees. *Id.* ¶ 83. During the *Lion Air* litigation, settlement, and afterwards, Hatcher served "as the clients' first-line point of contact," *id.* ¶ 56, sending false and misleading messages over WhatsApp to coverup the Enterprise's fraudulent scheme, to lull the Clients into thinking there were no problems with their settlement money, and to prevent the Clients from talking to anyone outside the Enterprise about the

---

[1]     Defendant David Lira has not filed a motion to dismiss for failure to state a claim. Plaintiff understands from the Baltimore City Sheriff that Defendant Christopher Kamon was served in custody on or about November 21, 2022.

delayed payments, *see, e.g.*, *id.* ¶¶ 184-200. At the same time, Hatcher was communicating with GK staff regarding partial settlement payments to the Lion Air Clients, *id.* ¶ 134-37; his own illegal payments, including sometimes directly from GK's client trust account, *id.* ¶ 172; false letters GK sent to the Clients, *id.* ¶ 188; and the fact that the GK operating account was not always solvent, *id.* ¶¶ 172, 195.

"Within the firm," Defendants David Lira and Keith Griffin managed the lawsuits and "struck the deals the firm needed to get a case to settlement," including sometimes "committing to pay out more than 100% of the available fees." *Id.* ¶ 6. Both Lira and Griffin also "were tasked with fending off inquiries from clients and other lawyers" about why payments were delayed or missing. *Id.* For example, Griffin knew that GK was sending partial payments to the Lion Air Clients while mischaracterizing it as a "loan," *id.* ¶¶ 134-37; he knew that Tom sent false letters to the Lion Air Clients, *id.* ¶¶ 156-68; he sent misleading communications to Multi Rizki long after he "knew that the Enterprise had stolen a substantial portion of Multi's settlement," *id.* ¶¶ 201-14; and he asked Eltaher to "convince [Multi] to wait until the end of November before taking any action to report the Girardi Family Enterprise to the authorities," *id.* ¶ 215. Meanwhile, Griffin drew a biweekly salary of over $10,000 from the GK payroll account, *id.* ¶ 123, despite knowing that the Lion Air Clients had not been paid and that "[t]he money used to fund [his] salary was obtained from funds held in trust for the Lion Air Clients," *id.* ¶ 291; *see also* Judge Durkin Order at 8-11.

As the "frontwoman" of the operation, Erika sold the image of GK's success to the public, *id.* ¶ 8, including by bragging about her "strong checkbook" and her "exorbitant spending habits," *id.* ¶¶ 43-44; *see also* Judge Durkin Order at 12 ("Indeed, Girardi's gaudy displays of wealth and extravagant lifestyle furthered the fiction that he and his firm were successful and solvent."). Erika is the sole owner and controller of EJ Global, LLC (together the "EG Defendants"), which she used "as a shell entity . . . for the purpose of funneling money from Girardi Keese" to her benefit. *Id.* ¶ 26. "[M]ore than $25 million of her own expenses were paid by Girardi Keese," including "more than $14 million in American Express charges that were made by Erika on a Girardi Keese card . . . , as well as more than $11 million in vendor payments that the Girardi Family Enterprise made for her benefit through the law firm." *Id.* ¶ 60. Erika knew that "the credit card bills and invoices that

1  she submitted to Girardi Keese related to her own personal expenses [] had no connection

2  whatsoever with the law firm." *Id.* ¶¶ 61-62. When asked about lawsuits against GK or about

3  money shortfalls, Erika obfuscated and misled the public. *Id.* ¶¶ 68-72. She made false statements

4  "to protect her and Tom's public image and to hold their countless other creditors at bay . . . .

5  demonstrate[ing] that Erika had specific knowledge that her financial arrangement with GK was

6  inappropriate and needed to be hidden from creditors using any means necessary." *Id.* ¶ 73. Erika

7  also signed lien agreements in 2019 showing that she knew "she and Tom were on the hook for

8  significant debt and that a lender had to be paid in full before her and Tom took any more money

9  from Girardi Keese." *Id.* ¶ 92. As recently as June 2022, "Erika opined on national television that

10  'We're not even sure that there were [Lion Air Clients] who weren't paid,'" and that there was a

11  "chance that they can be lying." *Id.* ¶ 75.

12       When the Enterprise needed additional money, it turned to Joseph DiNardo and his company

13  California Attorney Lending II ("CAL II"), in part because "by 2019, no legitimate lender wanted to

14  do business with Tom." *Id.* ¶¶ 9, 85. DiNardo knew by 2019 that the Enterprise "was stealing

15  money from Tom's clients" because he had received "copies of [GK's] monthly bank statements

16  and numerous other financial records that would have demonstrated that the firm was

17  misappropriating client settlement funds and improperly exercising control over funds held in its

18  client trust account." *Id.* ¶ 88. Nonetheless, DiNardo and CAL II provided the Enterprise with

19  additional loans "in the hopes of keeping the scheme going for long enough to recoup the money his

20  companies were owed." *Id.* ¶ 89. In exchange for the loans, "Tom agreed that [CAL II] would

21  receive 50% of the attorneys' fees from various cases when they settle, including from the Lion Air

22  Clients." *Id.* ¶ 93. CAL II and DiNardo insisted that the "settling defendants in the covered cases,"

23  including *Lion Air*, "wire [CAL II's] 50% portion of the attorneys' fees *directly* to California

24  Attorney Lending." *Id.* DiNardo knew or should have known that GK "was not actually entitled to

25  50% of the fees," or that "nothing would be left to actually fund the firm after DiNardo was paid—

26  again demonstrating that money was coming from somewhere else." *Id.* ¶ 94.

27  *//*

28

1   **III.    ARGUMENT IN OPPOSITION TO RULE 12(b)(6) MOTIONS**

2   **A.  Legal Standards**

3   On a Rule 12(b)(6) motion for failure to state a claim, dismissal is appropriate only when the

4   complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on

5   which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129

6   S. Ct. 1937, 1940, 1949 (2009) (complaint need only contain sufficient factual matter to state a

7   claim for relief that is plausible on its face: "The plausibility standard is not akin to a 'probability

8   requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

9   At this stage, the court takes all factual allegations as true and draws all reasonable inferences in

10   plaintiff's favor. *Asis Internet Servs. V. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 991 (N.D. Cal.

11   2009). For claims alleging fraud or mistake, plaintiffs "must state with particularity the

12   circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

13   person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

14   **B.  Plaintiff Adequately Alleges RICO Claims Against Hatcher and WDC.**

15   Defendant Wrongful Death Consultants moves to dismiss both the RICO conspiracy claim

16   against itself as well as both the direct RICO and RICO conspiracy claims against its owner, George

17   Hatcher. *See generally* Dkt. 43. As a threshold matter, Hatcher himself did not properly move to

18   dismiss the RICO claims against himself. Instead, WDC filed a brief explaining why it believes

19   Edelson failed to state a RICO claim against Hatcher, which Hatcher then attempted to incorporate.

20   Dkt. 41 at 2. This is improper because it effectively doubles the length of Hatcher's brief without

21   leave of court, and because WDC never explains why it has standing to seek dismissal of claims

22   against Hatcher. The Court should not permit such game-playing and should decline to consider the

23   12(b)(6) arguments made by WDC on behalf of Hatcher.

24   In any event, even if the Court does consider the arguments, they are without merit. "To

25   state a civil RICO claim, a plaintiff must allege facts showing each defendant engaged in '(1)

26   conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate

27   acts) (5) causing injury to plaintiff's business or property.'" *Huynh v. Walmart, Inc.*, No. 22-CV-

28   00142-JSC, 2022 WL 3109562, at *7 (N.D. Cal. Aug. 4, 2022) (Corley, J.) (quoting *Living Designs,*

*Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). To state a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must allege "either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). A plaintiff need not allege that a defendant "personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy." *Nationstar Mortg. LLC v. Presley*, No. 20-CV-00620-JLT-BAK, 2022 WL 1616546, at *3 (E.D. Cal. May 19, 2022). Rather, the defendant simply must "be aware of the essential nature and scope of the enterprise" and have "intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993).

WDC makes three main arguments that relate to RICO specifically. First, it contends that Plaintiff fails to allege the existence of an enterprise with a common purpose. To the contrary, the complaint details the existence of a group of people acting together to operate the Girardi Family Enterprise. Second, it contends that Plaintiff does not allege that WDC and Hatcher directed the affairs of the Girardi Family Enterprise. In fact, Plaintiff alleges that Hatcher participated in the Girardi Family Enterprise by directing its affairs, particularly by helping it gather clients and prevent those clients from reporting illegal activities to the authorities. Third, WDC insists that there is no pattern of racketeering activity, despite allegations of a pattern spanning many years. And fourth, WDC suggests that it and Hatcher did not participate in predicate acts, despite plain allegations that they participated in wire fraud and other relevant crimes.

Because Plaintiff alleges plausible facts to support each element of its RICO claims, the Court should deny WDC's motion to dismiss the RICO claims.

### 1. Enterprise

"RICO defines the term 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4). This expansive definition is not very demanding[,]" has a "wide reach," and should be "liberally construed to effectuate its remedial purposes." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (internal quotation marks omitted). "To show the existence of an enterprise . . . , plaintiffs must plead that the enterprise has (A) a common purpose,

1   (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic*

2   *Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

3      Plaintiff alleges more than sufficient facts to show an association-in-fact enterprise with "a

4   purpose, relationships among those associated with the enterprise, and longevity sufficient to permit

5   these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946

6   (2009). Lira, Griffin, Kamon, and Hatcher worked together on numerous lawsuits, *see* Compl. ¶¶

7   260-72, and the Complaint describes the roles each member played in the Enterprise. *Id.* ¶¶ 49-58

8   ("Lira and Griffin managed the law firm side . . . . Kamon was the bookkeeper . . . . [T]hey turned

9   to Hatcher to bring clients into the enterprise, and then to assist—as the client's first-line point of

10   contact—in lying to the clients and lulling them into thinking that all was well with their settlement

11   money"); *see also id.* ¶¶ 5-9 (describing each player's role in the "basic scheme"); *id.* ¶ 274

12   (alleging that they "maintained those roles over the years and from scheme to scheme"). The

13   Complaint also points to communications between Hatcher and each of the others, showing that

14   they had relationships with each other and worked together. *Id.* ¶¶ 135, 172, 188, 195, 202, 216.

15   These allegations show an "ongoing organization, formal or informal" and that "the various

16   associates function as a continuing unit." *Boyle*, 556 U.S. at 945. No more is required.

17      WDC nevertheless contends that Plaintiff fails to allege an enterprise because the "alleged

18   'enterprise' . . . exists solely to commit the pattern of racketeering activity." Dkt. 43 at 19-20. That

19   argument badly misstates the law. The Supreme Court has expressly rejected the idea "that the

20   existence of an enterprise may never be inferred from the evidence showing that persons associated

21   with the enterprise engaged in a pattern of racketeering activity[.]" *Boyle*, 556 U.S. at 947. The

22   enterprise in *Boyle*, for example, consisted of "a core group, along with others who were recruited

23   from time to time" who were responsible for about 30 similar thefts from night deposit boxes at

24   banks. *Id.* at 941. There was no suggestion that the enterprise had a purpose other than committing

25   bank robberies or any organization beyond that required to plan and commit said bank robberies.

26      Here, the key purpose of the Girardi Family Enterprise was to use lawsuits on behalf of

27   injured clients to make money illegally, and to maintain a public image of success and propriety in

28   order to retain more clients and make more money. *See* Compl. ¶ 259; *see also id.* ¶¶ 5-9

(describing the "basic scheme"). Hatcher—and by extension, his company WDC—knew of and agreed to these goals. *Id.* ¶ 59. This is not mere speculation. For example, Hatcher knew that GK sometimes paid him directly from the firm's client trust account, and he knew that the firm's operating account was not always solvent. *Id.* ¶ 172. He regularly communicated with the Lion Air Clients, "intend[ing] to build trust" so that he could assist the Enterprise in its scheme. *Id.* ¶ 185. He knew that other members of the Enterprise were lying to clients but covered up for those lies. *Id.* ¶¶ 187-88. By all of these actions, he "intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely." *Id.* ¶ 191; *see also id.* ¶ 198 ("Hatcher intended to convince [Bias] not to take any action that would result in the discovery of the Enterprise's crimes.").

It is not relevant whether Hatcher shared others' "'lavish lifestyle' goals" or whether he personally hoped for the clients to be paid eventually, *see* Dkt. 43 at 20-22, since "the common purpose element . . . does not require the enterprise participants to share all of their purposes in common." *In re Nat. W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009). Rather, "[i]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Christensen*, 828 F.3d at 780-82 (finding a valid RICO claim where alleged common purpose was "earning income through the conduct of diverse criminal activities"). The Complaint sufficiently pleads the existence of an Enterprise involving Hatcher.

### 2. Participation in the Conduct of the Enterprise

WDC next argues that Hatcher did not "participate, directly or indirectly, in the conduct of such enterprise's affairs" as required for liability under 18 U.S.C. § 1962(c), because he was an "outsider to the firm who had no control over the affairs of the firm and had to 'get in line' with the other creditors of the firm and beg for payment." Dkt. 43 at 24. But control over the GK bank accounts is far from the only criminal activity alleged to be part of the Girardi Family Enterprise's affairs.

Under *Reves v. Ernst & Young*, "*some* part in directing the enterprise's affairs is required"

for RICO liability. 507 U.S. 170, 179 (1993). Defendants need not have "primary responsibility for the enterprise's affairs," have a "formal position," or exercise "significant control," *id.* at 179 & n.4, but they must "participate in the operation or management of the enterprise," *id.* at 185. In applying this "operation or management" test, courts consider factors such as "whether the defendant occupied a position in the chain of command through which the affairs of the enterprise are conducted, whether the defendant knowingly implemented the decisions of upper management, and whether the defendant's participation was vital to the mission's success." *Kelmar v. Bank of Am. Corp.*, No. CV-12-6826-PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012), *aff'd*, 599 F. App'x 806 (9th Cir. 2015) (cleaned up); *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). RICO liability is not limited to "upper management," since "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves*, 507 U.S. at 184; *Christensen*, 828 F.3d at 781 (noting that "[t]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise").

Here, Hatcher Participated in the operation of the Enterprise by entering into an exclusivity agreement with GK, *see* Compl. ¶ 5, recruiting and referring clients to GK in exchange for illegal payments, *id.*, and then "assist[ing]—as the clients' first-line point of contact—in lying to the clients and lulling them into thinking that all was well with their settlement money," *id.* ¶ 56. Thus, while it's true that Hatcher was not "upper management" at GK, he helped implement decisions made by Tom Girardi and others by lying to the clients and convincing them not to raise concerns to anyone outside the Enterprise. *E.g.*, *id.* ¶¶ 183-200. He also "occupied a position in the chain of command," such as by recruiting Mohamed Eltaher to help solicit clients on the ground in Indonesia, *id.* ¶¶ 83, and serving as the "clients' first-line point of contact," *id.* ¶ 56. *See Kelmar*, 2012 WL 12850425, at *7. Hatcher's participation in the Enterprise was thus "vital to the mission's success," *id.* (cleaned up), and he was far more ingrained in the Enterprise's operations than "outsider," professional service providers such as the accountants in *Reves*, the insurance marketers in *Crichton v. Golden Rule Insurance Co*, 576 F.3d 392 (7th Cir. 2009), the outside law firm in *Nastro v. D'Onofrio*, 542 F. Supp. 2d 207 (D. Conn. 2008), or the service providers in *Goren v.*

*New Vision International, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998). *See* Dkt. 43 at 23-24.

In a case with similar allegations regarding "runners" or "cappers" recruiting injury victims for an insurance scam, the court found that the complaint "sufficiently describes [a defendant's] operation and management of the alleged enterprise" where the plaintiffs alleged that the defendant "was the 'face of the enterprise' in that he targeted the Hispanic community as a runner and capper and brought prospective clients to [the co-defendant clinic]." *Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*, No. 05-0951 PAM/RLE, 2005 WL 3526581, at *2 (D. Minn. Dec. 22, 2005) (noting that "[w]hen clients resisted or threatened to reveal the scheme, [the "runner" defendant] engaged in witness tampering and threatened to reveal their illegal immigration status in order to conceal the enterprise's activity"). Hatcher likewise participated in the operation of the Enterprise when he referred clients exclusively to GK in exchange for illegal payments, served as the first-line point of contact with the clients, lied to cover up the Enterprise's activities, and convinced the clients not to reveal the scheme.

As far as WDC is concerned, conspiracy liability does not require the type of direct management or control that a direct RICO claim requires. Rather, it is sufficient that the defendant "knew about and agreed to facilitate the scheme." *United States v. Fiander*, 547 F.3d 1036, 1041 (9th Cir. 2008). To the extend WDC is an entity distinct from Hatcher (and the nature of their motion to dismiss briefing strongly suggests that it isn't), the fact that WDC accepted and cashed checks that represented profits of the Enterprise's theft is sufficient to permit the conclusion that it knew about and facilitated the scheme. Compl. ¶¶ 173-74.[2]

### 3.  Pattern

WDC's only challenge regarding the "pattern of racketeering activity" element is that the

---

[2]     Plaintiff's Complaint alleges that Wrongful Death Consultants is "owned and controlled exclusively by George Hatcher," Compl. ¶ 31, so the allegations regarding Hatcher's knowledge of the Enterprise's purpose and his agreement to participate in it may be imputed to WDC as well. *See In re Crown Vantage, Inc.*, No. 02-3836-MMC, 2004 WL 1635543, at *5 (N.D. Cal. July 12, 2004), *aff'd sub nom. Crown Paper Liquidating Tr. v. Pricewaterhousecoopers LLP*, 198 F. App'x 597 (9th Cir. 2006) ("The knowledge of a corporation's sole shareholder is legally imputed to the corporation."). Neither Hatcher nor WDC argues otherwise in their motions to dismiss.

1    Complaint failed to allege "continuity." Dkt. 43 at 16-19. To show a pattern of racketeering activity,

2    a plaintiff must allege that the predicate acts are "related, and that they amount to or pose a threat of

3    continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Continuity

4    can be showed either by a "closed period of repeated conduct" (*i.e.*, closed-ended continuity) or by

5    "past conduct that by its nature projects into the future with a threat of repetition" (*i.e.*, open-ended

6    continuity). *Id.* at 241. The requirement is designed to ensure that RICO is used in the way

7    Congress intended: to fight "long-term criminal conduct." *See id.* at 242.

8         Regarding closed-ended continuity, the Complaint alleges that the Girardi Family

9    Enterprise—which is defined to include Hatcher—operated a Ponzi scheme for "over a decade,

10   embezzling funds from clients who settled cases against Dole, TXI Riverside Cement, Boeing,

11   EgyptAir, Pacific Gas & Electric, Risperdal, Lockheed and others." Compl. ¶¶ 262-72. Hatcher's

12   and WDC's receipt of multiple $50,000 payments from GK that were unconnected to the *Lion Air*

13   case—or any other case—is sufficient to permit the conclusion that Hatcher and WDC's

14   involvement with the Girardi Family Enterprise was deeper and longer-lasting than just the *Lion Air*

15   fraud. *Id.* ¶¶ 171-82; *see also id.* ¶ 189 (Hatcher discussing "all the years I know the firm and

16   Tom"). Even looking only at the Enterprise's conduct regarding the *Lion Air* case, the Complaint

17   alleges that Hatcher recruited victims' families and referred them to GK "immediately" after the

18   Lion Air plane crash in October 2018, *see id.* ¶¶ 81-82, and that Hatcher lied to the clients over

19   WhatsApp on November 17, 2020, *id.* ¶¶ 199-200. Therefore, Hatcher's and the Enterprise's pattern

20   of racketeering activity was conducted over a "substantial period of time." *H.J.*, 492 U.S. at 242;

21   *Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 759 (9th Cir. 2015) ("More than two years

22   amounts to a substantial period of time to satisfy the closed-ended continuity requirement.");

23   *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) ("thirteen months . . . . would have

24   demonstrated that the criminal activity spanned a 'substantial period of time'").

25        In any event, Plaintiff's Complaint also satisfies the requirement of open-ended continuity

26   because it alleges that the Enterprise's racketeering actions had a "threat of repetition" and were

27   also the Enterprise's "regular way of doing business." *H.J.*, 492 U.S. at 242. For instance, the

28   Complaint describes the "basic scheme" the Enterprise followed to bring in clients, reach

settlements, and embezzle client money. Compl. ¶¶ 5-9. It also alleges that the Enterprise operated its Ponzi scheme "time and time again," *id.* ¶ 11, that the goals of the Enterprise were to "operate[e] Girardi Keese in a manner that appears to be a legitimate plaintiffs' law firm but in fact is a vehicle to obtain settlements . . . then steal the settlement funds," and to "permit[] Girardi Keese to retain more clients and steal more money," *id.* ¶ 259. The Complaint thus alleges that the Ponzi scheme was GK's and the Enterprise's "regular way of doing business" and that the Enterprise intended to—and did—repeat the scheme over and over again. *See id.* ¶¶ 262-71 (detailing a scheme similar to the *Lion Air* scheme that GK conducted several years prior).

Hatcher's argument that "there is no realistic possibility the alleged scheme could qualify as an open-ended scheme" because "Tom Girardi is bankrupt," "GK is defunct," and "the scheme eventually collapsed" can easily be disregarded. Dkt. 43 at 18-19. "Open-ended continuity is determined based not on whether [the] activity is literally ongoing at the present time, but on whether at the time of the activity there was a 'threat of repetition.'" *Bokaie v. Green Earth Coffee LLC*, No. 18-CV-05244-JST, 2018 WL 6813212, at *5 (N.D. Cal. Dec. 27, 2018); *Blech v. Gantman*, No. 18-CV-02086-JLS-JDE, 2019 WL 3240111, at *7 (C.D. Cal. Apr. 24, 2019). Hatcher's proposed version of the open-ended continuity requirement would make no sense, since it would preclude RICO liability for criminal enterprises whose activities collapsed when the participants were, for instance, arrested. *See Allwaste*, 65 F.3d at 1529 (adopting Sixth Circuit holding that "fortuitous interruption of criminal acts does not preclude a finding of open-ended continuity"). Just like the defendants in *Allwaste*, if the Girardi Family Enterprise had not been "fortuitously interrupted . . . , the predicate acts could have recurred indefinitely." *Id.* at 1530. Plaintiff adequately alleges open-ended continuity.

### 4. Racketeering Activity

In the twenty pages Hatcher and WDC submit on the Rule 12(b)(6) motion to dismiss, they spends little time discussing the allegations of underlying racketeering activity in the Complaint— *i.e.*, "acts of wire fraud, engaging in monetary transactions in property derived from specified unlawful activity, and interstate transportation of stolen goods." Compl. ¶ 278. In addition to the allegations related to stolen goods, *e.g.*, *id.*, the multiple alleged wire fraud violations by themselves

1    constitute a pattern of racketeering activity.

2        Wire fraud claims under 18 U.S.C. § 1343 have three elements: (1) the formation of a

3    scheme to defraud, (2) the use of interstate wires in furtherance of that scheme, and (3) the specific

4    intent to defraud. *Eclectic Props.*, 751 F.3d at 997. "The intent to defraud may be inferred from a

5    defendant's statements and conduct. In the absence of direct evidence of intent, the party asserting

6    fraud must first prove the existence of a scheme which was reasonably calculated to deceive persons

7    of ordinary prudence and comprehension, and then, by examining the scheme itself the court may

8    infer a defendant's specific intent to defraud." *Id.* (internal citations and quotation marks omitted).

9    Allegations of wire fraud also must satisfy the heightened pleading requirements of Rule 9(b). *Id.* at

10   995 n.5 (noting that the "circumstances constituting fraud" must be alleged with particularity, but

11   "fraudulent intent" may be alleged generally).

12       Hatcher's only arguments regarding the alleged wire fraud are that "[t]he 'lulling'

13   allegations are unbelievable on their face and fail to pass the *Twombly/Iqbal* plausibility standard,"

14   Dkt. 43 at 21-22, and that Hatcher could not have had the requisite intent to defraud, *id.* at 25

15   ("How could Hatcher help hide a scheme he didn't know about?"). These conclusory arguments fall

16   flat since Plaintiff's allegations establish a reasonable inference that Hatcher intended—at the

17   least—to participate in a "scheme which was reasonably calculated to deceive persons of ordinary

18   prudence and comprehension." *Eclectic Props*, 751 F.3d at 997.

19       As discussed above, the Complaint alleges that Hatcher knew that GK repeatedly entered

20   into illegal payment arrangements, *see* Compl. ¶¶ 55-58, 172, that he knew GK repeatedly delayed

21   (at best) paying clients their settlement funds, *id.* ¶¶ 189 (Hatcher telling the Lion Air Clients,

22   "Mohamed will tell you that he's had cases with us that disburse slow"), and that he "intended to

23   lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the

24   authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely," *id.* ¶

25   191; *see also id.* ¶ 198. At the same time, Hatcher used interstate wire communications when he lied

26   to the Lion Air Clients about whether GK's office was opening and processing payments, *id.*

27   ¶¶ 187, 190, did not tell them that the letters Girardi had sent them contained lies, *id.* ¶ 188, tried to

28   talk to them out of discussing matters with people outside the enterprise, *id.* ¶ 192, and withheld

information about GK's poor financial situation from them, *id.* ¶¶ 195-200. Hatcher is welcome to argue at trial that his WhatsApp messages to the Clients should be "read as a sincere reflection of Hatcher's thoughts," Dkt. 43 at 22, rather than misleading communications intended to further a fraudulent scheme. But at this motion to dismiss stage, when these facts are read in the light most favorable to the non-moving party, Plaintiff plausibly alleges facts—including the details of particular communications—to support its claim that Hatcher committed multiple wire fraud violations.

The Complaint also contains sufficient allegations to support the RICO conspiracy claim as to both Hatcher and WDC. Among other agreements, the Complaint plausibly alleges that Hatcher, Kamon, Girardi, GK, and WDC all agreed that GK would make $50,000 payments to Hatcher using the money stolen from the Lion Air Clients. Compl. ¶¶ 171-82. These payments were contemporaneous with Girardi's lies to the Lion Air Clients and Hatcher's attempts to minimize and cover up those lies. *Id.* ¶¶ 183-200. At the pleading stage, those allegations are sufficient to support the conclusion that Hatcher, Kamon, Girardi, GK, and WDC all agreed to commit wire fraud together as part of the Girardi Family Enterprise. At the pleading stage, no more is required.

**C. Plaintiff Adequately Alleges RICO Conspiracy Claims against the EG Defendants.**

Despite allegations that they agreed to participate in the Girardi Family Enterprise, the EG Defendants argue that Plaintiff fails to plead a RICO conspiracy claim as to their conduct. In fact, Plaintiff adequately alleges that Erika Girardi was "aware of the essential nature and scope of the enterprise" and "intended to participate in it." *Baumer*, 8 F.3d at 1346.[3] The EG Defendants' motion should be denied.

First, the EG Defendants incorrectly contend that "Plaintiff pleads no facts to provide a basis for th[e] conclusion" that "Ms. Girardi—and therefore EJ Global—knew about the Ponzi scheme."

---

[3]    The EG Defendants misleadingly splice excerpts from *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 990 (9th Cir. 2006) to suggest that Rule 9(b) applies "especially [to] the existence of an agreement." *See* Dkt. 60 at 17. This is not true, since elements of intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

Dkt. 60 at 15-16.[4] To the contrary, the Complaint alleges that Erika generated more than "$25 million in credit card charges and invoices that she sent to the firm for payment," and "had actual and specific knowledge that the credit card bills and invoices that she submitted to Girardi Keese related to her own personal expenses [] had no connection whatsoever with the law firm." Compl. ¶¶ 60-62. It is not plausible that Erika thought this arrangement was normal or acceptable because Plaintiff alleges that she repeatedly made false public statements about "pay[ing] [her] own bills" and about the status of lawsuits against her and Tom. *Id.* ¶¶ 68-73. It is also reasonable to infer, based on the facts alleged, that Erika "knew that her false statements would further her and Tom's scheme by ensuring that their hordes of creditors continued to believe that they were wealthy and that clients would continue to hire Tom and trust him with their money." *Id.* ¶ 74. The Complaint also points to agreements Erika signed with California Attorney Lending which support the reasonable inference that "Erika had actual and specific knowledge that she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese." *Id.* ¶ 92. Finally, the Complaint alleges that Erika was served with subpoenas regarding her assets and an attachment order in 2020, making her "increasingly aware that the money was drying up and that creditors were circling her." *Id.* ¶¶ 221-25.

These allegations, taken together, support a reasonable inference that Erika both knew and intended to participate in the "essential nature and scope" of the Enterprise: to use GK as a vehicle to obtain settlements and then misappropriate the settlement funds, and to cover up the scheme—including by increasing Tom's and Erika's public profiles—to permit GK to retain more clients and steal more money. *Id.* ¶ 259; *see also Eclectic Props.*, 751 F.3d at 997 ("The intent to defraud may be inferred from a defendant's statements and conduct."). Like Hatcher, the EG Defendants can argue at trial that they were "duped by Tom Girardi" and believed that GK was operating appropriately. *See* Dkt. 60 at 16. But the question at this phase of litigation is not whether alternative interpretation of facts are "more plausible" or "just as plausibl[e]." *Id.* As long as the

---

[4]       As with Hatcher and WDC, the Complaint alleges that EJ Global is wholly owned and operated by Erika Girardi, so Erika's knowledge and agreements may be imputed to EJ Global for purposes of § 1962(d) liability. The EG Defendants do not argue otherwise.

1  facts viewed in the light most favorable to the Plaintiff state a claim, then whether the EG

2  Defendants are more likely than not liable is a question for another day.

3    The EG Defendants next argue that Plaintiff's RICO Conspiracy claim fails because the

4  Complaint does not allege "plausible, non-conclusory facts that Ms. Girardi's, and by extension EJ

5  Global's, actions were the proximate cause of Plaintiff's injuries." Dkt. 60 at 18; *see also id.* at 20

6  (arguing that Tom Girardi and GK were more directly responsible for Plaintiff's losses). This

7  argument ignores a fundamental tenet of conspiracy claims—that defendants may be held

8  vicariously liable for the acts of other co-conspirators in furtherance of the conspiracy. *See Oki*

9  *Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) ("If a RICO

10  conspiracy is demonstrated, '[a]ll conspirators are liable for the acts of their co-conspirators.'");

11  *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000) (noting that "a plaintiff could, through a § 1964(c) suit

12  for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the

13  substantive provisions of § 1962"); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F.

14  Supp. 2d 880, 917-18 (C.D. Cal. 2012) (same). Therefore, it is not necessary for Plaintiff to allege

15  that any of Erika's actions proximately caused the eventual injury, as long as Plaintiff alleges that

16  Erika agreed to the essential nature and scope of the conspiracy that caused the harm.

17    The EG Defendants concede that, under the facts pleaded, racketeering activity committed

18  by members of the Girardi Family Enterprise was directly responsible for the Lion Air Clients'

19  losses. *See* Dkt. 60 at 19-20. Plaintiff therefore adequately states a RICO Conspiracy claim against

20  the EG Defendants because they were "aware of the essential nature and scope of the enterprise"

21  and "intended to participate in it." *Baumer*, 8 F.3d at 1346.

22  
23  **D. Plaintiff Adequately Alleges Receipt of Stolen Property Claims Against Hatcher, WDC, and the EG Defendants.**

24    Both Hatcher/WDC and the EG Defendants also move to dismiss Counts 3-4 of the

25  Complaint, which allege that Defendants received stolen property (Count 3) and concealed or aided

26  in the concealing of stolen property (Count 4) in violation of Cal. Penal Code § 496(a). Both

27  motions filed by these Defendants make essentially the same arguments: (1) Plaintiff cannot

28  plausibly allege that the funds Hatcher/WDC and the EG Defendants received was stolen from the

Lion Air Clients since all the GK money was commingled, and (2) for the same reason, Plaintiff cannot plausibly allege that these Defendants *knew* the money they received was stolen from the Lion Air Clients. *See* Dkt. 43 at 25-27; Dkt. 60 at 22-23. But Plaintiff does allege both of these elements as to these Defendants, based on plausible facts that support reasonable inferences, so the Court should deny the motions to dismiss Counts 3-4.

"[T]he crime of 'receipt of stolen property' basically consists of three elements: (a) the property was stolen, and (b) the defendant was in possession of it, (c) knowing it was stolen." *Verdugo-Gonzalez v. Holder*, 581 F.3d 1059, 1061 (9th Cir. 2009) (citing *People v. Anderson*, 210 Cal. App. 3d 414, 420 (1989)); *see also* Cal. Penal Code § 496(a). "[E]mbezzlement, which is defined as the fraudulent appropriation of property by a person to whom it is intrusted [sic] (§ 503), is a recognized form of theft within the meaning of section 496." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 350 n.11 (2022) (internal quotation marks omitted). "The mens rea element requires actual knowledge of or belief that the property is stolen." *United States v. Flores*, 901 F.3d 1150, 1161 (9th Cir. 2018).

On the first element, Plaintiff alleges specific facts about the money flowing out of the Girardi Keese Client Trust Account—down to the dates and amounts of specific checks. These facts support the allegation that the Enterprise misappropriated money that belonged to the Lion Air Clients and transferred that money to Hatcher/WDC and the EG Defendants. *See* Compl. ¶ 109 ("At the time the checks listed in Table 1 were deposited [in the GK operating account] . . . Girardi Keese was not entitled to attorneys' fees from the *Lion Air* matters" because "the entire amount of attorneys' fees owed to Girardi Keese had already been transferred directly from Boeing to California Attorney Lending."); *see also id.* ¶ 110 (explaining how "Girardi Keese could not be entitled to $500,000 of Anice Kasim's settlement"); *id.* ¶ 126 (explaining how thousands of dollars paid from the GK operating account to American Express "were for Erika's company, EJ Global, and could only have come from Anice Kasim's settlement" (internal citation omitted)); *id.* ¶¶ 173-80 (describing transfer of funds from the GK operating account and client trust account to Hatcher/WDC, and alleging that funds were "stolen from the Lion Air Clients"). While this case may require more fulsome forensic accounting during discovery and to prove liability at trial, the

allegations in the Complaint are sufficient to support the reasonable inference that Hatcher/WDC and the EG Defendants received specific funds that belonged to the Lion Air Clients.

The Complaint likewise plausibly alleges that both Hatcher and Erika knew that the money they received was stolen. Hatcher knew that the referral and fee-sharing arrangements he had with GK were illegal. *Id.* ¶¶ 55-58. He knew that GK sometimes paid him directly from the firm's client trust account, and he knew that the firm's operating account was not always solvent. *Id.* ¶ 172. He knew that the series of $50,000 checks he received between March and August 2020 were "*in addition* to the illegal one-third cut of the [Lion Air] fee that he was promised," that "he was not legally entitled to $50,000 of any Girardi Keese client's money, and was therefore not legally entitled to be paid from any client trust account," that some checks were indeed paid directly from the client trust account, and that the Lion Air Clients had not yet been paid their full settlement money. *Id.* ¶¶ 172-78; *id.* ¶ 197 (Hatcher acknowledging in November 2020 that the Lion Air Clients had not yet been fully paid). These allegations are neither "conclusory" nor "implausib[le]." Dkt. 43 at 26.

Erika knew that the $25 million in "credit card bills and invoices that she submitted to Girardi Keese related to her own personal expenses [] had no connection whatsoever with the law firm." Compl. ¶¶ 60-62. As stated above, the Complaint also plausibly alleges that "Erika had specific knowledge that her financial arrangement with Girardi Keese was inappropriate and needed to be hidden from creditors," *id.* ¶ 73. Erika signed agreements with California Attorney Lending which support the reasonable inference that "Erika had actual and specific knowledge that she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese." *Id.* ¶ 92. Finally, the Complaint alleges that Erika was served with subpoenas regarding her assets and an attachment order in 2020, making her "increasingly aware that the money was drying up and that creditors were circling her." *Id.* ¶¶ 221-25. Based on these facts, Plaintiff's claim that the EG Defendants "accepted payment of the American Express balances . . . with the knowledge that the funds used to make those payments had been obtained in a manner constituting theft," *id.* ¶ 297, is "[]supported by adequate factual allegations." Dkt. 60 at 23.

1    The Court should deny both Hatcher/WDC's and the EG Defendants' motion to dismiss

2    Counts 3-4.

3    **E.  Plaintiff Adequately Alleges Conversion Claims Against Hatcher and WDC.**

4        Hatcher/WDC move to dismiss Count 6 of the Complaint for the same reasons as Counts 3-

5    4. *See* Dkt. 43 at 25. For all the same reasons stated above, Plaintiff adequately states a claim for

6    conversion because the Complaint alleges that Hatcher/WDC intentionally sought illegal payments

7    from GK with the knowledge that he would be paid with money belonging to the Lion Air Clients.

8    *See Duke v. Superior Ct.*, 18 Cal. App. 5th 490, 501 (2017) ("[T]he elements of conversion are (1)

9    the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a

10   wrongful act or disposition of property rights; and (3) damages." (internal quotation marks

11   omitted)). The Court should therefore deny the motion to dismiss Count 6.

12   **F.  Plaintiff Adequately Alleges an Unfair Business Practices Claim Against CAL II.**

13       Defendant CAL II moves to dismiss Count 7 of the Complaint, which alleges unfair and

14   unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq*. CAL II makes

15   only one argument in support of dismissing the claim: "there is nothing in CAL II's creditor

16   relationship with Girardi Keese that constitutes 'fee sharing' prohibited by the Rules" because

17   Girardi Keese's obligation to repay the loan was "absolute and unconditional, and required the firm

18   to repay the entire amount borrowed." Dkt. 55 at 18-19. But including an unconditional obligation

19   to repay in the promissory note does not immunize CAL II from a § 17200 claim.

20       Cal. Bus. & Prof. Code § 17200 provides a right of action to people injured by unlawful,

21   unfair, or fraudulent business acts or practices. "The unlawful prong of [§ 17200] borrows

22   violations of other laws and treats them as independently actionable." *Drakeford v. Cap. Benefit,*

23   *Inc.*, No. 20-CV-04161-WHO, 2022 WL 2643984, at *7 (N.D. Cal. July 8, 2022) (internal quotation

24   marks omitted). Violations of the California Rules of Professional Conduct can serve as the basis

25   for § 17200 claims. *See People ex rel. Herrera v. Stender*, 212 Cal. App. 4th 614, 632 (2012). "The

26   unfair prong requires proving either (1) a practice that offends an established public policy or is

27   immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and that is

28   tethered to specific constitutional, statutory or regulatory provisions; or (2) that the utility of the

defendant's conduct is outweighed by the gravity of the harm to the alleged victim." *Drakeford*, 2022 WL 2643984, at *7 (cleaned up).

Here, Plaintiff has stated claims for both unlawful and unfair business practices. The Complaint alleges that DiNardo had "actual knowledge" by 2019 that GK was "misappropriating client settlement funds and improperly exercising control over funds held in its client trust account." Compl. ¶ 88. Nevertheless, CAL II continued to offer additional loans to GK, provided that CAL II "would receive 50% of the attorneys' fees from various cases when they settle, including from the Lion Air Clients" and that "the settling defendants in the covered cases [would] wire [CAL II's] 50% portion of the attorneys' fees directly to California Attorney Lending." *Id.* ¶ 93.[5] That payment structure falls squarely within the fee-sharing conduct prohibited by Rule 5.4(a) of the Rules of Professional Conduct. CAL II argues that GK's *total* obligation to CAL II was "absolute and unconditional," but that does not change the fact that GK agreed to share 50% of its fees from the Lion Air case—not 50% of the firm's "accounts receivable" or revenues or profits. The payment structure is also significant because, when GK had a shortfall of funds, it meant that CAL II got paid before the clients did. And as alleged in the Complaint, CAL II knew that this was a very real possibility. *See, e.g.*, *id.* ¶¶ 93-94.

CAL II's loan agreement with GK was also unfair because it offends public policy, and the utility of its conduct is far outweighed by the harm to victims like the Lion Air Clients. Rule 5.4 "addresses the risk posed by the possibility of control by a non-lawyer more interested in personal

---

[5]     Plaintiff has no objection to the Court's taking Judicial Notice of the existence of the contract submitted by Defendant CAL II. *See* Dkt. 56-1 (Fourth Amended and Restated Promissory Note). However, the contract should not be considered as evidence that CAL II or Girardi Keese complied with any provisions of the agreement, should not be considered to reflect the full scope of the relationship and the agreements between CAL II and Girardi Keese, and should not be considered evidence of any disputed issue of fact. These issues cannot be readily determined from the face of the documents and are subject to reasonable dispute, so they cannot be judicially noticed under Fed. R. Evid. 201(b).

    Moreover, the contract is not "incorporated by reference" into Plaintiff's Complaint because the Complaint does not "refer[] extensively to the document," nor does "the document form[] the basis of the plaintiff's claim[s]." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citing Wright & Miller proposition that "the mere mention of the existence of a document is insufficient to incorporate the contents of a document by reference").

1   profit than the client's welfare." *Matter of Gordon*, No. 12-O-15516, 2018 WL 5801495, at *6 (Cal.

2   Bar Ct. Oct. 31, 2018), *publication ordered*, No. 12-O-15516, 2019 WL 2108090 (Cal. Bar Ct. Jan.

3   30, 2019); *see also Gassman v. State Bar*, 18 Cal. 3d 125, 132 (1976) ("[P]articipation in an illegal

4   fee-splitting arrangement . . . posed serious danger to the best interests of his clients, and warrants

5   discipline in and of itself. Prohibited fee-splitting between lawyer and layman . . . poses the

6   possibility of control by the lay person, interested in his own profit rather than the client's fate[.]

7   That very possibility has been realized here." (internal citations and quotation marks omitted)).

8   CAL II's conduct violated the public policy behind Rule 5.4, and did indeed result in putting CAL

9   II's own profit above the interests of the Lion Air Clients. Certainly the utility of CAL II receiving

10  more prompt repayment on a loan—issued to a firm that CAL II knew had missed loan payments

11  and misappropriated client funds before—is far outweighed by the gravity of the harm to the Lion

12  Air Clients.

13      Therefore, nothing in CAL II's motion refutes the validity of Plaintiff's § 17200 claim. The

14  Court should deny the motion to dismiss Count 7.

15  **G. Plaintiff Adequately Alleges a CLRA Claim Against CAL II.**

16      CAL II moves to dismiss Plaintiff's CLRA claim on three grounds: (1) failure to file a venue

17  affidavit, (2) failure to serve pre-complaint notice, and (3) failure to state a plausible claim for

18  unconscionability. None of these arguments justify dismissal of Plaintiff's CLRA claim.

19      CAL II's substantive argument fails for all the same reasons discussed above. Its agreement

20  with GK was both illegal and unconscionable—particularly in light of CAL II's knowledge that GK

21  had misappropriated client funds before. *See* Cal. Civ. Code § 1770(a)(19) (proscribing "[i]nserting

22  an unconscionable provision in the contract"); *id.* § 1770(a)(26) (proscribing "selling a financial

23  product that is illegal under state or federal law").

24      The argument regarding the venue affidavit is incorrect because the rule cited does not apply

25  in federal court. Because venue is a procedural matter, federal law alone governs questions of venue

26  here. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988); *Manetti-Farrow, Inc. v. Gucci Am.,*

27  *Inc.*, 858 F.2d 509, 513 (9th Cir. 1988); *see also Logue v. Patient First Corp.*, No. 16-cv-1823, 2017

28  WL 11140438, at *3 (M.D. Pa. July 26, 2017) ("State rules governing venue are undoubtedly

procedural, and such rules are supplanted in federal cases by applicable federal procedural rules-in

this case, the federal venue statute codified at 28 U.S.C. § 1391."). The provision CAL II relies

upon provides:

> An action under subdivision (a) or (b) may be commenced in the county in which
> the person against whom it is brought resides, has his or her principal place of
> business, or is doing business, or in the county where the transaction or any
> substantial portion thereof occurred.
>
> In any action subject to this section, concurrently with the filing of the complaint,
> the plaintiff shall file an affidavit stating facts showing that the action has been
> commenced in a county described in this section as a proper place for the trial of
> the action. If a plaintiff fails to file the affidavit required by this section, the court
> shall, upon its own motion or upon motion of any party, dismiss the action without
> prejudice.

Cal. Civ. Code § 1780(d). "[T]hat provision—which limits the county in which a plaintiff may

file—is inapplicable [in federal court], as it conflicts with federal venue provisions." *Jenkins v. j2

Glob., Inc.*, No. 13-cv-9226-DSF-MRW(x), 2014 WL 12687417, at *4 (C.D. Cal. May 23, 2014).

Indeed, federal law provides an entirely different venue standard that is substantially broader and

contains no affidavit requirement. *See* 28 U.S.C. § 1391. If the Court enforced a rule requiring

Plaintiff to attest that this case satisfied inapplicable venue requirements, it would be no different

than actually enforcing those requirements. Further, even if Plaintiff had been inclined to submit the

affidavit, it would be impossible. This action has been commenced in a United States District Court,

not in any county of California, and the Court's rules provide no guarantee that the action would be

assigned to San Francisco County. *See* Civil L.R. 3-2 (providing that cases arising in San Francisco

County can be assigned to a judge sitting in Oakland, which is in Alameda County). The Court

should follow the numerous other courts that have declined to enforce this requirement. *See, e.g.*,

*Jenkins*, 2014 WL 12687417, at *4; *Henderson v. J.M. Smucker Co.*, No. CV-10-4524-GHK-VBK,

2011 WL 1050637, at *1 n.3 (C.D. Cal. Mar. 17, 2011); *Sandoval v. PharmaCare US, Inc.*, 145 F.

Supp. 3d 986, 999 (S.D. Cal. 2015).[6]

---

[6]     Plaintiff recognizes that some district courts have enforced the California venue rule. Those
cases are wrongly decided and the Court should not follow them. *See, e.g.*, *McVicar v. Goodman
Glob., Inc.*, 1 F. Supp. 3d 1044, 1055 (C.D. Cal. 2014) (deciding that CLRA venue provision
applied in federal court without explaining how it is consistent with 28 U.S.C. § 1391).

As to the pre-suit notice requirement in Cal. Civ. Code § 1782, CAL II has been on notice of Plaintiff's CLRA claim, including the "particular alleged violations of Section 1770," and the accompanying demand for damages since at least April 5, 2022, when Edelson PC publicly filed a draft complaint against CAL II and the other Defendants here. *See* Dkt. 1360-2, *In re Lion Air Flight JT 610 Crash*, No. 18-cv-7686 (N.D. Ill. Apr. 5, 2022). That draft complaint included essentially the same factual allegations and CLRA claim against CAL II as in the Complaint eventually filed in this Court. *See, e.g.*, *id.* ¶¶ 89-90, 335-47. The draft complaint received media attention, and CAL II commented on the draft complaint in the press. *See, e.g.*, Declaration of Alexander G. Tievsky ("Tievsky Decl."), Ex. A (article published on Law.com on April 6, 2022 quoting CAL II's counsel's comments on the draft complaint). While "there is a split in authority on whether the CLRA requires strict compliance with its notice provision," *Janda v. T-Mobile USA, Inc.*, 378 F. App'x 705, 708-09 (9th Cir. 2010), courts have allowed CLRA claims to proceed when plaintiff "substantially complied with the notice requirement" and "satisfied the purpose behind the requirement—to give the entity the opportunity to investigate and settle the claim before suit was brought." *Parrish v. Volkswagen Grp. Of Am., Inc.*, 463 F. Supp. 3d 1043, 1060 (C.D. Cal. 2020). There was substantial compliance here, where CAL II received actual notice of Plaintiff's CLRA claim, the particular alleged violations of Section 1770, and the demand for damages three months before the Complaint was filed.

In any event, if the Court is inclined to dismiss Plaintiff's CLRA claim for noncompliance with § 1780(d), Plaintiff respectfully requests leave to amend the Complaint after providing notice in the manner described in § 1780(d). *See Bitton v. Gencor Nutrientes, Inc.*, 654 F. App'x 358, 362 (9th Cir. 2016) ("[E]ven if the notice was deficient, the district court erred in dismissing the CLRA claims with prejudice. A dismissal with prejudice of a damages claim filed without the requisite notice is not required to satisfy the purposes of the notice requirement. Instead, the claim must simply be dismissed until 30 days or more after the plaintiff complies with the notice requirements." (internal citations and quotation marks omitted)); *see also So v. HP, Inc.*, No. 22-cv-02327-BLF, 2022 WL 16925965, at *5 (N.D. Cal. Nov. 14, 2022) (granting leave to amend "because the statute [§ 1782(d)] specifically allows for amendment").

1    Therefore, the Court should deny CAL II's motion to dismiss Plaintiff's CLRA claim or, in

2    the alternative, should grant leave to amend.

3    **H. Plaintiff Adequately States a Claim for Money Had and Received.**

4         CAL II and DiNardo also argue that Plaintiff fails to state a claim for Money Had and

5    Received. *See* Dkt. 55 at 16-17; Dkt. 58 at 9-18. Under California law, "[t]his common count is

6    available in a great variety of situations and lies wherever one person has received money which

7    belongs to another, and which in equity and good conscience should be paid over to the latter."

8    *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 937 (2011) (internal citations and quotations omitted);

9    *see also Rotskoff v. Cooley*, No. 05-cv-0314-AG, 2008 WL 11342739, at *2 (C.D. Cal. Apr. 21,

10   2008) ("This theory is available in a great variety of situations, including those where plaintiffs seek

11   to recover money paid under mistake, fraud, or coercion where no contractual relationship is

12   involved." (internal quotation marks omitted)). "Where, as here, the defendant allegedly

13   misappropriates the proceeds of a settlement that belong to the plaintiff, the plaintiff can maintain a

14   money had and received cause of action." *Girardi*, 194 Cal. App. 4th at 937 (holding that the

15   plaintiff had a money had and received claim against Tom Girardi for allegedly stealing his

16   settlement funds).

17        Here, the money that CAL II and DiNardo received was part of the Lion Air Clients'

18   settlement and so should have been used for the Clients' benefit: paying the attorneys' fees for legal

19   services rendered in obtaining that settlement. The fees portion of the settlement represented a

20   contingent fee, so the clients were only supposed to pay GK if GK actually obtained a recovery for

21   them. But GK never actually gave a large chunk of the settlement—or in the case of Multi Rizki,

22   any of the settlement—to the Lion Air Clients. Accordingly, GK never earned those legal fees, and

23   the Lion Air Clients should not have had to pay them.

24        DiNardo insists that Plaintiff's claim lacks a "legal principal [*sic*] obligating DiNardo to

25   remit payment," Dkt. 58 at 12, but he ignores Plaintiff's allegations that CAL II and DiNardo were

26   not entitled to receive any portion of attorneys' fees in this case. For instance, Plaintiff alleges that

27   CAL II and DiNardo knew that GK had misappropriated client funds before, so they knew that was

28   a real risk in the *Lion Air* case. *See* Compl. ¶¶ 88, 93-94, 314. If they knew that GK was again not

1  going to pay the settlement amounts to the clients, then they obtained their portion of the fees by

2  fraud. And even if they did not know, then they obtained the money by mistake of fact (*i.e.*, under

3  the assumption that the Lion Air Clients would receive legal services that they did not, in fact,

4  receive). Either way, the result is the same: under principles of equity and good conscience, they

5  should not be allowed to keep it. *See Coleman v. Sterling*, No. 09-cv-1594 W BGS, 2011 WL

6  1668956, at *3 (S.D. Cal. May 3, 2011) ("A claim for money had and received can be based upon

7  money paid by mistake[.]"); *Rotskoff*, 2008 WL 11342739, at *2 ("The theory advanced by

8  Plaintiffs specifically states a claim for money had and received where fraud is involved, and this

9  theory is supported by the case law.").

10      At the same time as he demands a legal principle, DiNardo contends that the Money Had

11  and Received claim must fail because no other claims are asserted against him. But in support of

12  that position, he cites only cases stating that Money Had and Received claims should be dismissed

13  if they are duplicative of other dismissed claims asserted against the same defendant. Dkt. 58 at 17.

14  Those cases do not apply here. Moreover, by DiNardo's logic, Money Had and Received claims

15  could never exist at all: if pleaded at the same time as the legal principle underlying it, it has to be

16  dismissed as duplicative, but if pleaded without those principles, it has to be dismissed as

17  insufficient. This contention is plainly gibberish and can be disregarded.

18      DiNardo also spills a great deal of ink discussing the application of a more restrictive test for

19  money had and received. Dkt. 58 at 9-14. "But this three-element articulation of an action for

20  money had and received is not applicable in a case based on fraud." *Rotskoff*, 2008 WL 11342739,

21  at *2. And to the extent it is necessary to identify a sum certain for a claim based on mistake, *see,*

22  *e.g*, *Givex USA Corp. v. Spaghetti Warehouse Restaurants, Inc.*, No. 17-cv-03730-BRO-SSX, 2017

23  WL 8183140, at *5 (C.D. Cal. Oct. 11, 2017), Plaintiff has done so. DiNardo appears to argue that

24  federal notice pleading standards require the complaint to identify the breakdown of how much

25  DiNardo is now holding and how much CAL II is now holding, but that is incorrect. Federal

26  pleading "law does not require plaintiffs to plead the exact dollar amount of a sum certain at the

27  pleading phase. Instead, it is sufficient to plead facts showing that the amount sought is *capable of*

28  *being reduced to a sum certain.*" *Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 982 (C.D.

Cal. 2021) (emphasis in original). Here, Plaintiff alleges the total amount of attorneys' fees paid to GK, that 50% was wired directly to CAL, and that DiNardo kept a portion of it. *See* Compl. ¶¶ 287, 316, 327, 333. Bank records will easily enable calculation of the breakdown, and no more is required at the pleading stage.

Finally, as far as the statute of limitations is concerned, CAL II and DiNardo incorrectly argue that the statute of limitations for money had and received is always two years from the date of the receipt of the funds. In fact, "[t]he statute of limitations that applies to a cause of action for money had and received is determined on the basis of the underlying tort." *Ringler Ins. Agency v. Atlas Settlement Grp., Inc.*, No. 09-cv-597-DOC-MLGX, 2010 WL 11596114, at *3 (C.D. Cal. May 3, 2010) (citing *Fabricon Prods. V. United Cal. Bank*, 264 Cal. App. 2d 113 (1968)). "California courts [] therefore have applied different statutes of limitations to identically named causes of action for money had and received." *Id.* Where a cause of action for money had and received arises out of fraud or mistake, the statute of limitations is three years not two. *First Nationwide Sav. V. Perry*, 11 Cal. App. 4th 1657, 1670 (1992); *ChinaCast Educ. Corp. v. Chen Zhou Guo*, No. 15-cv-05475-AB (EX), 2016 WL 6645792, at *5 (C.D. Cal. June 3, 2016). Plaintiff filed this lawsuit well within the applicable three-year statute of limitations.

Neither CAL II nor DiNardo has demonstrated that the Money Had and Received claims against them should be dismissed. To the extent that the Court believes that additional facts need to be pleaded, Plaintiff requests the opportunity to do so, particularly with the benefit of additional information that has surfaced in other proceedings about the relationship between CAL II and GK.

## I.   Assignment of Claims Does Not Extinguish Them.

As a final point on the Rule 12(b)(6) motions, several of the Defendants make the bizarre argument that the Lion Air Clients' assignment of their claims to Edelson PC somehow extinguishes them. Two of the defendants who make this argument, WDC and the EG Defendants, contend that an assignment of rights for value necessarily extinguishes the assignor's claim. Dkt. 43 at 27; Dkt. 58 at 8. If this were true, assignments for value would be impossible, because the act of giving money to the assignor would make the assignment worthless. Indeed, the only case cited by WDC holds that "[t]he California rule is that a chose in action is presumptively assignable" and that

a party resisting the validity of an assignment cannot prevail if they "have shown no good reason why they should be excepted from its application." *Bush v. Superior Ct.*, 10 Cal. App. 4th 1374, 1378 (1992). The fact that the Lion Air Clients received consideration for their assignment of rights has no impact whatsoever on the continued validity of the assigned claims. *See also* Dkt. 1362, *In re: Lion Air Flight JT 610 Crash*, No. 18-cv-7686 (N.D. Ill. Apr. 6, 2022) (approving Edelson PC's assignment agreement with Lion Air Clients).

CAL II offers a slightly more nuanced, but no less wrong, version of this argument. According to CAL II, the California doctrine of equitable subrogation prevents Edelson from asserting its rights as an assignee. Dkt. 55 at 14-16. But the cases CAL II cites "limit[] contractual assignments only if the assignee is 'a surety . . . found not to be entitled to subrogation.'" *AMCO Ins. Co. v. All Sols. Ins. Agency, LLC*, 244 Cal. App. 4th 883, 901 (2016) (quoting *Meyers v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 11 Cal. 2d 92, 97 (1938)). By contrast, "the principles of equitable subrogation do not extend to situations where the contractual assignee was not a surety and does not occupy the role of potential equitable subrogee." *Id.* Here, Edelson PC was not a surety, and the principles of equitable subrogation have no application. In any event, even assuming those principles somehow could apply, CAL II's argument also depends on the conclusion that Edelson has "no subrogation rights," *see* Dkt. 55 at 15, which CAL II does not support with any argument or citation to authority. It has forfeited the opportunity to make that argument for the first time on reply. The Court should therefore disregard the suggestion that the Lion Air Clients lack valid claims against the Defendants following the assignment to Plaintiff here.

## IV.    ARGUMENT IN OPPOSITION TO RULE 12(b)(7) MOTIONS

Defendants Wrongful Death Consultants, George Hatcher, Keith Griffin, Erika Girardi, and EJ Global also move to dismiss under Rule 12(b)(7) for failure to join Thomas Girardi ("Tom") and GK as required parties pursuant to Rule 19. *See* Dkts. 41, 43, 49 and 60. In the alternative, Griffin urges the Court to stay this action until the conclusion of Tom's and GK's bankruptcy proceedings. Dkt. 49 at 7. These motions should be denied because neither Tom nor GK is a necessary party, and there is no reason for this Court to issue a stay.

The moving party has the burden of proving that dismissal for failure to join is proper. *Ikeda*

*v. San Francisco Firemen Credit Union*, No. 20-CV-08071-TSH, 2021 WL 4776705, at *5 (N.D. Cal. Oct. 13, 2021). When determining whether dismissal is appropriate under Rule 12(b)(7), the court undertakes "three successive inquiries." *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 662 (N.D. Cal. 2020), *aff'd on other grounds*, 17 F.4th 930 (9th Cir. 2021). First, the court must determine whether the non-party should be joined as "necessary" under Rule 19(a). *Id.* at 663. Second, if a nonparty is necessary, the court determines "whether it is feasible to order that the absentee be joined." *Id.* Third, "if joinder is not feasible, the court must determine whether the party is 'indispensable' under Rule 19(b), that is, whether 'in equity and good conscience, the action should proceed among the existing parties or should be dismissed.'" *Id.* (citing Fed. R. Civ. P. 19(b)).

### A.    Thomas Girardi and GK are Not Necessary Parties Under Rule 19(a).

A nonparty is necessary under Rule 19(a)(1)(A) if "in that person's absence, the court cannot accord complete relief among existing parties." A nonparty is necessary under Rule 19(a)(1)(B) "if that person 'claims a legally protected interest in the subject of the suit such that a decision in its absence will (1) impair or impede its ability to protect that interest; or (2) expose [an existing party] to the risk of multiple or inconsistent obligations by reason of that interest." *WhatsApp*, 472 F. Supp. 3d at 663 (quoting *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002)).

### 1.   The Court Can Accord Complete Relief Among Existing Parties Without Joining Tom and GK.

"Finding a party to be necessary under Rule 19(a)(1)(A) requires the court to determine that 'complete relief' cannot be accorded between the existing parties absent the joinder of the nonparty." *WhatsApp*, 472 F. Supp. 3d at 678. "Complete relief" means that the existing parties can get "consummate rather than partial or hollow relief" without multiple lawsuits on the same cause of action. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983). As alleged RICO co-conspirators, Defendants Griffin, Hatcher, WDC, Erika, and EJ Global (and Lira) are all jointly and severally liable to Plaintiff; Tom and GK would be as well, if joined. *Oki Semiconductor*, 298 F.3d at 775 (RICO conspirators are jointly and severally liable for the acts of

their co-conspirators). It has long been the rule that nonparties who are also jointly and severally liable are not necessary parties because a Plaintiff can recover complete relief from any defendants already in the action. *Ward v. Apple Inc.*, 791 F.3d 1041, 1049 (9th Cir. 2015), *abrogated on other grounds by Sperring v. LLR, Inc.*, 995 F.3d 680, 682 (9th Cir. 2021); *Andrade v. Station Casinos LLC*, No. 20-CV-06495-EMC, 2021 WL 4441990, at *2 (N.D. Cal. Mar. 22, 2021) ("A plaintiff is not required to sue all co-conspirators in conspiracy; the plaintiff is not even required to sue the 'central player' in the conspiracy."). Therefore, Tom and GK are not necessary parties.

Defendants' arguments to the contrary make little sense. First, WDC and the EG Defendants argue that Tom and GK are necessary parties as "joint oblig[or]s."[7] Dkt. 43 at 28-29; Dkt. 60 at 24. But this is incorrect because RICO co-conspirators are jointly *and severally* liable, and joint obligors are generally not necessary or indispensable parties under Rule 19. *Travelers Prop. Cas. Co. of Am. v. Levine*, No. 17-CV-07344-LB, 2018 WL 3377692, at *2 (N.D. Cal. July 11, 2018).

In addition, Defendant Griffin argues that, without joinder of Tom and GK, he would be "unable to seek indemnity from his employer, [Tom or GK]," and thus would be unable to obtain complete relief. Dkt. 49 at 5. This is incorrect for two reasons. First, "a defendant's possible right of reimbursement, indemnity, or contribution against an absent party is not sufficient to make the absent party indispensable to the litigation." *SASCO v. Byers*, No. C 08-5641 JF (RS), 2009 WL 1010513, at *2 (N.D. Cal. Apr. 14, 2009). And in any event, Griffin is not entitled to indemnification from his former employer for the alleged acts because he knew the acts to be unlawful. *See* Cal. Lab. Code § 2802 (requiring an employer to indemnify an employee for conduct within the scope of employment *unless* the employee "believed [the conduct] to be unlawful"); *see also Dowie v. Fleishman-Hillard Inc.*, 422 F. App'x 627, 629 (9th Cir. 2011). Plaintiff alleges that Griffin knew his conduct was unlawful and committed intentional torts and crimes, *see, e.g.*,

---

[7]     These Defendants write that Tom and GK are necessary as "joint *obligees*" because they "are responsible for the malfeasance and the debts alleged in the Complaint." Dkt. 43 at 28-29; Dkt. 60 at 24 (citing *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991 (9th Cir. 1994)). Plaintiff assumes that they meant to argue that Tom and GK are joint *obligors* (those required to provide a benefit, such as debtors), since it would make little sense to argue that Tom and Girardi Keese are *obligees* (those entitled to receive a benefit, such as creditors).

Compl. ¶¶ 291, 303, 321, 353, 354, 360, so he is not entitled to the dismissal of any claims on indemnification grounds. *Dowie*, 422 F. App'x at 629 (no right to indemnification where underlying crimes had knowledge or specific intent requirements). Judge Matthew Kennelly reached the same conclusion when Defendant Lira raised a similar argument in *Edelson PC v. Girardi*. *See* No. 20 C 7115, 2021 WL 3033616, at *15 (N.D. Ill. July 19, 2021) ("Viewing the allegations in the light most favorable to [plaintiff], Lira's *chance* of indemnification by his employer would not justify a stay" since "[t]he complaint alleges that Lira knew his acts were unlawful" (emphasis added)).

### 2. There is No Risk of Impairing the Interests of Absent Parties, Nor Is There a Risk of Exposing an Existing Party to Inconsistent Obligations.

For a court to reach a Rule 19(a)(1)(B) analysis, the *absent party*—not an existing party— must claim a legally protected interest in the action. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999). Defendants present no evidence that Tom or GK claim any such interest. *See generally* Dkt. 43 at 28-29; Dkt. 49 at 5-6; Dkt. 60 at 23-25.

Even if Tom or GK had claimed an interest, Defendants do not show that Rule 19(a)(1)(B) would apply. WDC's and Griffin's motions allude only vaguely to the risks of inconsistent judgements and obligations in their motions, Dkt. 43 at 29; Dkt. 49 at 10, but their conclusory arguments should be disregarded. WDC does not offer any specifics as to which parties would be subject to inconsistent obligations or what those inconsistent obligations might be. *See* Dkt. 43 at 29. Griffin claims that he risks facing "inconsistent judgments" if he is required to pursue his indemnification in bankruptcy court, Dkt. 49 at 10, but Rule 19(a)(1)(B) is only concerned with "inconsistent *obligations*," where "a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Kelley v. AW Distrib., Inc.*, No. 20-CV-06942-JSW, 2022 WL 1659119, at *2 (N.D. Cal. May 25, 2022) (quoting *Cachil Dehe Bend of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 976 (9th Cir. 2008)). Griffin does not suggest that he would be at risk of breaching any court orders. And, as discussed above, any finding of liability for Plaintiff's claims here—which all require knowledge that his conduct was unlawful—would preclude a finding of indemnification in any forum.

Therefore, neither Rule 19(a)(1)(A) nor 19(a)(1)(B) suggests that Tom and GK are

1    necessary parties here.

2        **B.**    **It is Not Feasible to Join Tom and GK to this Action Due to the 11 U.S.C. §**
3             **362(a) Automatic Stay.**

4        Even if Tom and GK were necessary parties under Rule 19(a), it is not feasible to join them

5    because both are undergoing bankruptcy proceedings and are subject to an automatic stay under 11

6    U.S.C. § 362(a). *Gross Belsky Alonso LLP v. Henry Edelson*, No. C 08-4666 SBA, 2009 WL

7    1505284, at *5 n.2 (N.D. Cal. May 27, 2009) (nonparty "cannot be joined as a result of its

8    bankruptcy filing[.]"). The EG Defendants contend that "the automatic stay may no longer apply to

9    Mr. Girardi" because "a complaint seeking a denial of discharge under section 727 of the

10   Bankruptcy Code was filed," and "Mr. Girardi defaulted." Dkt. 60 at 24. This argument presumably

11   refers to the bankruptcy court's January 24, 2022 order denying discharge of Tom's debts. *See* Dkt.

12   16, *In re: Girardi*, No. 2:21-ap-01216-BR (Bankr. C.D. Cal. Jan. 24, 2022) (default judgment order

13   denying discharge). However, there is no order from the bankruptcy court suggesting that the stay

14   has been lifted as to Tom, and indeed counsel for the Trustee in Tom's Chapter 7 bankruptcy has

15   advised that the automatic stay is still in place. *See* Tievsky Decl. ¶ 2.

16        **C.**    **Rule 19(b) Supports Allowing This Action To Proceed Among the Existing**
17             **Parties.**

18       Because Tom and Girardi Keese are not necessary parties under Rule 19(a), "the Court need

19   not explore whether [they are] indispensable part[ies] under Rule 19(b)." *Oculus Innovative Scis.,*

20   *Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 205068, at *3 (N.D. Cal. Jan. 25, 2007). However,

21   even if they were necessary, the Rule 19(b) factors strongly favor proceeding among the existing

22   parties.

23       A judgment in this case would pose no risk of prejudice to Tom or Girardi Keese. There is

24   no right to contribution or indemnification for RICO claims, so a finding of liability against any

25   Defendants here would not impose any contribution obligations on Tom or GK. *See* Fed. R. Civ. P.

26   19(b)(1)-(2); *Tan v. Quick Box, LLC*, No. 3:20-CV-01082-H-DEB, 2021 WL 2473948, at *6 (S.D.

27   Cal. June 16, 2021). Any judgment in the non-parties' absence would be adequate in that it would

28   settle the entire dispute without the need for piecemeal litigation. *See* Fed. R. Civ. P. 19(b)(3);

1    *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 870 (2008) ("adequacy refers to the public

2    stake in settling disputes by wholes, whenever possible" (internal quotations omitted)). And finally,

3    dismissing this action for nonjoinder of Tom and Girardi Keese would essentially deny Plaintiff a

4    forum for its claims against the Defendants here, and would immunize those Defendants from

5    accountability for their own unlawful acts. *See* Fed. R. Civ. P. 19(b)(4).

6            Tom and Girardi Keese are not necessary parties, their joinder is not feasible, and they are

7    not indispensable. Therefore, Defendants' Rule 12(b)(7) motions to dismiss should be denied.

8        **D.    This Action Should Not Be Stayed Pending Completion of the Bankruptcy
             Proceedings.**

9

10           Defendant Griffin moves, in the alternative, for an order staying this action until the

11   conclusion of Tom's and Girardi Keese's bankruptcy proceedings. Dkt. 49 at 7. This request, too,

12   should be denied.

13           An automatic stay arising from 11 U.S.C. § 362(a) "generally protects only the debtor." *In*

14   *re Hamilton*, 795 F. App'x 552, 553 (9th Cir. 2020). Griffin seeks to invoke the Fourth Circuit's

15   "unusual circumstances" exception, claiming that a stay of this case is nevertheless appropriate

16   because his alleged right to indemnification makes Tom and Girardi Keese the real parties in

17   interest in this case. *See* Dkt. 49 at 8 (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.

18   1986)). But this argument faces a number of problems. First, as discussed above, Griffin has not

19   established that he is entitled to indemnification and cannot at the pleading stage. Second, the Ninth

20   Circuit has never adopted the "unusual circumstances" exception and has, in fact, considered and

21   rejected the exception on multiple occasions. *See, e.g.*, *Klinkenborg Aerial Spraying & Seeding, Inc.*

22   *v. Rotorcraft Dev. Corp.*, 690 F. App'x 540, 540 (9th Cir. 2017) ("We have never adopted the

23   'unusual circumstances' exception in the Ninth Circuit and we decline to do so here."); *In re*

24   *Chugach Forest Prod., Inc.*, 23 F.3d 241, 247 (9th Cir. 1994). Third, Griffin is making this

25   argument in the wrong forum. "[T]he exception requires the *bankruptcy court* to extend the

26   automatic stay using its equity jurisdiction after hearing and the establishment of unusual need to

27   take this action to protect the administration of the bankruptcy estate." *Klinkenborg Aerial Spraying*

28   *& Seeding*, 690 F. App'x at 540-41 (emphasis added). Griffin's request for a stay therefore should

1   be denied, just as other courts have found when Defendant Lira attempted the same argument. *See*

2   *Edelson*, 2021 WL 3033616, at *13-16 (holding that "Lira may not invoke section 362(a)(1) to

3   obtain a stay of these proceedings from this Court"); *see also* Dkt. 31, *In re: Girardi Keese*, No.

4   2:21-ap-01039-BR (Bankr. C.D. Cal. May 13, 2021) (order rejecting Lira's attempt to remove

5   another case to the bankruptcy court and remanding back to L.A. Superior Court); Tievsky Decl.,

6   Ex. B (May 11, 2021 Hr'g Tr.) at 11-12 (bankruptcy court explaining its decision to remand the

7   case against Lira, stating, "I'm not as worried about the possibility that the State Court judge might

8   make a ruling inconsistent").

9   **V.     CONCLUSION**

10          For all of the foregoing reasons, the Court should deny each of Defendants' motions to

11   dismiss or stay under Rules 12(b)(6) and 12(b)(7). In the alternative, the Court should grant Plaintiff

12   leave to amend any claims that are dismissed.

13

14                                                Respectfully Submitted,

15   Dated: November 23, 2022                      By: /s/ Alexander G. Tievsky

16                                                 *One of Plaintiff's Attorneys*

17                                                 Rafey S. Balabanian (SBN 315962)
                                                   rbalabanian@edelson.com
18                                                 EDELSON PC
                                                   150 California Street, 18th Floor
19                                                 San Francisco, California 94111
                                                   Tel: 415.212.9300
20                                                 Fax: 415.373.9435

21                                                 Jay Edelson (*pro hac vice*)
                                                   jedelson@edelson.com
22                                                 J. Eli Wade-Scott (*pro hac vice*)
                                                   ewadescott@edelson.com
23                                                 Alexander G. Tievsky (*pro hac vice*)
                                                   atievsky@edelson.com
24                                                 Hannah P. Hilligoss (*pro hac vice* motion forthcoming)
                                                   hhilligoss@edelson.com
25                                                 EDELSON PC
                                                   350 North LaSalle Street, 14th Floor
26                                                 Chicago, Illinois 60654
                                                   Tel: 312.589.6370
27                                                 Fax: 312.589.6378

28